# EXHIBIT C

# Federal Bureau of Prisons: Special Housing Unit Review and Assessment

Key Contributors:

Kenneth McGinnis, Dr. James Austin, Karl Becker, Larry Fields, Michael Lane, Mike Maloney, Mary Marcial, Robert May, Jon Ozmint, Tom Roth, Emmitt Sparkman, Dr. Roberta Stellman, Dr. Pablo Stewart, George Vose, and Tammy Felix

December 2014



Distribution limited to  Federal Bureau of Prisons



## Acknowledgements

The project team acknowledges and thanks Director Charles E. Samuels, Jr. and the executive staff of the Bureau of Prisons for their assistance and support in conducting an independent assessment of the restrictive housing programs within the agency. This review could not have been successfully completed without Director Samuels' strong personal support of the scope of the review and the goals and objectives of this project. His personal involvement and interest in the independent review of the operations and programs of this aspect of the Bureau was critical to completing the assessment. In addition, the project team thanks the wardens and staff of the institutions visited by the team for their outstanding support and willingness to fully open their operation to outside scrutiny.

Finally, this project could not have been possible without the support and deep involvement of the National Institute of Corrections and Acting Director Robert M. Brown, Jr. and his staff. In particular, the CNA project team is grateful to Shaina Vanek for her commitment to and coordination of the project and for facilitating communication and the exchange of information between the project team and the Bureau staff. Without her personal involvement and the initiative she took to find resolution to literally every challenge that arose during the project, this report could not have been completed.

## Distribution

Distribution limited to Federal Bureau of Prisons. Specific authority: Order Number DJBP0700NAS079

Distribution authority is controlled by Federal Bureau of Prisons.

This document represents the best opinion of CNA at the time of issue.

**Approved by:**                                                    **December 2014**

*Monica Giovachino*

Monica Giovachino
Managing Director, Safety and Security
CNA, Institute for Public Research

Copyright © 2014 CNA



# Abstract

This report provides an independent, comprehensive review of the Federal Bureau of Prisons' operation of restrictive housing and identifies potential operational and policy improvements. Specifically, it provides a comprehensive, detailed evaluation of the Bureau's use of restrictive housing, including the following key areas: national trends and best practices in the management of restrictive housing units; profile of the Bureau's segregation population; Bureau policies and procedures governing the management of restrictive housing; unit operations and conditions of confinement; mental health assessment and treatment within restrictive housing units; application of inmate due-process rights; reentry programming; and the impact of the use of restrictive housing on system safety and security. The report also evaluates the impact of the restrictive housing program on the federal prison system and places the Bureau's use of segregation in context with professional standards and best practices found in other correctional systems.

The findings and recommendations contained in this report are based on the information and data collected while conducting site visits to the Bureau's restrictive housing units and facilities from November 2013 through May 2014. Any operational changes or new written policies implemented by the Bureau after completion of the site visits regarding their use of restrictive housing are not reflected in this report. Some such changes were in process or were scheduled for implementation after the completion of the site visits.



This page intentionally left blank.



# Executive Summary

The Federal Bureau of Prisons (Bureau) uses restrictive housing for serious infractions of institutional and system-wide rules governing inmate conduct, such as engaging in violent, aggressive behavior against other inmates and staff. Restrictive housing is also used for inmates who cannot be safely managed in a general population setting, or who have been otherwise determined to be a security threat. There are three categories of restrictive housing used by the Bureau: Special Housing Units (SHU), Special Management Units (SMU), and the United States Penitentiary, Administrative Maximum (ADX) in Florence, Colorado.

The Bureau's Program Statements governing the three types of segregated housing units indicate that all three types of housing have a similar function and purpose which is to "separate inmates from the general inmate population to protect the safety, security, and orderly operation of Bureau facilities, and to protect the public." The specific placement criteria and conditions of confinement vary for each type of segregated housing unit as does the type of inmate housed in each of the respective units.

As of November 2013, approximately 5 percent of the entire Bureau's prisoner population was being housed in one of these restrictive housing populations with the vast majority in the SHU status (see Figure 1). Shortly thereafter the number of inmates held in SHU housing began to decline. Similarly the SMU population began to decline in the summer of 2013. The Bureau population as a whole has also been slightly reduced from a peak of 217,815 to its current population of 212,283 as of December 12, 2014. This level of use of restrictive housing is consistent with that experienced by most state correctional systems.

Much of the decline is attributable to a reduction in the SHU population and, in particular, inmates who have been assigned to protective custody or are serving disciplinary segregation sanctions. The Bureau was able to provide detailed SHU population statistics beginning in February 2013. At that time, the count was 10,262 in over 100 facilities and has steadily declined since then reaching 8,939 by June 2014. This is a reduction of 31 percent from the 13,000 reported count of the SHU population in 2011. There have been no reductions in the ADX populations.



Figure 1.   Number of ADX, SMU and SHU Inmates  February 2013 – June 2014



Below we summarize key findings from our review:

- The general conditions of confinement in restricted housing units are consistent with national regulations and standards.

- Management of the SHU's is complicated by the high percentage of inmates that have requested protection from other inmates, often due to gang related issues.

- The Bureau does not have adequate non-punitive protective custody housing units that have equivalent levels of programs and privileges as general population inmates.

- Backlogs in inmates awaiting transfer to the next program level negate the intent of the program design and decrease the motivation to change behavior.

- Mental health services in restrictive housing require improvement in three specific areas: 1) proper mental health diagnoses; 2) more effective treatment; and 3) providing sufficient psychiatric staffing.

- The lack of time parameters for completion of disciplinary hearings results in substantial variation among facilities in the amount of time served in segregation for similar offenses, and can result in disproportionately long sanctions.

- There is no formal Bureau-wide reentry preparedness program specific to restrictive housing and inmates in these settings have very limited access to reentry programming.

iv



- Bureau information systems do not effectively track the number and movement of inmates within the restrictive housing units.

There are additional opportunities available to the Bureau to further lower the SHU and SMU populations by adopting the recommendations outlined in this report. Primary approaches to further reduce the restrictive housing population include:

- Establish a time limit on the amount of time that an inmate can be held in investigative status;

- Allow credit for time served in SHU upon determination of disciplinary sanction;

- Establish a housing option separate from SHU for inmates in protection status (protective custody);

- Continue rigorous review of referrals to restrictive housing;

- Reduce the time period for completion of the SMU program from the present 18-24 months to 12 months and compress the four levels to three levels by combining Level 3 and Level 4 and allowing more differentiation between the conditions of confinement between the levels; and

- To ensure appropriate treatment for seriously mentally ill inmates, a complete review of all inmates assigned to ADX, SMU and SHU should be completed by the Bureau to identify all inmates who should be transferred to a secure mental health program similar to the ones being developed at USP Atlanta and USP Allenwood.



This page intentionally left blank.



# Contents

**Chapter 1:    Introduction**........................................................................................1

Project background.........................................................................................1

Methodology...................................................................................................2

    Facility selection.....................................................................................3

    Operational assessment—facility site visit protocol ...........................4

    Inmate samples and interviews.............................................................6

    Mental health interviews ......................................................................8

    Quantitative data analysis—individual level ......................................9

    Quantitative data analysis—aggregate level......................................10

Composition of the Bureau of Prisons special housing ...........................11

    Special housing units ..........................................................................11

    Special management units ...................................................................14

    Administrative maximum facility program ........................................18

    ADX and SMU population trends ......................................................20

Summary of the Bureau's recent initiatives and segregation capacity ...22

    Development of the reintegration housing unit ..................................23

    USP Atlanta mental health unit .........................................................24

**Chapter 2:    National trends and use of segregated housing** .......................25

Definitions of segregation and types of inmates in segregation .............28

Key litigation issues....................................................................................31

Standards regarding segregation................................................................33

Segregation sentencing structures .............................................................35

Impact of segregation systems on institutional safety .............................36

Mental health issues in segregated housing..............................................38

Step-down programs ...................................................................................43

    Virginia ................................................................................................44

    Mississippi...........................................................................................44

    Washington..........................................................................................46

    Maine...................................................................................................46

Reductions in segregation populations......................................................47

    Mississippi ...........................................................................................47

    Colorado...............................................................................................48



Reentry and prerelease programming ...................................................................48
Summary ...........................................................................................................50

**Chapter 3:    Analysis of the restrictive housing populations** .......................**51**

Population characteristics ...............................................................................51
    Primary offenses and sentences .................................................................52
    Medical and mental health care levels......................................................54
    Security and special management issues....................................................56
    Time in restrictive housing ......................................................................58
    Disciplinary conduct of the SMU and ADX ...............................................58
    Recidivism rates of ADX and SMU inmates ..............................................63
    Trends in assault rates and lockdowns ......................................................64
    Summary of major findings......................................................................66

**Chapter 4:    Due process** ..................................................................................**67**

Federal due process standards...........................................................................68
Inmate discipline .............................................................................................70
    Disciplinary process observations.............................................................75
Special housing units ........................................................................................79
    Placement.................................................................................................80
    Placement of protection cases in administrative detention............................81
    Protective custody.....................................................................................82
    Weekly review meetings............................................................................85
    Segregation reviews ..................................................................................86
Special management units ................................................................................88
    Referral and assignment...........................................................................88
    Progression through program phases .........................................................94
    Observations on progression......................................................................97
Due process and ADX........................................................................................102
Administrative remedy program .......................................................................105

**Chapter 5:    Mental health assessment and treatment**...................................**111**

Assessment process ..........................................................................................113
Inmate interviews and case review trends ..........................................................115
Clinical analysis and observations ....................................................................118
    Mental health diagnostic process .............................................................118
    Mental health treatment ..........................................................................126
    Other site-specific observations ...............................................................129

**Chapter 6:    Reentry** ........................................................................................**133**



Reentry programs for inmates in the general population ..................................... 134
Reentry program evaluation .................................................................................. 138
    Program services in restrictive housing ............................................................ 139
    Reentry program services in restrictive housing............................................. 141
    Reentry program observations ........................................................................... 146

**Chapter 7:    Restrictive housing operations and conditions of confinement..... 151**
Organizational structure ........................................................................................ 151
    Special housing unit management...................................................................... 151
    ADX Florence unit management ......................................................................... 153
    Restrictive housing management structure observations ............................... 154
Correctional operations staffing levels and approach ......................................... 155
    Special housing unit staffing .............................................................................. 155
    Special management unit staffing ...................................................................... 158
    Control unit staffing at Florence ADX ............................................................... 160
    Staffing observations ........................................................................................... 162
Staff training, curriculum, and approach............................................................. 163
    Bureau of Prisons employee development manual........................................... 165
    Annual refresher training.................................................................................... 165
    Specialized training ............................................................................................. 166
    Special housing unit specific training................................................................ 167
    Special housing unit training curriculum ......................................................... 168
    Staff training observations.................................................................................. 169
Security systems and practices .............................................................................. 170
    Physical plant characteristics ............................................................................. 171
    Patrol requirements............................................................................................. 173
    Inmate movement practices................................................................................ 174
Impact of gang issues and separation practices.................................................. 178
Post orders............................................................................................................... 180
Use of force and critical incidents ........................................................................ 180
    Types of force ....................................................................................................... 182
    Use of force observations.................................................................................... 187
    Use of force at USP Lewisburg............................................................................ 187
Conditions of confinement ..................................................................................... 188
Adequacy and allocation of program space .......................................................... 204
    Statutory and Bureau requirements.................................................................. 205
    Existing potential program space ...................................................................... 207
    Observations on conditions of confinement..................................................... 209
Program reviews ..................................................................................................... 210
    Program review observations ............................................................................. 211
    Reporting .............................................................................................................. 212



Operational review observations ................................................................... 213

**Chapter 8: Summary of conclusions** ........................................................ **215**
Extent of segregation.................................................................................. 215
Conditions of confinement ........................................................................ 217
Impact of the "separatee" status ............................................................... 218
Investigation, protective custody, and pending transfer inmates in SHU............ 219
Inmates awaiting administrative actions ................................................... 219
Protective custody inmates in special housing units ............................... 220
The special management unit program....................................................... 221
Mental health services................................................................................ 222
Crowding and segregation.......................................................................... 224
Due process ................................................................................................. 225
Reentry ........................................................................................................ 227
Information system needs............................................................................ 228
Summary of findings and recommendations............................................. 228
Statistical analysis of restrictive housing ............................................. 228
Due process............................................................................................. 229
Mental health ........................................................................................ 231
Reentry ................................................................................................... 233
Conditions of confinement .................................................................... 234

**Appendix: Research team bios** ................................................................ **237**



# List of figures

Figure 1.    Number of ADX, SMU and SHU Inmates  February 2013 – June
              2014 ................................................................................................ iv
Figure 2.    SMU and ADX populations, January 2004 – July 2014 ........................... 21
Figure 3.    ADX and SMU populations and inmate assault rate, 2004-2013 ......... 65
Figure 4.    Inmate disciplinary process ....................................................................... 71



This page intentionally left blank.



# List of tables

Table 1.     SMU and ADX facilities and populations selected for site visits, November 2013 ................................................................................... 3

Table 2.     SHU facilities and populations selected for site visits, December 2013 ................................................................................................... 4

Table 3.     SHU and SMU prisoner interviews attempted and completed by facility ..................................................................................................... 8

Table 4.     Inmates interviewed and evaluated regarding mental health status by facility ......................................................................................... 9

Table 5.     SHU populations by status, February 2013 – June 2014 ...................... 14

Table 6.     SMU populations by facility, December 2013 ......................................... 18

Table 7.     Bureau segregation populations by segregation type, 2004–2014 ...... 22

Table 8.     Demographic attributes of ADX, SMU, SHU, and other Bureau populations, November 23, 2013 ............................................................. 52

Table 9.     Primary offenses of ADX, SMU, SHU, and other Bureau populations, November 23, 2013 ............................................................. 53

Table 10.    Sentence and time served attributes of ADX, SMU, SHU, and other Bureau populations, November 23, 2013 ................................................. 54

Table 11.    Medical and mental health care levels of ADX, SMU, SHU, and other Bureau populations, November 23, 2013 ................................................. 56

Table 12.    Security and other management issues of ADX, SMU, SHU, and other Bureau populations, November 23, 2013 ...................................... 57

Table 13.    Length of time in ADX, SMU, and SHU status, November 23, 2013 .... 58

Table 14.    Disciplinary reports for current ADX and SMU populations, as of November 23, 2013—total number of reports ...................................... 59

Table 15.    Disciplinary reports for ADX and SMU populations, as of November 23, 2013—reports in the 12 months before and after restrictive housing placement .................................................................. 59

Table 16.    Types of disciplinary infractions by ADX inmates, as of November 23, 2013 ............................................................................................... 60

Table 17.    Types of disciplinary infractions by current SMU inmates, as of November 23, 2013 ................................................................................... 61

Table 18.    In-prison recidivism rates for inmates released from ADX and SMU. 64

Table 19.    Prison recidivism rates for inmates released from SMU by time in SMU ............................................................................................................ 64

Table 20.    Changes in ADX and SMU populations, assaults, and lockdowns, 2008–2013 ................................................................................................. 65



Table 21.     Hearing dismissal rates ..................................................................76
Table 22.     SMU referrals and outcomes, January 2013 – February 2014 ..............92
Table 23.     Remedy/SMU filings by reason, December 19, 2012 – December
              19, 2013 ..........................................................................................108
Table 24.     Remedy SHU filings by disposition type, December 19, 2012 –
              December 19, 2013 ..........................................................................108
Table 25.     Symptoms of a mental health disorder among prison and jail
              inmates............................................................................................112
Table 26.     Cases interviewed and assessed........................................................115
Table 27.     Key health care attributes of assessed inmates ...................................117
Table 28.     Key conclusions of independent psychiatric review ............................118
Table 29.     Mental health treatment staff at reviewed facilities............................124



# Glossary

| | |
|---|---|
| ACA | American Correctional Association |
| ADX | Administrative Maximum Security Institution |
| ART | Annual Refresher Training |
| ASCA | Association of State Correctional Administrators |
| BOP | Federal Bureau of Prisons |
| CHS | Criminal History Score |
| CFR | Code of Federal Regulations |
| DHO | Disciplinary Hearing Officer |
| DR | Disciplinary Report |
| DSCC | Designation and Sentence Computation Center |
| ESL | English as a Second Language |
| FCI | Federal Correctional Institution |
| GAO | Government Accountability Office |
| GED | General Educational Development |
| LCP | Life Connections Program |
| MDOC | Mississippi Department of Corrections |
| NIC | National Institute of Corrections |
| OC | oleoresin capsicum |
| ORE | Office of Research and Evaluation |
| PRD | Program Review Division, Federal Bureau of Prisons |
| PREA | Prison Rape Elimination Act |
| RAC | reentry affairs coordinator |
| RHU | reintegration housing unit |
| RPP | Release Preparedness Program |
| RRC | residential reentry center |
| SAM | special administrative measure |
| SHU | special housing unit |
| SIS | Special Investigative Service |
| SMI | Serious Mental Illness |
| SMU | special management unit |
| SRO | segregation review official |
| SSU | special security unit |
| UDC | unit disciplinary committee |
| USP | United States penitentiary |
| VADOC | Virginia Department of Corrections |



This page intentionally left blank.



# Chapter 1: Introduction

## Project background

The use of high-security, restrictive housing units, also known as segregation units, by prison systems to manage dangerous or problematic offenders has received increased scrutiny in recent years. Virtually all state correctional systems, as well as most large local jail systems, use these units as a disciplinary tool and as a means to manage offenders who may need to be kept separate from general institutional populations. These units are typically characterized by very limited out-of-cell time and reduced access to privileges such as phone calls, visits, and personal property.

The Federal Bureau of Prisons (Bureau) uses restrictive housing for serious infractions of institutional and system-wide rules governing inmate conduct, such as engaging in violent, aggressive behavior against other inmates and staff. Restrictive housing is also utilized for inmates who cannot be safely managed in a general population setting, or who have been otherwise determined to be a security threat. There are three categories of restrictive housing used by the Bureau:

- Special housing units (SHU)

- Special management units (SMU)

- The administrative maximum (ADX) facility in Florence, Colorado

The Bureau has developed a comprehensive set of policies and procedures that govern the operation of these restrictive housing units. In order to assess the effectiveness of these policies and the consistency of restrictive housing operations with accepted national standards and best practices, the Bureau sought an independent, outside review of the restrictive housing program. Accordingly, on January 29, 2013, the Bureau issued *RFQ AS0139-2013, Special Housing Unit Review and Assessment*. The stated objective of the RFQ was to select a contractor to conduct an independent, comprehensive review of the Bureau's operation of restrictive housing and identify potential operational and policy improvements. After an extensive evaluation process including a technical review of qualifications by the National Institute of Corrections (NIC), CNA was selected to conduct this assessment. Upon completion of background checks of project team members, CNA received



notice to commence work on the project on September 19, 2013. Interviews and fieldwork at Bureau facilities began in November 2013 and continued through May 2014. Data analysis and follow-up reviews were completed by November 2014.

The CNA project team was composed of eight former state correctional system directors, four former deputy correctional system directors, two psychiatrists, and two PhD-level criminal justice system researchers. All team members had substantial experience in the management and evaluation of restrictive housing units.

The following report provides a comprehensive, detailed evaluation of the Bureau's use of restrictive housing, including the following key areas:

- National trends and best practices in the management of restrictive housing units

- Profile of the Bureau's segregation population

- Bureau policies and procedures governing the management of restrictive housing

- Unit operations and conditions of confinement

- Mental health assessment and treatment within restrictive housing units

- Application of inmate due process rights

- Reentry programming

- Impact of the use of restrictive housing on system safety and security

The report evaluates the impact of the restrictive housing program on the federal prison system and places the Bureau's use of segregation in context with professional standards and best practices found in other correctional systems.

# Methodology

The overall research approach consisted of a wide variety of qualitative operational assessments as well as quantitative methods that provided a comprehensive review of the Bureau's current restrictive housing practices. In this section of the report, these methods are described.



## Facility selection

The first step in structuring the analysis was selection of the facilities to be included in the review. The three Bureau facilities that house inmates in SMU and ADX status—Florence, Lewisburg, and Allenwood—were designated for comprehensive site visits. At the time the study commenced, there were approximately 2,100 inmates in the SMU and ADX units at these facilities. Table 1 shows the population breakdowns at these facilities at the beginning of the project. Inmates under special administrative measures (SAMs) located at the ADX were excluded from this study under the terms of the contract.

Table 1.    SMU and ADX facilities and populations selected for site visits, November 2013

| Facility | SMU | ADX | Control | Totals |
|----------|-----|-----|---------|--------|
| USP Florence | 645 | 0 | 97 | 742 |
| ADX Florence | 0 | 322 | 0 | 322 |
| USP Lewisburg | 786 | 0 | 0 | 786 |
| USP Allenwood | 249 | 0 | 0 | 249 |
| **Totals** | **1,680** | **322** | **97** | **2,099** |

Source: Bureau/NIC.

The next step was the selection of facilities that house the much larger SHU populations. A list of these facilities was provided by the Bureau/NIC, outlining each facility's SHU population and geographic location. The 14 private facilities that hold nearly 1,700 SHU inmates on any given day and the various metropolitan correctional centers were excluded from the study.[1] Table 2 lists the facilities selected for comprehensive, on-site SHU reviews. The USP Hazelton facility, which houses female SHU inmates, was included in the study in order to assess conditions in female restrictive housing. Currently, there are no female inmates in SMU or ADX status, largely because there is not a sufficient number to create specialized SMU or ADX female units.

The sites selected were the more secure USP facilities with the exception of the federal correctional institution (FCI) Butner Medium II. Concentrating on higher security facilities that contained significant SHU populations offered the most value to the project, given the project budget and the time constraints. However, the geographical mix of the facilities combined with the size of the sample they provide

---

[1] Bureau Secure Housing and Inmate Discipline Quarterly Report, June 30, 2013, p. 13.



ensures sufficient numbers to make this review valid and representative of the Bureau as a whole.

Table 2.    SHU facilities and populations selected for site visits, December 2013

| Facility | Region | Total SHU population | Disciplinary | Administrative |
|---|---|---|---|---|
| FCI Butner Medium II | Mid-Atlantic | 72 | 58 | 14 |
| USP Coleman I | Southeast | 184 | 36 | 148 |
| USP Hazelton (females) | Mid-Atlantic | 24 | NA | NA |
| USP Terre Haute | North Central | 206 | 19 | 187 |
| USP Tucson | West | 143 | 39 | 104 |
| USP Victorville | West | 256 | 46 | 210 |
| USP Florence | North Central | 13 | 13 | 0 |
| **Total** | | **898** | **211** | **663** |

Source: Bureau/NIC.

## Operational assessment—facility site visit protocol

The project team conducted an assessment of segregated housing unit operations at each facility. The teams assessed operational performance and compared policy compliance with applicable statutes; the Code of Federal Regulations (CFR); Bureau of Prisons program statements, policies, and operational memoranda; and American Correctional Association (ACA) standards. Each project team member has experience and expertise in the areas they were assigned to evaluate. The team included former directors of corrections, former prison wardens, program supervisors, psychiatrists with experience in mental health treatment and correctional medicine, an attorney, and project researchers.

Initially, the reviews addressed the facility mission, goals, and objectives of the restrictive housing unit. In advance of the site visits, a document review was conducted to determine the availability of data required for the assessment process. Each facility that was assessed is accredited by the Commission on Accreditation of the ACA, and the latest Visiting Committee report that led to the accreditation was assessed as part of preliminary data gathering. The team also reviewed any pending litigation and court orders that affected operational performance, policies, and/or operating procedures.

Each site visit included two to three days on site with observations of facility operations on all three shifts. CNA team members were able to access all areas housing segregated inmates and interview any staff member at the facility to gather information for the facility assessment. At the end of each site visit, the warden and



associated executive staff received a preliminary briefing on major findings and possible recommendations.

During the site visits, inmates from pre-selected representative samples were interviewed in conjunction with a review of their case files. A detailed description of the sampling process follows in the next section of this report. File reviews were conducted to determine if Bureau policies regarding due process issues were followed. The inmates' disciplinary records were also examined to better understand the basis for placement in restrictive housing.

Specific areas of review by the consultants included, but were not limited to, the following:

- Physical plant—assessment of unit design and the availability of services within the context of the design. Cell size and adequacy of cell furnishings were examined as well as the present cell occupancy versus the intended cell design.

- Conditions of confinement—adequacy of recreation space, amount of out-of-cell time, quality and quantity of meals, clothing, access to hygiene products, correspondence privileges, access to legal services, visitation, access to commissary, and access to showers and sanitary facilities. As part of this process, facility records on out-of-cell time, recreation, meals, showers, haircuts, telephone use, and visitation were reviewed.

- Staffing levels—unit staffing plans were assessed to determine the adequacy of staffing to meet unit demands and workload. As part of the analysis, records of actual deployment on posts in the staffing plan were reviewed to ensure that staffing levels were consistent with the post plan. The consultants reviewed up to three months of records, known as staffing rosters, to make their judgments. The staffing assessment included a review of the manner in which the Bureau supervises staff and assigns staff to work in the units and the staff rotation schedule.

- Staff training—evaluations of Bureau training programs that prepare staff to work in the correctional environment, as well as training specific to the management of restrictive housing units. Special attention was paid to training in the use of force, use of chemical agents, self-defense, and unit operations, as related to restrictive housing operations. Staff training attendance records were reviewed to determine if the staff in need of such training was receiving it.

- Use of force—analysis of federal regulations and policies relating to the authorized use of force, including a review of six months of data on use-of-force incidents and a close examination of a random selection of use-of-force incidents, including review of video footage of the incidents.



- Disciplinary procedures and due process—compliance with federal regulations and the program statements concerning inmate discipline, including an examination of disciplinary records documenting compliance with due process requirements.

- Operational requirements—review included job descriptions, post orders, policies and procedures, supervision and patrol requirements, the application of restraints, documentation of unit activity such as logs, inmate movement procedures, and visits by institutional staff including managers, supervisors, healthcare professionals, and program staff. The frequency of critical incidents and use-of-force incidents was also a part of this assessment.

- Classification procedures and compliance—review included periodic progress reviews, interviews with unit team members, and a review of inmate case files. Compliance with segregation reviews was also reviewed.

- Programming/reentry—institutional practice relating to the availability of and inmate participation in programming. A review of practices providing inmates with a program release preparation prior to their release was also conducted.

- Access to medical services—examination of records documenting medical staff presence in the restrictive housing units and access to care inmates receive. The operational assessment did not include a review of the quality of medical care.

- Mental health care—review of the management of inmates with mental health issues, particularly those classified as seriously mentally ill. The project reviewed medical and mental health records and conducted interviews with inmates and clinical staff.

## Inmate samples and interviews

As noted above, representative samples of inmates at selected facilities served as the focus of the data collection and analysis. By closely examining these inmates through case file review, observations, and interviews, the project team obtained a better understanding of the nature and effects of restrictive housing within the Bureau. A considerable amount of time was also spent interviewing staff at each facility and at the Bureau executive level to gain their perspectives. Restrictive housing operations were also assessed through a review of a wide range of Bureau documents and reports.

The design of the study called for sampling of inmates currently housed at the selected facilities. Once selected, all data on the inmate was collected and evaluated on each of the factors listed above. The Bureau created an electronic spreadsheet for



each facility approximately one week prior to the site visit. Based on that spreadsheet, a random number was assigned to each listed inmate and samples of approximately 25 or more were selected. The goal was to ensure that at least 20 inmates would receive an in-depth assessment, including interviews and case file reviews.

A central part of the assessment was a private interview with each inmate outside of his/her cell. Security procedures typically required that all inmates were escorted by two officers to the interview room in restraints. With the exception of USP Lewisburg, the interviews were conducted with just the inmate and interviewer.[2] All inmates were required to sign a standardized informed consent form that was developed by the NIC, the Bureau, and CNA.

The interviews were based on a structured format that sought responses from the inmates on the following topics:

- Extent of Bureau incarceration

- Extent of placement in SHU/SMU/ADX confinement

- Basis for placement and due process issues

- Conditions of confinement in restrictive housing, including time out of cell, access to programs, and privileges

- Medical and mental health status and care

- Staff and/or inmate abuse

- Recommendations

Table 3 summarizes the number of inmates who were selected and those who were actually interviewed. In order to attempt to meet the minimum number of 20 inmates per site, it was necessary to supplement the random selected sample with inmates who were not on the list but were willing to be interviewed. These "supplemental" sampled inmates may have biased the effort to generate representative samples in unknown ways. Limited analysis is provided in the report to determine how the inmates chosen for the random sample and inmates actually interviewed differed from the total SHU/SMU/ADX populations. Due to significant problems with the data requests, which are detailed later in this report, it was not possible to directly

---

[2] For some interviews, facility leadership required that a facility staff person sit in on the interview for security reasons.



identify the interviewed inmates and compare them with the total population in restrictive housing at each facility and across the Bureau.

Overall, there was a 70 percent interview completion rate, which, given the security requirements associated with the interviews, was better than expected. The lowest rates were at the Lewisburg and Tucson facilities, where less than 50 percent of the sampled inmates expressed a willingness to be interviewed. The average number of interviews across the 12 facilities or units was 22, which met the overall goal of having at least 20 interviews and cases analyzed.

Table 3.   SHU and SMU prisoner interviews attempted and completed by facility

| Facility | Completed | | Total | Completion rate |
|---|---|---|---|---|
| | No | Yes | | |
| **SMU** | | | | |
| Allenwood | 9 | 26 | 35 | 74% |
| Florence | 3 | 21 | 24 | 88% |
| Florence ADX | 11 | 23 | 34 | 68% |
| Lewisburg | 22 | 21 | 43 | 49% |
| SMU subtotal | 45 | 91 | 136 | 67% |
| **SHU** | | | | |
| ADX | 3 | 13 | 16 | 81% |
| Butner | 11 | 18 | 29 | 62% |
| Coleman | 8 | 29 | 37 | 78% |
| Florence | 10 | 12 | 22 | 55% |
| Hazelton | 1 | 30 | 31 | 97% |
| Terre Haute | 6 | 24 | 30 | 80% |
| Tucson | 28 | 25 | 53 | 47% |
| Victorville | 5 | 27 | 32 | 84% |
| SHU subtotal | 70 | 178 | 250 | 71% |
| **Grand total** | **115** | **269** | **386** | **70%** |

Source: CNA/JFA Institute.

## Mental health interviews

In addition to the inmate interviews listed above, separate lists were generated for inmates to be privately interviewed by the project team psychiatrists. Prior to their site visit, the roster generated by the Bureau was provided to the research team. This allowed the researchers to identify inmates by level of mental health condition. (Four levels exist, with Level 1 reflecting no significant mental health illness.) A sample was



then produced a few days in advance of the site visit. There was some very limited duplication of the inmate and mental health evaluations that were completed. The overall response rate for the mental health reviews was slightly higher than for the inmate reviews (81 percent). The interviews were designed to allow CNA consulting psychiatrists to offer their professional assessment.

Table 4 summarizes the completion rate for the mental health interviews by facility.

Table 4.     Inmates interviewed and evaluated regarding mental health status by facility

| Facility | Not completed | Completed | Completion rate |
|----------|--------------|-----------|-----------------|
| Allenwood | 0 | 20 | 100% |
| Atlanta | 0 | 7 | 100% |
| Butner | 1 | 9 | 89% |
| Coleman | 11 | 14 | 56% |
| Florence | 6 | 47 | 89% |
| Hazelton | 4 | 11 | 73% |
| Lewisburg | 2 | 25 | 93% |
| Terre Haute | 9 | 16 | 64% |
| Tucson | 8 | 13 | 62% |
| Victorville | 0 | 18 | 100% |
| **Total** | **41** | **180** | **81%** |

Source: CNA/JFA Institute.

## Quantitative data analysis—individual level

The study also sought to conduct a more comprehensive assessment of the SMU and SHU population using the Bureau data systems. Like most if not all state correctional data systems, the Bureau's data systems are not designed to directly measure the status of restrictive housing in terms of admissions to SHU and SMU, release from these same statuses, and the current restrictive housing populations. For this and other reasons, securing the necessary data and readying them for statistical analysis took much longer than originally projected.[3]

---

[3] Another reason for this delay was the decision by the Bureau to not allow the CNA researchers to have regular and informal contacts with the Bureau's Office of Research and Evaluation (ORE) staff. Instead formal meetings had to be convened and emails transmitted through the Contracting Officer Representative (COR) at NIC. This process resulted in lengthy



Beginning in November 2013, the Bureau first attempted to provide such information for the SMU and ADX populations. This was done by creating multiple large data files that captured all movements in and out of SMU and ADX status since 2009. These files were then merged and analyzed to create a snapshot of the SMU and ADX populations based on the absence of a release movement from that status. This was achieved in May 2014.

A similar effort was made to create cohorts of SMU and ADX releases. These cohorts were needed to calculate the length of stay in SMU and ADX status. Our goal was also to conduct a recidivism study to determine what percentage of SMU and ADX releases were returning to restrictive housing and for what reasons. After many efforts to create such release cohorts, Bureau researchers opted to create the cohorts for CNA using their considerable and intimate knowledge of the Bureau SENTRY data system. These cohorts were finally established in July 2014, leaving little time to conduct the analysis within the project schedule.

Until very recently, there have been no data system capabilities within the Bureau to evaluate the much larger SHU population. The new special housing unit application system is a stand-alone data system that has not been used by the Office of Research and Evaluation (ORE) staff for evaluation purposes. The ORE team made several attempts, without success, to create files from this system that could then be used to create SHU release and snapshot data files. It was decided in June 2014 that the Bureau would only be able to create a current SHU population listing with which more complete data could be merged. It was also mutually agreed that a SHU release cohort could not be produced for this study. The SHU snapshot file was produced in July 2014, which did not permit sufficient time to conduct a comprehensive analysis of that population as originally intended.

## Quantitative data analysis—aggregate level

The study design also proposed to review trends in the number of Bureau inmates in restrictive housing over time. The shift in Bureau policies that has led to a significant increase in the SMU population, large transfers of the SMU population from Florence to Lewisburg, and a significant decline in the SHU population have all significantly affected the Bureau's restrictive housing population over time. We also requested that the Bureau provide the numbers of assaults on staff and inmates over time as well as the number of lockdowns occurring each month.

---

delays in receiving answers to data questions and data files. The typical time frame for receiving such data files for similar studies in Ohio, Mississippi, Oklahoma, Kentucky, Colorado and Georgia has been 30-60 days.



Data on the SMU and ADX populations going back to 2004 were provided in a timely manner. Data on staff and inmate assaults were provided in May 2014. The number of lockdowns per month was not being collected on a systemic basis until 2008, and those data were provided in June 2014.

Similar data on the number of inmates in SHU status per month were available in a "dashboard" report that was available only in a portable document format (PDF). These data were not retrieved in a spreadsheet format until July 2014, when ORE was able to manually transfer the information for the CNA team.

# Composition of the Bureau of Prisons special housing

As described earlier, the Bureau operates three types of segregated housing units: special housing units (SHUs), special management units (SMUs), and the administrative maximum security (ADX) institution in Florence, Colorado. The Bureau also operates communications management units. The conditions of confinement in these units are similar to general population in that inmates are allowed to participate in out-of-cell activities for up to 16 hours per day. The communications management units were excluded from the scope of work of this study.

The Bureau's program statements governing the three types of segregated housing units indicate that all three have similar functions and purpose: to "separate inmates from the general inmate population to protect the safety, security, and orderly operation of Bureau facilities, and to protect the public."[4] The specific placement criteria and conditions of confinement vary for each type of segregated housing unit, as does the type of inmate housed in each.

## Special housing units

As outlined in *Program Statement 5270.10, Special Housing Units*, the purpose of the SHU is as follows:

> Special Housing Units (SHUs) are housing units in Bureau institutions where inmates are securely separated from the general inmate population, and may be housed either alone or with other inmates.

---

[4] Program Statement 5270.10, Special Housing Units, 28 C.F.R. 541.21.



> Special housing units help ensure the safety, security, and orderly operation of correctional facilities, and protect the public, by providing alternative housing assignments for inmates removed from the general population.

The policy further indicates that inmates placed in SHU are in either administrative detention status or disciplinary segregation status.

Section 541.22 of the program statement describes administrative detention as follows:

> Administrative detention status is an administrative status, which removes you from the general population when necessary to ensure the safety, security, and orderly operation of correctional facilities, or protect the public. Administrative detention status is nonpunitive, and can occur for a variety of reasons.

The program statement permits placement in administrative detention status for the following reasons:[5]

- The inmate is awaiting classification or reclassification.

- The inmate has been placed in holdover status and is awaiting or in transit to a designated institution or other destination.

- It is determined that the inmate's removal from general population is necessary because continued placement in general population poses a threat to life, property, self, staff, other inmates, the public, or to the security or orderly running of the institution and one or more of the following—

  o The inmate is under investigation or awaiting a hearing for possibly violating a Bureau regulation or criminal law.

  o The inmate is awaiting transfer to another institution or location.

  o It has been determined that the inmate requires protective custody based on the inmate's request or staff determination that administrative detention status is required for the inmate's own protection.

  o The inmate has been determined to require postdisciplinary detention and is ending confinement in disciplinary segregation status, and a return to

---

[5] Program Statement 5270.10, Special Housing Units, 28 C.F.R. 541.23.



the general population would threaten the safety, security, and orderly operation of a correctional facility, or public safety.

As noted in the above eligibility standards for placement in the SHU, inmates may be placed in administrative detention status for protection. The program statement outlines the following circumstances in which this can occur:[6]

- Inmate has been determined to be a victim of inmate assault or threats.

- Inmate has been confirmed to be an informant and his/her safety is at risk because of providing, or being perceived as having provided, information to staff or law enforcement authorities regarding other inmates or people in the community.

- Inmate has refused to enter general population because of alleged pressures or threats from unidentified inmates, or for no specific expressed reason.

- Based on evidence, staff believes that the inmate's safety may be seriously jeopardized by placement in the general population.

The statistical analysis of the SHU population was severely hampered by the inability of the Bureau to provide an accurate data file of the inmates assigned to and released from SHU status as well as an accurate snapshot of the current SHU population. At that time, the count was 10,262 in over 100 Bureau facilities, with the population steadily declining since then, reaching 8,939 by June 2014. This is a significant reduction from the self-reported count of the SHU population of over 13,000 in 2011.

As with the SMU and ADX population, a very large percentage (66 percent) of the SHU population has "separatee orders," which means they have enemies and/or there are safety and security concerns that prohibit specific inmates from being housed with one another. This issue greatly restricts the Bureau's ability to return SHU (as well as SMU and ADX) inmates to the general population—even when considering transfers to other Bureau facilities.

A further complication is the level of crowding that exists within the Bureau. As of 2013, the Bureau stated it was at 137 percent of its rated capacity. The rates of crowding are even higher at their high- and medium-security facilities (154 percent and 144 percent, respectively). Since many of the SMU inmates upon their release will require placement in the high- and medium-security facilities, this level of crowding

---

[6] Program Statement 5270.10, Special Housing Units, 28 C.F.R. 541.27.



further exacerbates the difficulty of transferring these inmates out of SHU in a timely manner.

Table 5.      SHU populations by status, February 2013 – June 2014

| Date | Total | Disciplinary segregation | Investigation | Protective custody | Pending actions | Other |
|------|-------|------------------------|---------------|-------------------|----------------|-------|
| 2/2013 | 10,262 | 1,722 | 4,581 | 1,882 | 2,002 | 75 |
| 3/2013 | 10,070 | 1,700 | 4,516 | 1,868 | 1,868 | 118 |
| 4/2013 | 10,235 | 1,802 | 4,634 | 1,906 | 1,769 | 124 |
| 5/2013 | 10,086 | 2,041 | 4,355 | 1,854 | 1,714 | 122 |
| 6/2013 | 9,915 | 1,860 | 4,369 | 1,825 | 1,719 | 142 |
| 7/2013 | 9,821 | 1,542 | 4,707 | 1,787 | 1,675 | 110 |
| 8/2013 | 9,808 | 1,716 | 4,635 | 1,687 | 1,598 | 172 |
| 9/2013 | 9,696 | 1,803 | 4,458 | 1,709 | 1,515 | 211 |
| 10/2013 | 9,530 | 1,771 | 4,483 | 1,613 | 1,516 | 147 |
| 11/2013 | 9,483 | 1,768 | 4,451 | 1,718 | 1,405 | 141 |
| 12/2013 | 9,434 | 1,506 | 4,567 | 1,562 | 1,726 | 73 |
| 1/2014 | 9,357 | 1,570 | 4,283 | 1,593 | 1,825 | 86 |
| 2/2014 | 9,484 | 1,424 | 4,750 | 1,532 | 1,718 | 60 |
| 3/2014 | 9,177 | 1,585 | 4,388 | 1,432 | 1,704 | 68 |
| 4/2014 | 9,096 | 1,533 | 4,336 | 1,380 | 1,766 | 81 |
| 5/2014 | 8,926 | 1,508 | 4,260 | 1,340 | 1,716 | 102 |
| 6/2014 | 8,939 | 1,376 | 4,252 | 1,361 | 1,802 | 148 |

Source: Bureau/ORE.

## Special management units

As specified in *Program Statement 5217.01, Special Management Units*, inmates who have participated in or had a leadership role in geographical group/gang-related activity, and/or present unique security and management concerns may be designated to an SMU, where enhanced and more restrictive management approaches have been determined to be necessary to ensure the safety, security, or orderly operation of Bureau facilities, or protection of the public.

The program statement defines the SMU as a nonpunitive program status that may be appropriate for any inmate meeting the referral criteria as outlined in Section 2 of P5217.01. The objective of the SMU status as outlined in that document is to enhance a safe and orderly environment at all Bureau institutions.

14



Bureau policy permits placement in a SMU for any sentenced inmate whose history, behavior, or situation requires enhanced management approaches that would ensure the safety, security, or orderly operation of Bureau facilities, or for protection of the public. The policy states that one or more of the following criteria must exist to support consideration for placement in an SMU:

- Participated in disruptive geographical group/gang-related activity.

- Had a leadership role in disruptive geographical group/gang-related activity.

- Has a history of serious and/or disruptive disciplinary infractions.

- Committed any 100-level prohibited act.[7]

- Participated in, organized, or facilitated any group misconduct that adversely affected the orderly operation of a correctional facility.

- Participated in or was associated with activity such that greater management of the inmate's interaction with other people is necessary to ensure the safety, security, or orderly operation of the Bureau facilities, or protection of the public.[8]

The SMU program has four levels or phases, differentiated by the conditions of confinement and expected time frames for completion. Completion of all levels is expected to occur within 18–24 months in the absence of any further behavioral issues. Level 1 completion is expected within four months. Levels 2 and 3 are expected to take from six to eight months each, and Level 4 is expected to take two to four months.

*Level 1—minimum stay four months.* At this level, interaction between inmates is minimal (for example, showers and recreation). All inmates are double bunked. The associate warden is responsible for determining which inmates may be housed or can participate in activities together, as necessary, to protect the safety, security, and good order of the institution. Inmates are ordinarily restricted to their assigned cells.

Inmates participate in an institution and unit admission and orientation program as outlined in the policy on admission and orientation. The goal of the SMU admission and orientation program is to provide inmates with information regarding the institution's operations, program availability, and the requirements for successful

---

[7] ·P.S. 5270.09, Inmate Discipline Program.

[8] Program Statement 5217.01, Special Management Unit, Section 2, Referral Process.



progression through each of the four levels of the program, based upon specific goals established for each inmate. Institution staff will interact with each inmate on an individual basis to assess the inmate's program and counseling needs, discuss the SMU program objectives and expectations, establish a set of program goals based on the inmate's individual needs and the programming available within the unit, and communicate the requirements of the SMU program. Progression through Level 1 is based upon the inmate's compliance with behavioral expectations as established by institution and SMU staff. A multidisciplinary special management review is conducted by the unit manager, captain, and associate warden (chairperson) or the person acting in that capacity. This review includes input from the SMU unit team, correctional staff, psychology staff, education staff, and other appropriate staff to determine the inmate's readiness to progress to the next level. After the initial programming assessment, Level 1 inmates are reviewed at least every 90 days. Inmates are expected to progress to Level 2 after four months.

*Level 2—minimum stay six to eight months.* At this level, interaction between inmates remains minimal. The associate warden is responsible for determining which inmates may be housed or participate in activities together, as necessary to protect the safety, security, and good order of the institution. Inmates are ordinarily restricted to their assigned cells; however, out-of-cell activities and programming may be increased on a case-by-case basis depending on behavioral performance. Inmates continue their involvement in General Educational Development (GED) (or high school equivalency) or ESL (English as a second language) education, either individually or in a classroom setting. Initially at this level, inmates may be involved in programs on a self-study basis; then, individual and small group counseling sessions dealing specifically with treatment readiness and fundamental communication skills will be required.

The associate warden is responsible for determining which inmates will participate in group activities. All program activities are intended to reinforce the goal of coexisting and acting responsibly. Curriculum at this level targets "treatment readiness skills" (such as basic empathy, attentiveness responding, respect, and genuineness) to enhance inmate receptivity to the new concepts which they will be exposed to in Level 3. Small-group counseling sessions, in particular, focus on treatment readiness and fundamental communication skills. Progression through this level is based upon the inmate demonstrating the potential for positive community interaction.

During Level 2, inmates generally program and function separately. Progression to Level 3, however, requires the inmate to demonstrate the ability to coexist with other individuals, groups, or gangs. Level 2 inmates are reviewed at least every 90 days and are expected to progress to Level 3 after six to eight months. Inmates who fail to make satisfactory progress may be returned to a previous level.

16



*Level 3—minimum stay six to eight months.* Inmates at this level begin to interact in an open but supervised setting with individuals from various groups, including open movement in the unit with their demonstrated ability to effectively coexist with other inmates. The associate warden is responsible for determining which inmates may be housed or participate in activities together, as necessary to protect the safety, security, and good order of the institution. There are also increased privileges (for example, commissary and property) at this level for those who accomplish unit goals and maintain appropriate conduct. Progression through this level is based upon the inmate's ability to demonstrate positive community interaction skills. Inmates are formally reviewed by the unit team every 90 days and are expected to progress to Level 4 after six to eight months. Inmates who fail to make satisfactory progress may be returned to a previous level.

*Level 4—minimum stay two to four months.* At this level, inmates must be able to demonstrate their sustained ability to coexist and interact appropriately with other individuals and groups in the unit. The associate warden is responsible for determining which inmates will participate in group activities. This level encompasses the inmate's last two-to-four months in the SMU program. Level 4 inmate reviews are conducted every 30 days and documented in the same manner as previous reviews.

SMU inmates are reviewed by the unit team in conjunction with regularly scheduled program reviews as provided in the policy on inmate classification and program review. The unit team specifically reviews inmates for progression through the levels of the program. An inmate's institutional adjustment, program participation, personal hygiene, and cell sanitation are considered during review for progression to subsequent levels.

Progression through the program levels is dependent upon time in the specific level, demonstration of appropriate behavior, and participation in programming goals. A panel review is conducted at the end of each level to make recommendations regarding progression. By policy, progression from Level 3 to Level 4 is based on the "ability of the inmate to demonstrate positive 'community' interaction. It must also be determined the inmate will likely meet the re-designation criteria." Progression from Level 4 to a general population facility is "based upon the inmate's ability to function in a general population setting with inmates of various group affiliations." Staff indicated that most team meetings for SMU inmates are done at the cell door. There are only slight programming and operational differences between inmates in Level 3 and Level 4. According to both policy and practice, Level 3 and Level 4 inmates may be housed in the same cell.

At the time that this review was initiated, there were SMU programs operating at USP Allenwood, USP Lewisburg, and USP Florence. As of November 2013, the SMU census issued by the Bureau showed a total of 1,680 inmates assigned to SMU status across



these three facilities (table 6). Since then, the Bureau has been transferring SMU inmates to USP Lewisburg with the intention of eliminating the SMU program at USP Florence.

Table 6.    SMU populations by facility, December 2013

| Facility | SMU population |
|----------|----------------|
| USP Florence | 645 |
| USP Lewisburg | 786 |
| USP Allenwood | 249 |
| **Totals** | **1,680** |

Source: Bureau/NIC/ORE.

The Bureau was not able to provide a count of the SMU population broken down by the four levels described above. USP Allenwood is supposed to contain only Level 3 and Level 4 SMU inmates, while USP Lewisburg and USP Florence house only Level 1 and Level 2 inmates. As discussed later in this report, we encountered inmates at USP Lewisburg who had graduated from Level 2 but were being retained at that facility, reportedly due to a lack of capacity at USP Allenwood. Assuming that USP Allenwood does represent the Level 3 and 4 SMU populations, it is clear from table 6 that 85 percent of inmates in SMU are in Levels 1 and 2. Given the minimum length of time required to complete Levels 1 and 2 (10–12 months), it may take an extended period for many of these inmates to be returned to the general population.

## Administrative maximum facility program

The ADX facility is located at the Federal Correctional Complex in Florence, Colorado. The ADX is a high security facility housing maximum-custody-sentenced inmates in single-occupancy cells. Maximum custody is the highest custody level that can be assigned to an inmate.

This is the only facility of its type in the Bureau. The stated missions of the ADX are to (1) assist the Bureau in maintaining the safety of both staff and inmates, while eliminating the need to increase the security of other open population penitentiaries; and (2) confine inmates under close controls while providing them opportunities to demonstrate progressively responsible behavior; participate in programs in a safe, secure, and humane environment, and establish readiness for transfer to a less secure institution. The ADX houses inmates who require an uncommon level of security due to their records of serious institutional misconduct, involvement in violent or escape-related behavior, and/or who have unusual security needs based on the nature of their offense. Placement of these inmates at another facility would pose a risk to the safety and security of the institution, staff, and inmates and the public.

18



The institution operates three distinct programs throughout its numerous housing units, which includes the general population and step-down program, control unit program, and special security unit program. The ADX also has an SHU.

Referrals of inmates for placement at the ADX must be approved by the regional director, the chief of the Bureau's Designation and Sentence Computation Center (DSCC), and the assistant director of the Correctional Programs Division in the central office. All inmates referred for placement receive a hearing prior to placement. Inmates may attend the hearing, make a statement, and present evidence to the hearing administrator conducting the hearing. A mental health evaluation is a required component of all referrals for placement at the ADX.

The facility census at the time of our review on March 31, 2014, was 410 inmates. Of those, 75 were assigned to the control unit; 23 to the SHU control overflow; nine to the SHU segregation unit; 19 to the J unit step-down program; 28 to the H unit (housing inmates with SAMs); and 256 in general population. The H unit, which houses the Special Security Unit Program, was excluded from this review under the terms of the contract.

A snapshot of the census was taken on the first of the month for a 12-month period from April 1, 2013, to April 1, 2014. During that time, the high census was 447 on April 1, 2013, and the low census was 411 inmates on March 1, 2014, and on April 1, 2014. For the 12-month period, the average census for the facility was 428.

The three main components of the ADX that were reviewed in this assessment were the general population step-down units, the special security unit (SSU), and the control unit. Each of these is summarized below.

*General population:* Inmates in this portion of the facility meet the basic ADX placement criteria. The purpose of the program is to monitor the inmate's adjustment to general population while providing an increasing level of privileges and recreation access. The general population and step-down units have a four-phase, 36-month minimum program length. Inmates are gradually placed in less restrictive housing and program conditions based on their adjustment to their conditions of confinement.

*Special security unit:* The SSU houses inmates who have the need for more restricted conditions or have a SAM authorized by the attorney general. SAMs may be deemed reasonably necessary to prevent disclosure of classified information that would pose a threat to national security if disclosed. SAMs include, but are not limited to, placing an inmate in administrative detention and restricting social visits, mail privileges, phone calls, and access to other inmates and to the media. While in the unit, each inmate participates in a three-phase program, with each phase being less restrictive.



Inmates housed in the SSU are reviewed annually to determine if the SAM status should be renewed or modified.

*Control unit:* The control unit program, established by *Program Statement 5212.07*, provides housing for inmates who are unable to function in a less restrictive environment without posing a threat to others or the institution. Referral to the unit is outlined in PS 5212.07 and is reviewed by the regional director in the region which the inmate is housed. If the regional director concurs with the placement, the referral is submitted to the regional director of the North Central region, where ADX Florence is located. The regional director then designates a hearing administrator to conduct a hearing to review the placement referral. A mental health evaluation is a required component of the referrals to the control unit, and medical, psychological, and psychiatric concerns are considered during the review.

The hearing administrator conducts the hearing, which the inmate may attend and present evidence, call witnesses, and receive the assistance of staff if necessary. The decision of the hearing administrator is then submitted to the Executive Panel (warden of ADX Florence, North Central regional director, and assistant director of the Correctional Programs Division) for final review and placement.

Inmates placed in the control unit are reviewed within four weeks of initial placement. Subsequent reviews are conducted on a monthly basis by the unit team, while the Executive Panel is to review each inmate's status and placement on a quarterly basis.

The Psychology Services Branch reviews all ADX referrals, a process that has been in place since 2012. Psychology Services reviews all cases prior to designation to the ADX. Bureau staff reported that cases have been rejected for ADX placement based upon this review, but no data were available on the number of cases in this category.

## ADX and SMU population trends

The historical trends for both the ADX and SMU populations are shown in figure 2. A dramatic increase in the SMU population began in 2009 and plateaued at about 2,000; the population recently declined through July 2014. The ADX population has remained fairly stable at 425 since 2004.

Figure 2.    SMU and ADX populations, January 2004 – July 2014



After a dramatic increase in the SMU program that began in 2009, there have been recent and significant reductions in the SHU and SMU populations (table 7). Similarly, the Bureau population has also been slightly reduced, from a peak of 217,815 to 210,961 as of December 25, 2014. However, even with the decline in the Bureau population, the proportion of inmates in some form of segregation is at 5 percent—down from an estimated 6.9 percent in 2011. Much of the total decline is attributed to a reduction in the SHU population and, in particular, inmates who have been assigned to protective custody or are serving disciplinary segregation sanctions. There have been no reductions in the number of SHU inmates being investigated or the ADX populations over this time frame.

21



Table 7.    Bureau segregation populations by segregation type, 2004–2014

| Year | Total | SMU | ADX | SHU | Total segregation | % of total Bureau population |
|------|-------|-----|-----|-----|-------------------|------------------------------|
| 2004 | 180,328 | 46 | 393 | NA | 439 | NA |
| 2005 | 187,618 | 71 | 398 | NA | 469 | NA |
| 2006 | 193,046 | 60 | 472 | NA | 532 | NA |
| 2007 | 199,618 | 61 | 487 | NA | 548 | NA |
| 2008 | 201,280 | 98 | 466 | NA | 564 | NA |
| 2009 | 208,118 | 894 | 449 | NA | 1,343 | NA |
| 2010 | 209,771 | 1,357 | 427 | NA | 1,784 | NA |
| 2011 | 216,632 | 1,491 | 451 | 13,000 | 14,942 | 6.9% |
| 2012 | 217,815 | 1,942 | 434 | 10,262 | 12,638 | 5.8% |
| 2013 | 216,570 | 1,680 | 419 | 9,434 | 11,533 | 5.3% |
| 2014 | 215,324 | 1,399 | 409 | 8,939 | 10,747 | 5.0% |

Source: Bureau/ORE.
Note: 2011 SHU population is a self-reported estimate by the BOP. The 2014 populations are as of June 2014.

## Summary of the Bureau's recent initiatives and segregation capacity

As the populations have been reduced, there have also been reductions in the capacity of the program since its formation. Bureau Director Charles E. Samuels, Jr. reported that an SMU had been closed at FCI Talladega, Alabama, where there was an 80-bed unit for Level 1 and 2 inmates. This SMU was deactivated in February 2013. The director also reported that there had been plans to open an additional SMU program at Oakdale, Louisiana, but that plan was withdrawn, again due to the steady reduction in counts at the existing SMU programs and the absence of growth in previous years.

The capacity of other units within existing SMU facilities has also been modified based on the reduced SMU population—for example, the deactivated units at USP Lewisburg that were observed during the site visit to that facility in January 2014. G unit, which had a potential capacity of 162 SMU inmates, was closed at the time of the site visit.

Also during the site visit to Florence, Colorado, the complex warden reported that the SMU there was being phased out and the SMU inmates transferred to USP Lewisburg. At the time of our site visit (April 2, 2014), the SMU at USP Florence had a



capacity of 750 and a population of 474. The capacity was split, with 374 beds for Levels 1 and 2 and 376 beds for Levels 3 and 4. The available capacity was, in practice, lower than 750, as D unit was being used as a general population unit and other beds were housing the ADX step-down program. The warden indicated that those in Levels 3 and 4 would remain at USP Florence until completion of the program, while those in Levels 1 and 2 would gradually be transferred to USP Lewisburg.

## Development of the reintegration housing unit

The Bureau has also initiated a housing and program option for the protective custody population, which makes up a significant portion of the overall SHU population. It was reported that in November 2013 there were 1,437 protection cases in special housing, with an additional 172 in special housing awaiting placement back into the general population. In October 2013, the Bureau issued a memorandum that provided field staff with procedures and criteria for placement of inmates in the reintegration housing unit (RHU) located at the Federal Correctional Complex at Oakdale, Louisiana.[9]

The target population for the RHU consists of male inmates who "consistently refuse to enter general population at multiple locations" and those who have been designated through the classification process as protective custody. The stated purpose of the RHU is as follows:[10]

- Remove inmates from SHUs and provide a less restrictive housing environment.

- Address factors that cause inmates to refuse placement in general population.

- Develop skills to increase amenability to entering general population.

- Reduce continued transfers and SHU placement.

The preferred candidates and outcomes for the RHU include the following:

- Target inmates who consistently refuse to enter general population at multiple institutions and who have a general fear of placement in general population.

---

[9] Memorandum to All Regional Directors, October 18, 2013, from Acting Assistant Director, Correctional Programs Division titled *FCC Oakdale – RHU Activation Procedures*.

[10] Reintegration Housing Unit PowerPoint.



- Remove inmates from SHUs and provide a less restrictive housing environment.

- Address factors that cause inmates to refuse general population.

- Develop skills to increase amenability to entering general population.

- Reduce continued transfers and SHU placement.

The initial capacity of the RHU was established as 160 beds with a potential for future expansion to 320 beds. The RHU provides alternative housing outside the SHU for protective custody inmates who are not security threat group members and who could transition to general population housing.

## USP Atlanta mental health unit

Finally, the Bureau has established a specialized unit for Mental Health Care Level 3 mentally ill inmates as an alternative to housing in the SMU, SHU, or ADX. This program, the USP Atlanta Secure Mental Health Step-Down Program, has an initial capacity of 24–30 and is primarily intended to remove some but not all Level 3 inmates with serious mental illness (SMI) from the ADX and other high-security USPs. Inmates classified by the Bureau as Mental Health Care Level 4 are housed in the Bureau's medical referral centers.



# Chapter 2:    National trends and use of segregated housing

Removal of disruptive and violent inmates from the general population and their placement in separate housing units has been a common practice in prison systems since their inception.[11] In the United States, placement of inmates in solitary confinement—the most extreme form of segregated housing—has been documented as early as the 1800s, when administrators believed that silent contemplation led to reform.[12]

Although the use and management of segregated housing have changed, the practice of separating and isolating inmates using special cells or facilities has continued.[13] The modern use of segregation and solitary confinement within specialized units and facilities began to emerge in the 1970s, as prison populations began to rise, spurring a series of highly publicized riots, prison violence, and increased prison crowding.[14] It was hoped that segregating the most disruptive inmates for extensive periods of time under extreme forms of security would serve both to deter and to incapacitate highly disruptive behavior.

By incapacitating disruptive inmates, centralized and specialized segregation units would allow the vast majority of inmates who were conforming to the prison systems rules and regulations to carry out their daily routines of work, recreation, and program participation without the fear of violence or intimidation by more aggressive inmates. It also allowed the other prisons to avoid lengthy lockdowns and major disturbances.

---

[11] C. Riveland. *Supermax Prisons: Overview and General Considerations.* National Institute of Corrections Technical Assistance Number 98P4002. Jan. 1999.
[12] D.P. Mears and J. Watson. "Towards a Fair and Balanced Assessment of Supermax Prisons." *Justice Quarterly* 23, no. 2, Jun. 2006: 232-270.
[13] J.M. Pizarro, V.M. Stenius and T.C. Pratt. "Supermax Prisons Myths, Realities, and the Politics of Punishment in American Society." *Criminal Justice Policy Review* 17, no. 1, Mar. 2006: 6-21.
[14] J. Wooldrege. "Research Note: A State Level Analysis of Sentencing Policies and Inmate Crowding in State Prison." *Journal of Crime and Delinquency* 42, no. 3, Jul. 1996: 456-466.



Three factors that influenced the rise of segregated housing deserve further attention: (1) the significant increases in the nation's state and federal prison populations, (2) the attending increased crowding, and (3) the increased presence of organized street and prison gangs.

After many decades of relative stability in the rate of incarceration, state and federal prison populations began to accelerate in the 1970s, which served to disrupt prison subcultures. In 1972 alone, 90 prison riots were reported by state and federal officials.[15] As noted by many criminologists, prison administrators depend heavily upon a cooperative and conforming inmate population.[16] Correctional officers are greatly outnumbered by the inmate population at any given time and are armed with few, if any, lethal weapons. Control is maintained by their daily interactions with inmates and by offering differing levels of freedom of movement, privileges, and activities (work, programs, and recreation) to mitigate the monotony of "doing time." However, as the prison populations grew, greater numbers of less experienced people were needed to work in the expanding field of corrections.

Prison crowding also worsened as policy-makers passed legislation designed to sentence more people to prison for longer periods of time. It simply was not possible to build a sufficient number of prisons to accommodate the rising tide of inmates. Crowding further exacerbated the level of violence in prisons and the need to better control highly disruptive inmates.

Finally, the presence of modern organized street gangs within the prison population increased, which served to further disrupt stability.[17] Although prison gangs have long been a prison management issue, the 1970s saw a new development in which street gangs that were organized outside the prison system began to enter it in much larger numbers.

[15] Useem, B. & Piehl, A.M. (2008). *Prison state: The challenge of mass incarceration.* New York: Cambridge University Press.

[16] Starting with Donald Clemmer's *The Prison Community* (New York: Holt, Rinehart, 1958), social scientists produced an extensive literature on prisoner society as it existed from the 1930s through the 1960s. A few of the studies are Graham Sykes, *The Society of Captives* (Princeton, NJ: Princeton University Press, 1958); Rose Giallombardo, *The Society of Women* (New York: Wiley, 1966); David Ward and Gene Kassebaum, *Women's Prison* (Chicago: Aldine, 1965); John Irwin, *The Felon* (Upper Saddle River, NJ: Prentice-Hall, 1970); James Jacobs, *Stateville* (Chicago: University of Chicago Press, 1977), and; and James Austin and John Irwin, *It's About Time: America's Imprisonment Binge, 4th Edition* (Palo Alto, CA:

[17] Irwin, John. *Prisons in Turmoil* (Boston: Little, Brown, 1980). Jacobs, James, B. *Stateville: The Penitentiary in Mass Society* (Chicago: University of Chicago Press, 1977).



There was also shift from what Ward and Carlson described as the *dispersion* approach to the *concentration* approach to segregation housing.[18] The dispersion approach involved dispersing disruptive inmates and repeatedly transferring them to different high-security prisons in the hopes of breaking up potential cliques or gangs and preventing them from recruiting other inmates. It also provided some relief to staff who had to manage these inmates on a daily basis. However, as prison populations and the number of disruptive inmates grew, the efficacy of this approach waned. It has now been replaced by the concentration approach, in which specially designed facilities are constructed or older facilities renovated to permit the long-term confinement of disruptive inmates in a highly controlled setting. These facilities have relatively small housing units with cells that are difficult to damage, enable staff to turn off water and electricity, and facilitate the use of force when needed to conduct searches and cell extractions. Specially designed "cages" are constructed to permit limited access to recreation, case managers, and medical and mental health staff. The security staff are expected to be specially trained in working in these prisons or units, which sometimes were known as "supermax" prisons.

The first forms of supermax and high segregation units can be traced to the Bureau's opening of Alcatraz in 1934 as a high-security penitentiary for "habitual" and "intractable" federal inmates. After its closure in 1963, the Bureau experimented with the dispersion model. With a rising population and increased levels of disruption, the agency decided to once again concentrate its disruptive inmates at a special high-control unit at the Marion Penitentiary, which opened in 1978. In 1983, the deaths of two officers and an inmate resulted in this prison's conversion to indefinite administrative segregation, or lockdown. Marion continued to house this population until it opened a modern high-security, secure segregation unit called the administrative maximum penitentiary in Florence, Colorado, in 1994. This unit is now referred to as the ADX. Following the Bureau's lead, supermax prisons and housing units began to spring up in most state prisons systems as well as many of the largest jail systems.

It must be emphasized that, in most jurisdictions, the proportion of segregated inmates is relatively small. The last national survey, conducted in 2002, found that, on average, 5 percent of the state prison population was assigned to some form of

---

[18] Ward, David A. and N. A. Carlson. "Super-Maximum Custody Prisons in the United States." *Prison Service Journal*, Issue No. 97. April 1994.



administrative or disciplinary segregation.[19] That same survey found significant variation among the states with a range of 1 percent to 16 percent.

# Definitions of segregation and types of inmates in segregation

Segregated housing is known by a variety of names, including (but not limited to) restrictive housing, segregation, administrative segregation, punitive segregation, disciplinary segregation, isolation, control unit, special housing unit (SHU), special management unit (SMU), intensive management unit, security control unit, and supermax. For purposes of this report and based on several prior studies, the following definitions of segregation from the prison general population are used:

- *Protective custody*—The purpose is to protect an inmate from threats of violence and extortion from other inmates. The inmate remains in this status until the threats have been removed or the inmate is released from prison.

- *Acute/serious mental health needs*—The purpose is to provide intense mental health treatment to inmates with SMIs. The placement of an inmate and the treatment plan are determined by the mental health team.

- *Acute medical needs*—The purpose is to provide intense medical care to inmates with life-threatening medical conditions and/or physical disabilities. The placement of an inmate and the treatment plan are determined by medical health professionals, including a psychiatrist or a physician.

- *Investigation segregation*—The purpose is to temporally segregate an inmate until serious allegations of misconduct or the need for protective custody is determined. Once the investigative process is completed, the inmate can be assigned to a segregation status or returned to the general population.

- *Disciplinary segregation*—The purpose is to punish an inmate for a violation of a major disciplinary rule. The inmate is to be released back to the general population once the period of disciplinary segregation has been served.

---

[19] Austin, James and McGinnis, Kenneth. *Classification of High-Risk and Special Management : A National Assessment of Current Practices.* National Institute of Corrections. NIC Accession Number 01946. June 2004.



- *Administrative segregation*—The purpose is to incapacitate an inmate whose presence in the general population would pose an ongoing threat to inmates and staff. The placement of an inmate in this status is solely determined by a limited set of criteria established by correctional administrators.[20]

In general, an inmate who is suspected of serious misconduct can be assigned to a segregation unit until an investigation is completed. If convicted of the charges, the inmate can then be sentenced to a specific period of time in segregation—often referred to as disciplinary segregation. While most states limit the amount of time one can serve in segregation, it is possible to accrue more time in disciplinary segregation based on misconduct committed in the unit. Once the disciplinary segregation time has been served, the inmate can then be placed in administrative segregation for an indefinite period of time.

Some inmates do not pose a threat to the security of the prison system, but require protection from other inmates. They are referred to as protective custody inmates. It is not uncommon to find these inmates comingled with disciplinary and/or administrative segregation inmates.[21]

Placement in these various forms of segregation is wholly determined by correctional administrators. Segregation is allowed for a variety of reasons; consideration of the offense committed, the number of infractions, and pending investigations all factor into placement decisions. Some correctional systems further constrain placement decisions to include only those instances in which evidence of specific harm or an escape attempt is present.

Despite their overall low prevalence, highly disruptive offenders have historically presented significant challenges for prison administrators and staff. Segregation units by their very nature require higher levels of staffing on all levels (security, medical, mental health, facility maintenance, programs and recreation, and legal services). In response to this dynamic, corrections administrators have increasingly developed and implemented a myriad of population segregation measures designed to mitigate the impact of highly disruptive offenders within the correctional system.

A key issue is the nature and extent of isolation and solitary confinement. The most recent and comprehensive survey of current practices by the state and the Bureau

---

[20] H. Metcalf, J. Morgan, S. Oliker-Friedland, J. Resnik, J. Spiegel, H. Tae, A. Work, and B. Holbrook. *Administrative Segregation, Degrees of Isolation, and Incarceration: A National Overview of State and Federal Correctional Policies.* Yale Law School, Public Law Working Paper No. 301. Jun. 1, 2013. Austin and McGinnis, 2004.

[21] Metcalf, et al., 2013.



was completed by Metcalf et al. in 2013. They found that there was general agreement that the practice of segregation involves removing inmates from the general population and restricting their participation in recreation, group meals, and programmatic offerings.[22] The same report found that the degree of isolation varied across systems, although the national standard is confinement to a cell at least 23 hours per day with very limited access to recreation, visits, and program services.

Recent reviews of segregation in Oklahoma, Kentucky, Illinois, Ohio, New York, California, and the Bureau of Prisons have found that large numbers of the segregated population are double celled rather than placed in a single cell, thus negating the claims of solitary confinement.

In a study examining inmates' experiences in administrative segregation, O'Keefe noted a general lack of interpersonal contact, meaningful activity, access to reading materials, and windows.[23] According to Kupers et al., some of the particulars associated with segregation practices include near 24-hour-per-day cell confinement alone or with a cellmate, meals eaten in cells, limited trips to a recreation area, and relatively infrequent noncontact interactions with family and friends.[24]

A somewhat contrasting view of segregation was presented by Berger et al., who described cells that generally house two inmates and the ability to communicate with inmates on either side of single-occupancy cells.[25] They also noted that inmates may talk with one another during recreation and with staff members during rounds. Furthermore, segregation cells are similar in size to (or larger than) those in general population, and meals served are similar to those received by general population inmates. With respect to activities, inmates in segregation can receive mail, make phone calls, participate in out-of-cell recreation and institutional programing (including educational and religious services), and possess reading material, but on a very restricted basis.

---

[22] Metcalf, et al., 2013.

[23] M.L. O'Keefe. "Administrative Segregation From Within: A Corrections Perspective." *The Prison Journal* 88, no. 1, Mar 2008: 123-143.

[24] Kupers, T.A., T. Dronet, M. Winter, J. Austin, L. Kelly, W. Cartier, T. J. Morris, S. F. Hanlon, E. L. Sparkman, P. Kumar, L. C. Vincent, J. Norris, K. Nagel, and J.McBride. "Beyond Supermax Administrative Segregation: Mississippi's Experience Rethinking Prison Classification and Creating Alternative Mental Health Programs." *Criminal Justice and Behavior* 36, no. 10, Oct. 2009: 1037-1050.

[25] R.H. Berger, M. P. Chaplin, and R. L. Trestman. "Commentary: Toward an Improved Understanding of Administrative Segregation." *The Journal of the American Academy of Psychiatry and the Law* 41, no. 1, Mar. 2013: 61-64.



As will be shown below, inmates in segregation often have more frequent contact with medical, dental, and mental health service providers, all of whom are often mandated to make daily rounds of segregated housing units. It can also be argued that inmates in segregation may also enjoy greater privacy, the ability to eat meals without interruption, a reduced likelihood of victimization and injury, and possibly a lower probability of committing infractions that would serve to increase their prison terms. These so-called benefits of segregation manifest themselves in inmates who refuse to be released to the general population, instead preferring to complete their prison sentence in segregation status.

# Key litigation issues

There are key legal issues that correctional agencies must address in the operation of their segregation units. A growing number of cases being filed against correctional agencies are challenging the constitutionality of segregation. Our intent is not to provide a comprehensive legal analysis of these issues but to summarize key issues and court decisions.

Virtually all of the pending and past litigation on the use of segregation focuses on the placement process, conditions of segregation, and duration of segregation. These three issues are linked to constitutional requirements of due process and the imposition of cruel and unusual punishment. The 5th and 14th Amendments to the US Constitution provide due process protections. The 8th Amendment bans cruel and unusual punishment.

Fred Cohen's recent comprehensive review of case law and Supreme Court decisions showed that the use of solitary confinement and segregation for extended periods of time is constitutional and does not necessarily violate the 8th Amendment.[26] He noted that there are many cases where the courts have ruled that excessive deprivation of basic services and conditions of confinement (for example, objectionable food, insufficient clothing, insufficient heat, lack of lighting, or lack of mental health services) does constitute cruel and unusual punishment. Further, in several cases the courts have ruled that correctional officials must provide some level of due process in determining initial and continued placement in certain segregation housing conditions.

---

[26] Cohen, Fred. "Penal Isolation: Beyond the Seriously Mentally Ill," *Criminal Justice and Behavior* Vol. 35, No. 8, August 2008, 1017-1047.



Although many cases have direct bearing on these issues, three major cases that are narrowly related to segregation are frequently referenced by the courts:

- *Sandin v. Conner*, 515 U.S. 472, 484 (1995)

- *Wilkinson v. Austin*, 545 U.S. 209 (2005)

- *Estate of DiMarco v. Wyoming Department of Corrections.*, 473 F.3d 1334, 1342 (10th Cir. 2007)

The *Sandin* case was decided by the U.S. Supreme Court. It involved an inmate in the Hawaii prison system who received a 30-day sentence to segregation. He was not allowed to call witnesses on his behalf. The Court ruled that the prisoner was not able to show that 30 days in segregation within the Hawaii prison system constituted "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Consequently, there was not a protected liberty interest that would entitle him to due process procedures.

In the *Wilkinson* case, which was brought against the Ohio Department of Rehabilitation and Correction and its recently created supermax facility, the U.S. Supreme Court unanimously held that recently adopted policies were sufficient to address the due process issues. The issue of cruel and unusual punishment was not addressed by the Court, as it had been previously settled by the parties.

The *DiMarco* decision was based on the use of segregation within the Wyoming Department of Corrections. The case involved an anatomical male living as a female, who sued the Department of Corrections for being placed in solitary confinement for her own protection. The Tenth Circuit identified four factors that need to be assessed to determine if a liberty interest existed relative to the proper use of segregation:

1. Segregation relates to and furthers a legitimate penological interest, such as safety or rehabilitation.

2. Segregation conditions of confinement are extreme.

3. Placement in segregation increases the duration of confinement.

4. Placement is indeterminate.

In its ruling, the Tenth Circuit found all four factors justified the placement of Ms. DiMarco in isolation.

The *Austin* decision was focused on the Ohio State Penitentiary, which is the state's supermax facility. The state had already settled with the plaintiff on conditions-of-confinement claims, which significantly and positively changed the range of services



and privileges afforded inmates. In particular, a step-down level system was created, which permitted the vast majority of inmates to work their way out of segregation and back to the general population.

These reforms left the U.S. Supreme Court to focus on due process issues. When the Ohio State Penitentiary first opened, the Court observed the following:

> There is no official policy governing placement that was in effect, and the procedures used to assign inmates to the facility were inconsistent and undefined, resulting in haphazard and erroneous placements.

In response to the initial litigation, Ohio officials significantly narrowed the criteria by which a prisoner could be assigned to the Ohio State Penitentiary. Further, the authority to transfer prisoners to or release them from the Ohio State Penitentiary could only be approved and authorized by the central classification office. The Supreme Court held that the new criteria and review procedures did provide sufficient due process protection. It is worth noting that, with the new policies in place, the Ohio State Penitentiary segregation population dropped significantly.

## Standards regarding segregation

Despite the widespread use of segregation, there is a lack of accepted guidelines or standards governing its use. In particular, criteria and process for placement in segregation, conditions of segregation, and criteria and process for release from segregation vary substantially by state.[27] For example, Nebraska reports a total of 19 reasons that would justify segregation placement, including "any other information regarding the inmate that the classification authority deems appropriate."[28] Conversely, Mississippi allows only five such rationales for segregation placement.

There are differences among the states in due process/notification procedures. Most states require a formal hearing and some form of written notice to the prisoner prior to reaching a decision on whether to place him/her in segregation. Such hearings usually must be held within 14 days of the notice. Very few states allow inmates to have a legal representative or advocate present at the hearing. Standards for periodic reviews are even less defined in agency policies. These reviews can occur as often as every six months, with most states requiring 30- or 60-day reviews. Only a few states

---

[27] Metcalf, et al., 2013.
[28] Metcalf, et al., 2013:6.

33



report a requirement for a face-to-face interview with the inmate as part of the review.[29] When a face-to-face interview is not mandated, these reviews may simply be case file paper reviews with a notice sent to the prisoner after the decision has been reached.

It was not until 2013 that the Association of State Correctional Administrators (ASCA) Administrative Segregation Sub-Committee examined the issues surrounding segregation and provided recommendations regarding the use of restrictive housing.[30] The subcommittee's final recommendations to correctional systems and administrators on the use of *administrative segregation only* were published as follows:

1. Provide a process, a separate review for decisions to place an offender in restrictive status housing.

2. Provide periodic classification reviews of offenders in restrictive status housing every 180 days or less.

3. Provide in-person mental health assessments, by trained personnel, within 72 hours of an offender being placed in restrictive status housing, and periodic mental health assessments thereafter including an appropriate mental health treatment plan.

4. Provide structured and progressive levels that include increased privileges as an incentive for positive behavior and/or program participation.

5. Determine an offender's length of stay in restrictive status housing on the nature and level of threat to the safe and orderly operation of general population as well as program participation, rule compliance and the recommendation of the person(s) assigned to conduct the classification review as opposed to strictly held time periods.

6. Provide appropriate access to medical and mental health staff and services.

7. Provide access to visiting opportunities.

8. Provide appropriate exercise opportunities.

9. Provide the ability to maintain proper hygiene.

---

[29] Metcalf et al., 2013: pp 11-13.

[30] Association of State Correctional Administrators, Administrative Segregation Sub-Committee. *Final Restricted Status Housing Policy Guidelines.* Aug. 9, 2013.



10. Provide program opportunities appropriate to support transition back to a general population setting or to the community.

11. Collect sufficient data to assess the effectiveness of implementation of these guiding principles.

12. Conduct an objective review of all offenders in restrictive status housing by persons independent of the placement authority to determine the offenders' need for continued placement in restrictive status housing.

13. Require all staff assigned to work in restrictive status housing units to receive appropriate training in managing offenders on restrictive status housing status.

Although the ASCA guidelines provide the first effort to standardize the use and conditions of segregation, they offer little in terms of specifics. For example, guidelines 7 and 8 state that visits and recreation are to be provided, but fail to state the number of visits or recreation periods per month and their minimum duration. The recommendations are also silent on whether inmates requiring protective custody should be placed in administrative segregation and under what conditions of confinement.

# Segregation sentencing structures

There are two basic models for committing a person to segregation status that mimic the indeterminate and determinate criminal sentencing structures. Most states use relatively short sentences for placing an inmate in disciplinary segregation, which often can range from five to thirty days. However, if an agency wishes to continue the segregation status beyond that time frame, they have developed two models.

One model is comparable to an indeterminate sentencing structure, where release from administrative segregation is not specified and occurs only at the discretion of the agency. Under this structure, the inmate is committed to segregation with no specified release date. States including Ohio, Mississippi, and Colorado have used this model, often in tandem with a step-down, incentive-based program that is discussed in the next section.

The determinate structure is essentially a segregation sentence that can range from 30 or more days to many years. Under this model, serious disciplinary offenses can produce long, fixed segregation terms. The only way to mitigate these terms is for the agency to reduce them at review hearings based on good conduct. States including Kentucky, New York, and California use this model.



# Impact of segregation systems on institutional safety

The overriding objective of administrative segregation is to protect inmates and staff by incapacitating high-risk inmates. But it may also serve to deter other inmates from becoming involved in serious rule infractions or in acts of violence out of fear of being segregated for long periods of time. With the recent advent of progressive step-down programs, one can also argue that disruptive inmates are being successfully treated or rehabilitated while segregated.

It has also been alternately argued that supermax prisons and/or increased use of administrative segregation units are either excessively expensive or cost-effective. There is consensus among correctional professionals that segregation units require higher staff-to-inmate ratios and increased presence of medical and mental health staff. Some have also argued that segregation increases the likelihood of mental illness and suicide. However, it may be that segregation units reduce the danger of violence in the general population, which allows the vast majority of the prison system to operate with greater efficiency and effectiveness.

Although there have been several descriptive studies of administrative segregation, Mears[31] and Berger et al.[32] both suggest that there have been few, if any, credible studies on its outcomes. The primary methodological issue is establishing a control or "counterfactual" research design that would answer the basic question of what would have happened had the use of segregation not increased.

A study of three state prison systems found that the increased use of segregation had no effect on inmate-on-inmate assaults, but did reduce the incidence of inmate-on-staff assaults.[33] A subsequent study in Illinois found the same results and offered evidence that the number of lockdowns in the other facilities was reduced.[34]

---

[31] Mears, Daniel P. 2013. "Supermax Prisons: The Policy and the Evidence." *Criminology & Public Policy* V. 12, (4): 681–720.

[32] Berger, et al., 2013.

[33] Briggs, Chad S., Jody L. Sundt, and Thomas C. Castellano. 2003. "The effect of supermaximum security prisons on aggregate levels of institutional violence," *Criminology* 41:1341–76.

[34] Sundt, Jody L., Thomas C. Castellano, and Chad S. Briggs. 2008. "The sociopolitical context of prison violence and its control: A case study of supermax and its effect in Illinois." *The Prison Journal* 88:94–122.



In Washington state, research found no difference in recidivism rates between inmates who had experienced its supermax system and a matched group that had not. However, the same study found that inmates released directly from supermax to the community had a significantly higher recidivism rate than the matched group (69 percent rearrested for a felony versus 51 percent for the control group).[35]

Mears and Bales completed what is arguably the most sophisticated quasi-experimental study of supermax confinement in the state of Florida.[36] Using complex matching procedures, they found little if any difference in recidivism rates for inmates who experienced supermax confinement and those who did not. More significantly, there were no differences in recidivism rates based on how long a person was in supermax. In other words, it made little to no difference if an inmate was confined for 4, 8, 12, or 24 months—the recidivism rates were the same. The study also tried to replicate the Washington state finding that inmates released directly from segregation had higher recidivism rates. The authors concluded that it did not, but they used a measure of "recency" and not direct segregation releases.[37]

The United States Government Accountability Office (GAO) reported in 2013 that there are five states (Colorado, Kansas, Maine, Mississippi, and Ohio) where the use of administrative segregation has been reduced and that there has been no adverse impact on institutional safety.[38] However, there may have been no association between reducing the size of the segregation population and assault rates, homicides, or other serious incidents; this does not by itself indicate a causal relationship.

Conversely, the New York state prison system found a sharp decline in its rates of assaults as it rapidly expanded the size of its SHU population.[39] These data led the agency to conclude that increasing the size of its SHU population caused the rate of assaults to decline. The Bureau made a similar claim to the GAO, saying that the rise in the SMU population was the reason assault rates and the number of lockdowns

[35] Lovell, David, L. Clark Johnson, and Kevin C. Cain. 2007. "Recidivism of supermax inmates in Washington State." *Crime & Delinquency* 53:633–56.

[36] Mears, Daniel and William Bakes. 2009. "Supermax Incarceration and Recidivism." *Criminology* 47.4:801-836.

[37] Recency referred to inmates who were relatively close (within a few months) to their prison release dates.

[38] U.S. Government Accountability Office. May 2013. *Bureau of Prisons: Improvements Needed in Bureau of Prisons' Monitoring and Evaluation of the Impact of Segregated Housing.* Washington, DC: GAO.

[39] Goord, G.S. 2006. *Prison safety in New York.* Albany: NYDOCS. Available online at http://www.docs.state.ny.us/PressRel/06CommissionerRpt/06PrisonSafety.Rpt.pdf



had declined.[40] Despite these positive associations, it is not clear if there is a causal relationship between segregation policies and institutional safety.

# Mental health issues in segregated housing

Mental illness has become increasingly prevalent in corrections systems. According to the Bureau of Justice Statistics (BJS), as of mid-2005, 56 percent (705,600) of state and 45 percent (78,800) of federal inmates had some type of mental health problem over the past 12 months.[41] It should be recognized that the definition of "mental health problem" was broad and included symptoms such as insomnia, sadness, loss of appetite, and persistent irritability. The BJS survey also showed proportional increases in the number of inmates who said they had used prescribed medication for a mental health problem since admission to prison, used prescribed medication for a mental or emotional problem, or received mental health treatment.

This is not to say that all or even a majority of these inmates require placement in specialized treatment programs or housing units. The majority of them suffered from some form of depression or mania, which is treatable by medication and counseling. The number of inmates who require special housing due to a severe mental illness (SMI) is much lower. According to Lovell, Allen, Johnson, and Jemelka, reviews of clinical studies indicate agreement that 10 to 15 percent of inmates in state prisons suffer from SMI.[42] A 1999 BJS report on the same topic estimated that 16 percent of state and jail inmates and probationers were "mentally ill," while only 7 percent of Bureau inmates were classified the same way.[43]

These figures are likely unsurprising to mental health clinicians and correctional officers who have witnessed the relationship between deinstitutionalization and the increasing number of mentally ill inmates in the correctional system.[44]

---

[40] GAO, 2013, pp. 33-34.

[41] D.J. James and L.E. Glaze, L. E. *Mental Health Problems of Prison and Jail Inmates.* Bureau of Justice Statistics Special Report NCJ 213600. Sep. 2006 (revised Dec. 2006).

[42] D. Lovell, D. Allen, C. Johnson and R. Jemelka, Ron. "Evaluating the Effectiveness of Residential Treatment for  with Mental Illness." *Criminal Justice and Behavior* 28, no. 1, Feb. 2011: 83-104.

[43] Ditton, Paula M. *Mental Health and Treatment of  and Probationers.* Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics. July 1999.

[44] A.L.S Brandt. "Treatment of Persons with Mental Illness in the Criminal Justice System: A Literature Review." *Journal of Offender Rehabilitation* 51, no. 8, Nov. 2012:541-558.



The BJS report also found that violations and fight-related injuries are common among mentally ill inmates. Within the state-level prison population, 58 percent of those with mental illness, compared with 43 percent of those without, committed violations or were injured as a result of fighting. Among state and federal prison populations, mentally ill inmates were also more frequently involved in physical or verbal assaults on correctional staff or inmates. Mentally ill inmates are often more disruptive than inmates without mental illness, and disruptive behavior associated with mental illness often leads to the inappropriate placement of mentally ill inmates in administrative segregation.

Given the above national statistics, it is not surprising that mentally ill inmates are more frequently segregated and often spend a longer time in segregation.[45] Mentally ill inmates are also placed in segregation for protective custody reasons and because of a lack of proper placement options. It has also been claimed that the experience of segregation for lengthy periods of can result in an inmate decompensating and developing mental illness(es). Some have suggested that many SMIs worsen due to the stress of incarceration, presenting risks of self-injury and harm to staff or other inmates.[46]

Some courts have held that placement in administrative segregation under certain conditions is unsuitable for mentally ill, developmentally disabled, and nuisance inmates.[47] For example, in 1995 a federal court in California found that the placement of certain inmates—those with mental illness such as, borderline personality disorder, brain damage, mental retardation, chronic depression, and/or impulse control disorders—in California's Pelican Bay SHU constituted cruel and unusual punishment, an 8th Amendment violation.[48] In *Madrid v. Gomez*, the court examined the placement of mentally ill inmates in the SHU at California's Pelican Bay State Prison, a supermax facility, and found that an 8th Amendment violation existed for

> those who the record demonstrates are at a particularly high risk for suffering very serious or severe injury to their mental health,

---

[45] J. Skeem, J. Peterson, and E. Silver. "Toward Research-Informed Policy for High Risk Offenders with Serious Mental Illness." In B. McSherry and P. Keiser, eds., *Managing High Risk Offenders: Policy and Practice.* New York: Routledge. 2011. 111-121.

[46] Ford, Julian, Robert L. Trestman, Fred Osher, Jack .E. Scott, Henry J. Steadman and Pamela C. Robbins. *Mental Health Screens in Corrections.* National Institute of Justice Research for Practice. May 2007.

[47] F.R. Maue. "Management of the Mentally Ill in Administrative Segregation: Legal and Management Challenges." *Corrections Today*, July 2006, pp 46-47.
[48] Madrid v. Gomez, 889 F. Supp. 1146 (N.D. Cal. 1995)



including overt paranoia, psychotic breaks with reality, or massive exacerbations of existing mental illness as a result of conditions in the SHU.[49]

The *Madrid* court also found that inmates did not undergo psychiatric screening prior to placement in the Pelican Bay State Prison SHU, and that the provision of mental health services to SHU inmates with SMI was noticeably lacking.

Although many researchers and experts agree that administrative segregation is generally not a suitable placement option for inmates with SMI, the evidence on whether such placement causes deterioration among mentally ill inmates is mixed.[50] For example, a 2010 study of administrative segregation in the Colorado corrections system found that not only did inmates with and without mental illness not deteriorate while in segregation, but some actually exhibited signs of improvement.[51]

The authors of the study warned of its limited generalizability and the need for replication. In supportive reaction to the Colorado study's findings, Berger et al. explained that context matters, and that some mentally ill inmates seek placement in segregation as a way to decrease interpersonal and environmental stimulation.[52] These inmates, according to Berger et al., exhibit tendencies (such as self-imposed isolation) that are similar to individuals with SMI in a community setting. Other inmates self-select into segregated housing as a means of avoiding foes and reducing safety risks that they believe exist in general population settings.

Conversely, Haney noted that personal accounts, descriptive studies, and systematic research published over several decades have substantiated that solitary confinement is associated with negative psychological effects, and that these effects are particularly pronounced among mentally ill inmates.[53] This evidence, Haney asserted, is bolstered by findings from other areas of inquiry that demonstrate the

---

[49] Madrid v. Gomez, 889 F. Supp. 1146 (N.D. Cal. 1995)

[50] B.A. Arrigo and J.L. Bullock. "The Psychological Effects of Solitary Confinement on Inmates in Supermax Units." *International Journal of Offender Therapy & Comparative Criminology* 52, no. 6, Dec. 2008: 622-640.

[51] M.L. O'Keefe, K. J. Klebe, A. Stucker, K. Sturm, and W. Leggett. *One Year Longitudinal Study of the Psychological Effects of Administrative Segregation.* National Institute of Justice Document 232973. Oct. 2010.

[52] R.H. Berger, M. P. Chaplin, and R. L. Trestman. "Commentary: Toward an Improved Understanding of Administrative Segregation." *The Journal of the American Academy of Psychiatry and the Law* 41, no. 1, Mar. 2013: 61-64.

[53] Haney, Craig. "Prison Effects in the Age of Mass Incarceration." *The Prison Journal* 92, no. 4, 2012:1-24.



negative effects of acute sensory deprivation, the effects of elderly loss of social contact, and the consequences of isolating mentally ill patients.

Researchers have struggled to disentangle the relationship between high rates of mental illness in the segregation population and the potential role that segregation may play in the deterioration of mental health status.[54] It may be the case that higher rates of mental illness in segregation reflect self-selection of mentally ill offenders into segregation placements. Studies seeking to distinguish and closely examine the effects of segregation have often been constrained due to small sample sizes, timing of segregation placement relative to the study period(s), and reliance on quasi-experimental design. (True experimental design in this context is not feasible due to ethical concerns associated with denial or delay of mental health or medical services for research purposes.) Despite these constraints, research on mentally ill offenders and the use of administrative segregation, along with relevant legal guidance, can help frame discussions regarding appropriateness and application.

In an evaluation of mental health screening tools, Ford et al. explained that mental health screenings and assessments are necessary to the timely identification and effective treatment of inmate mental health needs.[55] Furthermore, information provided through screenings and assessments underlies the provision of services to which inmates are constitutionally entitled and facilitate positive readjustment when the inmate is released into general population or the community. Peters asserted that without early identification of mental disorders, inmates are unlikely to seek treatment, and missed identification of trauma undermines appropriate diagnosis, which in turn may lead to inadequate participation in treatment, supervision, and reentry planning.[56]

The guidance from ASCA on the use of restrictive housing suggests that facilities should conduct an in-person mental health assessment within 72 hours of an inmate's placement in a segregated setting.[57] Further, mental health assessments should be performed by trained personnel and conducted on a periodic basis following the initial assessment.

Despite the disproportionate share of infractions committed by mentally ill inmates and the overrepresentation of inmates with mental illness in segregation settings, a survey of state-level corrections disciplinary processes found that many state

---

[54] M. L. O'Keefe, et al., 2013.

[55] J. Ford, et al., 2007.

[56] R.H. Peters. *Assessing Dependence, Comorbidity, and Trauma.* Mental Health Law & Policy Faculty Publications Paper 642. 2013.

[57] ASCA, Aug. 9, 2013.



correctional systems do not have formal policies on the role of mental health in the disciplinary process.[58] In some states, mental health plays no role or merely a minor role for mentally ill inmates facing disciplinary charges. However, most states' correctional policies require adequate medical and mental health treatment for mentally ill inmates placed in segregation. For mentally ill inmates found guilty of disciplinary infractions, most states have formal or informal policies directing consultations with mental health professionals regarding inmate disposition.

The ACA National Commission on Correctional Health Care guidelines assert that health care staff should "immediately review the health care needs of offenders placed in disciplinary segregation to determine if there is any known health contraindication to segregation placement."[59] These guidelines also stress that processes must be implemented to ensure that mentally ill inmates in segregation undergo continued evaluation that is conducted by a qualified mental health professional, and significant inmate deterioration—indicating that segregation is no longer suitable—warrants an alert to correctional administrators.

During the ACA 2013 Winter Conference plenary session entitled "Re-evaluating Administrative Segregation: The Human, Public Safety and Economic Impact," correctional administrators highlighted the need for ACA standards regarding segregation. Expert panelists identified several approaches that could enhance compliance with the law,[60] including the following:

- Defining the types of mental illnesses that are incompatible with segregation, and having mental health staff conduct screenings.

- Providing access to in- and out-of-cell mental health treatment for segregation inmates.

- Creating individualized mental health services plans through multidisciplinary treatment team collaborations.

- Identifying mental illnesses in a timely fashion, because early identification prevents deterioration.

---

[58] M.S. Krelstein. "The Role of Mental Health in the Inmate Disciplinary Process: A National Survey." *The Journal of the American Academy of Psychiatry and the Law* 30, no. 4, Dec. 2002: 488–96.

[59] Association of State Correctional Administrators, Administrative Segregation Sub-Committee. *Final Restricted Status Housing Policy Guidelines.* Aug. 9, 2013.

[60] J. Scafuri. "Administrative Segregation: Continuing the Conversation." *On the Line: An Online Publication of the American Correctional Association*, Sep. 2013.



# Step-down programs

The ASCA's *Guiding Principles for Restrictive Housing Status* also suggested that correctional systems provide segregated inmates with the opportunity to progress through structured levels that link increased privileges to positive behavior and/or program participation.[61] Its recommendation was based on a number of states, as well as the Bureau, that are actively working to reduce the number of inmates in segregation through the development and implementation of step-down, intensive management, and behavioral management programs.[62]

Metcalf et al. examined some of the step-down programs that attempt to link the transition out of administrative segregation to achievement of specific goals, including the completion of behavioral management plans and/or courses. Inmates in transition programs are selected according to specific, stringent processes. A minimum stay (generally six months to one year) is a common feature of these programs, and inmates are made aware that any disciplinary infraction during the program period will likely lead to additional time in segregation.

Several states, including Colorado, Massachusetts, Mississippi, Virginia, and Washington, are developing or have developed programs that provide administratively segregated inmates with increased opportunities for group activities and therapy while maintaining a safe degree of separation. Connecticut, Massachusetts, Mississippi, New Jersey, New Mexico, and Virginia have all reported development of programs that target inmate behavior issues. New Mexico's program, for example, is structured around a two-level system that incentivizes positive inmate behavior through a corresponding measured reduction of restrictions. More detailed reports follow on the Virginia, Mississippi, Washington, and Maine step-down programs.

---

[61] Association of State Correctional Administrators, Administrative Segregation Sub-Committee. *Final Restrictive Status Housing Policy Guidelines.* Aug. 9, 2013.

[62] H. Metcalf, J. Morgan, S. Oliker-Friedland, J. Resnik, J. Spiegel, H. Tae, A. Work, and B. Holbrook. *Administrative Segregation, Degrees of Isolation, and Incarceration: A National Overview of State and Federal Correctional Policies.* Yale Law School, Public Law Working Paper No. 301. Jun. 1, 2013.



## Virginia

The Virginia Department of Corrections (VADOC) is one of several state corrections departments that have developed an administrative segregation step-down program using evidence-based practices.[63] The program claims to have reduced the administrative segregation population and lowered prison safety incidents, each by over 50 percent, and to have decreased inmate grievance filings by 23 percent.[64] VADOC also reported a reduction in the use of sick leave and highlighted this finding as an indication of reduced staff stress and improved morale, although it is not clear how this assessment was made. The reported size of the Virginia program as of 2013 was 460 inmates and, as of August 2013, approximately two years after inception of the step-down program, none of the enrolled offenders had returned to administrative segregation.

The VADOC step-down initiative includes an enhanced classification review prior to inmate assignment to or placement in segregation.[65] Multidisciplinary staff teams and validated instruments that determine criminal risks, underlying reasons for negative individual inmate behaviors, and inmate motivators form the foundation of the more extensive assessment. Throughout this initiative, inmates are provided cognitive programming opportunities that promote learning and practice of positive behaviors. The process includes an additional step-down classification security level that provides a test bed for changed behavior. Segregation inmates who demonstrate that they can participate appropriately in programs and control behavior can earn additional responsibility.

## Mississippi

In response to litigation regarding the use of segregation, the Mississippi Department of Corrections (MDOC) changed its classification process and mental health programming, leading to significantly decreased rates of violence, disciplinary infractions, and use of force in the segregation unit.[66] One of the specific changes

---

[63] "Virginia Recognized for Transforming Highest-Security Prisons." *Virginia Department of Corrections Press Release,* Aug. 7, 2003.

[64] "Virginia Step Down Program for Administrative Segregation." *Southern Legislative Conference Press Release,* 2013; These reductions occurred over approximately two years following implementation of the VADOC Step-Down initiative.

[65] Virginia DOC, 2013.

[66] T. A. Kupers, T. Dronet, M. Winter, J. Austin, L. Kelly, W. Cartier, T. J. Morris, S. F. Hanlon, E. L. Sparkman, P. Kumar, L. C. Vincent, J. Norris, K. Nagel, and J.Mcbride. "Beyond Supermax Administrative Segregation: Mississippi's Experience Rethinking Prison Classification and



made by MDOC was the development of a step-down unit for inmates with SMI, as required under the 2007 *Presley v. Epps* consent decree.

Inmates requiring intermediate mental health treatment, but not inpatient psychiatric services, are eligible for the unit, which is jointly administered by MDOC and its medical and mental health contractor. The step-down unit, housed in MDOC's segregation facility, was designed to gradually move inmates with SMI from a segregated setting to a more open one as they demonstrate appropriate behaviors and the ability to function within an open unit. To be eligible for the step-down unit, inmates must have a condition that is classified as an SMI. Inmates demonstrating motivation to succeed in the unit are given priority. Once in the unit, inmates earn their progress from the segregated tier to the open tier, and finally to general population upon graduation.

The MDOC step-down unit relies on the "assertive community treatment" approach, and staff focus on inmates' "intact faculties, ambitions, positive life experiences, and strengths of character, and how those buffer against disorder," rather than on their mental illness[67]. Inmates learn about their illnesses and the means for appropriately addressing anger, impulses, and anxiety, and are rewarded via incentives (such as additional time alone in activities rooms with media equipment, and use of additional library materials) for positive behaviors. Although initial group treatment among inmates who are still segregated includes the use of ankle restraints secured to the floor, it still provides a necessary opportunity for interpersonal communication and connectedness. Once inmates have transitioned to the open tier, they participate in group sessions without restraints.

Staff selection, training, and collaboration are critical to the success of the MDOC step-down unit. While respecting inmate confidentiality, mental health providers meet on a weekly basis with correctional staff to ensure the delivery of a high level of care in a secure environment. Correctional officers assigned to the unit must complete an intensive mental health training curriculum and upon completion are given the title of correctional mental health manager. The MDOC step-down unit's success is indicated by a reduction in rule violation reports filed against inmate graduates. An examination of a cohort of 43 graduates revealed an average of 4.7 rule violation reports per inmate in the six months prior to unit admission. During the cohort's time in the unit, that figure fell to an average of 1.2 per inmate. In the

Creating Alternative Mental Health Programs." *Criminal Justice and Behavior* 36, no. 10, Oct. 2009: 1037-1050.

[67] Kupers, et al., p. 6



six months following unit graduation, the cohort exhibited an average of only 0.6 per inmate.

## Washington

Similar to the experiences in Virginia and Mississippi, the limited information available regarding segregation reduction efforts in Washington indicates decreases in behavioral incidents. The Washington Department of Corrections, in collaboration with Disability Watch Washington and the Vera Institute of Justice, developed "intensive management" or "intensive treatment" programs that allow for structured group activities as well as a variety of therapy options for inmates housed in segregation. Inmates must participate to return to general population, and are assigned to specific programs based on individual mental health and behavioral assessments. Programming delivery formats include self-directed, cell-front and classroom, and course offerings include cognitive programming.[68] It is now rare for an inmate in the Washington State corrections system to spend more than 90 days in segregation, and the proportion of inmates that return to segregation has decreased.[69] In the past, inmates released from segregation came back more than 50 percent of the time. Since the inception of the intensive management program, 131 inmates have graduated and of those, only 24 have returned.

## Maine

The Maine Department of Corrections conducts risk assessments for each administrative segregation inmate, and the information from the assessment is used to develop individualized behavioral programs. The unit team reviews inmate cases weekly and determines whether inmates will be provided the opportunity to participate in group recreation and therapy. Program participation/attendance is required and can include in-cell as well as individual and group counseling. While in the program, inmates are under an incentive system that allows them opportunities for increased amounts of out-of-cell time, more recreation time, fewer restraints, and access to additional property. Following the policy changes, the Maine Department of Corrections has not observed increased violence or other problems in the general population. Additionally, although the policy changes are relatively new, both behavioral incidents and the amount of time spent in segregation have decreased since the changes were implemented.

---

[68] Association of State Correctional Administrators. *Segregation Survey*. Jan. 7, 2013.
[69] J. Martin. "State Prisons Rethink Solitary Confinement." *Seattle Times*, Jan. 7, 2013.



# Reductions in segregation populations

A number of states have reduced their segregation populations. As suggested above, these declines have occurred by narrowing the criteria for placement in segregation and/or reducing the period of segregation. The latter is often achieved by implementing a step-down program or by adjusting the lengths of segregation sentences. Following are some examples of states that have accomplished such reductions.

## Mississippi

Prior to 2006, Mississippi had approximately 1,000 inmates assigned to its high-security unit 32 at the Mississippi State Penitentiary prison complex in Parchman. In response to ongoing litigation that contested the criteria for placement in segregation and the conditions of confinement, the Mississippi Department of Corrections developed a plan to reduce this population over 12 months. The reforms centered on the following tasks:

1. Develop new criteria to limit the basis for admission to long-term segregation.

2. Using the new criteria, review all inmates in segregation at Parchman to determine who should be immediately transferred to other facilities.

3. Remove all inmates with a SMI and transfer them to the MDOC's mental health facility.

4. For the remaining inmates, create a step-down program that would allow the inmates to be released to the general population within nine months.

By the close of 2008, the Parchman segregation population was below 100. As of 2014, there are fewer than 230 inmates in long-term segregation out of a total prison population of 21,148 (or 1 percent of the total prison population).[70]

The remaining segregation population had been moved by the MDOC to private prisons located in the state that operate on contract with the MDOC. The most recent data indicates that a total of 280 long term segregation inmates are maintained in the system of which 109 are mental health cases. These inmates are

---

[70] Kupers, T.A., et al., 2009.



housed at the East Mississippi Correctional Center, which is a private prison operated by the Management and Training Corporation (MTC).[71]

## Colorado

In 2011 there were approximately 1,500 inmates in administrative segregation in the Colorado Department of Corrections, or 7 percent of the entire prison population. Since then the number of inmates in restrictive housing has steadily declined.[72] This was accomplished by narrowing the criteria for placement in segregation and reducing the length of stay. In particular, a more structured step-down protocol was established that allowed inmates to be released to general population within nine months if their behavior was compliant.[73] This involved a four-level system with specific rules and privileges associated with each of the four 90-day periods.

After the recommendations were implemented, the segregation population began to decline, reaching approximately 600 inmates by the end of 2013. Further programmatic reforms were implemented by the department in 2014, which resulted in the restrictive population dropping to below 200 (1 percent of the total population) by December 2014. There have been no associated increases in rates of institutional violence as the inmate population in restrictive housing has declined.[74]

# Reentry and prerelease programming

The reintegration of inmates who have been in segregation for significant periods back into the prison general population or the community is an increasingly important issue. It requires a strategy that balances less restrictive placement of inmates with institutional or community safety and security. Reintegration requires adequate assessment and intervention and should afford inmates the time and opportunity necessary to readjust to more regular human interaction and activity levels prior to a complete transition.

Inmates transitioning out of a segregation environment are at greater risk of recidivism than their general population counterparts. For example, within the

---

[71] Mississippi Department of Corrections Fact Sheet, December 1, 2014.

[72] Colorado Department of Corrections, http://www.doc.state.co.us/dashboard-measures.

[73] Based on telephone interview with Colorado Department of Corrections officials.

[74] Colorado Department of Corrections, http://www.doc.state.co.us/dashboard-measures.



Colorado Department of Corrections system, the recidivism rate for administrative segregation inmates was between 60 and 66 percent, while the rate for general population was only 50 percent.[75] Furthermore, 12 percent of inmates released from administrative segregation returned to segregation within one year; within two years, 20 percent had returned. One explanation for this trend is the comparative lack of coping skills observed within the recidivist cohort. In addition, as reported earlier, 40 percent of the Colorado inmates released from segregation were being released directly to the community with no period of decompression.

Lessons learned from community re-entry programs (such as Reentry Partnership Initiatives[76]) provide a foundation for developing programs that transition inmates from administrative segregation to lower custody levels or the community. Taxman, Young, and Byrne asserted that a successful reentry program includes an "institutional phase" characterized by a wide range of programming options designed to prepare inmates for life within the community.[77] Program options include education, vocational training, life skills training, and individual and/or group counseling (for example, individual motivational readiness treatment). As applied to administrative segregation, the institutional phase could be viewed as the period during which inmates in administrative segregation have been identified for transition to a lower level of custody and are actively working toward movement out of segregation.

It should be noted that, despite the widespread validity of the re-entry concept, there is little evidence to date that such programs have been effective in reducing recidivism. The national evaluation of 12 adult reentry programs[78] found that while participation in re-entry programs accelerated, there were only modest positive results in post-release employment, housing, and freedom from substance abuse. Furthermore, there were no discernable effects on recidivism rates. The problem with

---

[75] *A Bill for an Act Concerning Appropriate Use of Restricted Confinement.* Sixty-eighth General Assembly of Colorado. Signed into law Jun. 3, 2011.

[76] Lattimore, Pamela K. and Christy A. Visher. 2013. "Prison Reentry Services on Short-Term Outcomes: Evidence From a Multisite Evaluation. Evaluation Review, 37(3-4) 274-313.

[77] F. S. Taxman, D. Young and J. Byrne. *Targeting for Reentry: Matching 8 Needs and Services to Maximize Public Safety.* National Institute for Justice Document 196491. Aug. 20, 2002.

[78] In 2008, Congress passed the Second Chance Act (P.L. 110-199), an effort to improve outcomes for people returning to communities after incarceration. This first-of-its-kind legislation authorizes federal grants to government agencies and nonprofit organizations to provide support strategies and services designed to reduce recidivism by improving outcomes for people returning from prisons, jails, and juvenile facilities. The Second Chance Act's grant programs are funded and administered by the Office of Justice Programs in the U.S. Department of Justice. Source: http://csgjusticecenter.org/nrrc/projects/second-chance-act.



these reentry programs was that the "dosage" (length of programming) was insufficient to produce stronger treatment effects.[79]

The implications of this study for reentry from segregation to the general population are not clear. We noted earlier that prior studies suggest that exposure to supermax conditions does not affect recidivism. There have been no published studies to date on whether exposure to supermax or other forms of segregation reduce inmate re-offending within the prison system itself. Important unanswered questions are (1) whether increasing or reducing the duration of segregation is of any value to institutional safety, and (2) whether an improved reentry regime would help mitigate that risk.

## Summary

The use of various forms of segregation began to increase in the 1970s as prison population growth began to accelerate. As segregation populations have increased, so, too, have concerns about their effects on segregated inmates and overall institutional safety. These concerns have led some states to reconsider their use of segregation and the conditions of confinement. In particular, states are reviewing their criteria for placement in segregation, conditions of confinement, and length of stay. Several states are under consent decrees regarding these issues and other constitutional matters.

The extent to which mental health issues are associated with these high-security units has also been questioned. In particular, are inmates placed in such units who have a diagnosed mental health issue being properly treated and/or should they be placed in a separate mental health treatment unit?

There is little published research to date on the effects of increased use of segregation. Published studies suggest that placement in segregation does not have a positive effect on recidivism rates. States that have reduced segregation populations have found no adverse impact on institutional safety. Still, many questions persist among corrections administrators and other stakeholders.

---

[79] Lattimore, Pamela V and Christy A. Visher. 2013. "Prison Reentry Services on Short-Term Outcomes: Evidence From a Multisite Evaluation. *Evaluation Review*, 37(3–4) 274-313



# Chapter 3:    Analysis of the restrictive housing populations

In this chapter, we present data on the key attributes of the three major restrictive housing populations (ADX, SMU, and SHU) in the Bureau. Where available data permit, we make comparisons between these three populations and the much larger number of inmates who are not in restrictive housing and who are mostly housed in the general population.

At the time that this study began, there were approximately 220,000 inmates incarcerated in the Bureau on any given day. Of that number, only 5 percent were housed in the ADX, SMU, or SHU. What follows is a review of this small percent of the Bureau population, their admission and release trends, and their lengths of confinement.

## Population characteristics

Table 8 compares the demographic attributes of the restrictive housing population and other Bureau inmates as of November 23, 2013. These and other comparisons are based on snapshot data files produced by the Bureau's Office of Research and Evaluation (ORE). There are few major differences between the restrictive housing populations and the general population, with the following exceptions:

1. The ADX and SMU restrictive housing populations are exclusively male.

2. The SMU population is disproportionately younger.

3. The ADX population is disproportionately older.

4. The SMU population is disproportionately black.

5. All segregated populations are disproportionately U.S. citizens.



Table 8.    Demographic attributes of ADX, SMU, SHU, and other Bureau populations, November 23, 2013

|  | ADX | SMU | SHU | Other |
|---|---|---|---|---|
| Total population | 415 | 1,675 | 9,189 | 207,166 |
|  | % | % | % | % |
| Gender |  |  |  |  |
| Males | 100% | 100% | 98% | 93% |
| Females | 0% | 0% | 2% | 7% |
| Current age |  |  |  |  |
| 25 or younger | 1% | 4% | 11% | 8% |
| 26–35 | 18% | 46% | 41% | 33% |
| 36–50 | 46% | 42% | 39% | 41% |
| 51 or older | 35% | 8% | 10% | 19% |
| Race |  |  |  |  |
| White | 59% | 46% | 55% | 60% |
| Black | 38% | 48% | 40% | 37% |
| Indian | 2% | 5% | 4% | 2% |
| Asian | 2% | 1% | 1% | 2% |
| Hispanic ethnicity | 16% | 28% | 30% | 35% |
| Citizenship |  |  |  |  |
| United States | 88% | 87% | 83% | 74% |
| Mexico | 4% | 9% | 12% | 18% |
| Other | 9% | 4% | 5% | 8% |

Source: Bureau/ORE.

## Primary offenses and sentences

Table 9 summarizes the primary offenses for which inmates have been sentenced. Members of the ADX population (and to a lesser degree, the SMU and SHU populations) are far less likely to be sentenced for a drug crime, which is the dominant offense for the nonsegregated Bureau population. Rather, ADX inmates are more likely to have been sentenced for the violent crimes of homicide, aggravated assault, robbery, and possession/use of weapons/explosives.

Regarding the type of sentences Bureau inmates are serving, ADX inmates are far more likely to have a life sentence (39 percent) than inmates of the SMU (9 percent), SHU (3 percent), or other Bureau facilities (2 percent). Predictably, the ADX inmates without a life sentence also have far longer sentences (average of nearly 30 years),



have served longer periods of incarceration (15 years), and have much longer periods of time left to serve (17 years).

It was also possible to estimate the number of inmates who were scheduled to be released within 12 months (as of November 23, 2013). For the nonsegregated Bureau inmates, about 30 percent or 55,430 were to be released in the next 12 months. In contrast, only 2 percent of the ADX population was to be discharged from prison in that time frame. The numbers were progressively higher for the SMU (9 percent) and SHU (21 percent) populations. Overall, over 2,000 inmates in restrictive housing were scheduled to be released within a year.

Table 9.    Primary offenses of ADX, SMU, SHU, and other Bureau populations, November 23, 2013

|  | ADX | SMU | SHU | Other |
|---|---|---|---|---|
| Total population | 415 | 1,675 | 9,189 | 207,166 |
| Primary offense | % | % | % | % |
| Drugs | 12% | 31% | 35% | 47% |
| Weapons/explosives | 12% | 28% | 21% | 14% |
| Homicide/aggravated Assault | 32% | 12% | 5% | 2% |
| Burglary/larceny | 15% | 7% | 5% | 4% |
| Robbery | 16% | 13% | 8% | 3% |
| Immigration | 1% | 5% | 10% | 11% |
| Fraud/bribery/extortion | 3% | 1% | 3% | 6% |
| Sex offense | 1% | 2% | 5% | 6% |
| Miscellaneous | 7% | 2% | 2% | 1% |
| Missing/unsentenced | 0% | 0% | 6% | 6% |

Source: Bureau/ORE.

These data have important implications for reentry programs and other related policies. Clearly, the need for such programs will be significant for the inmates in SHU and as well as the other nonrestricted inmate population; 57,525 of them were scheduled for release over the subsequent 12 months, as shown in table 10. This number should be fairly constant at any time. There is much less of a need for these programs for the ADX and SMU populations. However, given the long periods of placement in restrictive housing for these inmates, as described later in this chapter, the need for reentry programs remains significant for those nearing release in ADX and SMU housing.



Table 10.    Sentence and time served attributes of ADX, SMU, SHU, and other Bureau
populations, November 23, 2013

| Attribute | ADX | | SMU | | SHU | | Other | |
|---|---|---|---|---|---|---|---|---|
| | Inmates | % | Inmates | % | Inmates | % | Inmates | % |
| Lifers | 161 | 39% | 154 | 9% | 286 | 3% | 4,889 | 2% |
| | Average | Median | Average | Median | Average | Median | Average | Median |
| Sentence | 29 years | 25 years | 18 years | 15 years | 11 years | 9 years | 10 years | 8 years |
| Time served | 15 years | 14 years | 9 years | 7 years | 5 years | 4 years | 4 years | 3 years |
| Time left to serve | 17 years | 11 years | 9 years | 5 years | 6 years | 3 years | 4 years | 2 years |
| | Inmates | % | Inmates | % | Inmates | % | Inmates | % |
| Releases within 12 months | 9 | 2% | 155 | 9% | 1,931 | 21% | 55,430 | 29% |

Source: Bureau/ORE.

## Medical and mental health care levels

The official medical and mental health status of the restrictive housing population is quite similar to that of the overall Bureau population. As noted earlier, the mental health care levels established by the Bureau are as follows:[80]

- Level 1—no significant mental health care

- Level 2—routine outpatient mental health care or crisis-oriented mental health care

- Level 3—enhanced outpatient mental health care or residential mental health care

- Level 4—inpatient psychiatric care

The medical care levels as defined by the Bureau are as follows:

- Level 1—healthy or simple chronic

- Level 2—stable or chronic care

- Level 3—unstable, complex chronic care

---

[80] PS5310.16, page 8, 5/1/2014



- Level 4—medical referral center care required

The Bureau states that the mental health care level system is tied to resource needs, not diagnoses. Specifically, an inmate with a mental illness may be classified at mental health care level 1 if his/her treatment needs are minimal, or if he/she does not need care on an ongoing basis or crisis-oriented care of significant intensity. Mental health care levels are designed to identify inmates in need of more intensive mental health resources—for example, individual therapy or residential programming.

The majority (between 68 and 72 percent) of restrictive housing inmates have been classified by the Bureau as healthy or only needing simple chronic medical care, and not requiring any specialized medical treatment (table 11). These proportions are virtually identical to those of other Bureau inmates (also 72 percent). Of those requiring medical care, the level of care is mostly at the lowest threshold; between 26 and 30 percent are at "care level 2—stable, chronic care."

Regarding mental health care level, the proportions of the restrictive population determined to be in need of care or treatment are even lower, with the vast majority assigned to care level 1. The ADX has the highest proportion of inmates at mental health care levels 2 and 3, but they only represent 10 percent of the entire ADX population. These proportions are comparable to the mental health care levels of the populations in nonrestrictive housing.

As noted in the literature review, state prison systems have been reporting much higher proportions of inmates in their segregated population units. The chapter on mental health care does raise some questions on the accuracy of the mental health ratings provided by the Bureau's mental health staff and suggests that a higher proportion of the segregated population may have a significant mental health ailment.



Table 11.    Medical and mental health care levels of ADX, SMU, SHU, and other
Bureau populations, November 23, 2013

| Medical and mental health care levels | ADX | SMU | SHU | Other |
|---|---|---|---|---|
| Total Cases | 415 | 1,675 | 9,189 | 207,166 |
| Medical | % | % | % | % |
| Level 1 | 67% | 72% | 72% | 72% |
| Level 2 | 30% | 28% | 26% | 24% |
| Level 3 | 2% | 0% | 1% | 2% |
| Level 4 | 0% | 0% | 0% | 1% |
| Missing | 0% | 0% | 1% | 1% |
| Mental health | | | | |
| Level 1 | 90% | 94% | 87% | 93% |
| Level 2 | 6% | 5% | 8% | 6% |
| Level 3 | 4% | 0% | 1% | 0% |
| Level 4 | 0% | 0% | 0% | 0% |
| Missing | 0% | 0% | 4% | 1% |

Source: Bureau/ORE.

## Security and special management issues

As expected, the Bureau populations in restrictive housing pose special management issues, which is why they have been placed in ADX, SMU, or SHU. The Bureau's classification system is designed to identify those inmates who pose the highest risk to inmate and staff safety. Table 12 shows that, unlike other Bureau inmates, the inmates in restrictive housing are classified at the highest security levels. Virtually all ADX and SMU inmates are assigned to the "high" category. The SHU population is classified predominantly as high (36 percent) or medium (40 percent) security, while the rest of the Bureau population is largely classified as medium, low, or minimum security.



Table 12.    Security and other management issues of ADX, SMU, SHU, and other
Bureau populations, November 23, 2013

| Security attribute | ADX | SMU | SHU | Other |
|---|---|---|---|---|
| Total cases | 415 | 1,675 | 9,189 | 207,166 |
| Security level | % | % | % | % |
| Unclassified | 0% | 0% | 4% | 4% |
| Minimum | 0% | 0% | 5% | 18% |
| Low | 0% | 0% | 16% | 41% |
| Medium | 1% | 1% | 40% | 29% |
| High | 99% | 99% | 36% | 9% |
| Other issues | | | | |
| Separation required from specific other inmates | 96% | 93% | 67% | 40% |
| Gang member | 57% | 52% | 21% | 8% |
| Average criminal history score | 10 | 11.1 | 9.3 | 6.2 |

Source: Bureau /ORE.

The higher number of medium-security custody inmates is largely due to the high number of protective custody inmates assigned to SHU status and inmates who are being investigated for possible rules violations.

Virtually all ADX and SMU inmates have "separation" restrictions, which means that they cannot normally be placed in the same Bureau facility with one or more specific other inmates. Separation orders are often linked to rival gang affiliations, which are also a common attribute of the ADX, SMU, and SHU populations. Together, the separation and gang membership issues complicate efforts to double-cell inmates within the ADX, SMUs, and SHUs as well as to release them to the general population. The "Other" population has a lower but still noteworthy proportion of inmates with separation orders: 40 percent.[81]

Finally, the restrictive housing populations have significantly higher criminal history scores (CHSs). The CHS is a measure used by the federal courts to help determine whether a person should be incarcerated and how long the sentence should be. The higher the CHS, the more likely the person will be sentenced to prison and/or to a longer prison term. The higher CHS for the segregated populations means they have significantly more extensive prior convictions.

---

[81] "Other" refers to all other Bureau inmates who were not in any form of segregation as of November 23, 2013.



## Time in restrictive housing

The one-day snapshot also makes it possible to measure how long the current population has been in restrictive housing (table 13). ADX inmates have the longest periods of continuous assignment, with an average of approximately four years. The lower median number reflects inmates recently assigned to ADX and the small number of ADX inmates with extremely long periods of continuous confinement.

The SMU population has an average stay in the program of 277 days. The SHU population has a relatively short period of confinement of 76 days. The median numbers are considerably lower for the same reasons as for the ADX population.

The available data did not permit an analysis of length of stay in SHU for the various subgroups in this status (disciplinary segregation, administrative segregation, protective custody). SENTRY (the Bureau's inmate management/database system) and other Bureau data systems do not track this status in terms of length of stay.

Table 13.    Length of time in ADX, SMU, and SHU status, November 23, 2013

|  | ADX | SMU | SHU |
|---|---|---|---|
| Number of inmates | 415 | 1,675 | 9,189 |
| Time in restrictive housing |  |  |  |
| Average | 1,376 days | 277 days | 76 days |
| Median | 941 days | 211 days | 40 days |

Source: BOP/ORE.

## Disciplinary conduct of the SMU and ADX

As suggested by the classification and special management data, inmates in ADX and SMU have accumulated lengthy histories of misconduct. The average number of disciplinary reports (DRs) for the ADX population prior to placement in ADX was 15 with a median of 7. For the SMU population, the numbers were even higher, with an average of 17 and a median of 11 reports prior to placement in SMU.

For both groups, the number of reports since being placed in restrictive housing is substantially lower. However, these comparisons of disciplinary histories before and after restrictive housing do not account for the varying amounts of time different inmates served in the Bureau before and after placement in restrictive housing. Further, the number of DRs prior to the most recent placement in restrictive housing includes DRs received during prior commitments to ADX and SMU.



To further isolate the possible effects of restrictive housing on inmate misconduct, the analysis time frame was limited to the 12 months immediately before and after placement in restrictive housing (Table 15). Although the 12-month average and median numbers are lower than those based on total prior history, a suppression effect does not appear. This means that the conduct of the inmates in restrictive housing continues at the same rate that was occurring prior to placement in restrictive housing. While the inmates have been incapacitated, there appears to be little change on their behavior at least initially during the first 12 months of restrictive housing.

Table 14.   Disciplinary reports for current ADX and SMU populations, as of November 23, 2013—total number of reports

| Number of disciplinary reports | ADX | SMU |
| --- | --- | --- |
| Number of inmates | 415 | 1,675 |
| DRs prior to placement | | |
| Average | 15 | 17 |
| Median | 7 | 11 |
| DRs after placement | | |
| Average | 10 | 7 |
| Median | 3 | 2 |
| Total | | |
| Average | 19.5 | 19.8 |
| Median | 8 | 12 |

Source: BOP/ORE.

Table 15.   Disciplinary reports for ADX and SMU populations, as of November 23, 2013—reports in the 12 months before and after restrictive housing placement

| Disciplinary reports in past 12 months | ADX | SMU |
| --- | --- | --- |
| Number of inmates | 415 | 1,675 |
| 12 months before placement | | |
| Average | 5.1 | 4.3 |
| Median | 2 | 2 |
| 12 months after placement | | |
| Average | 5.6 | 4.6 |
| Median | 1 | 2 |

Source: BOP/ORE.

The types of infractions in the reports accumulated by ADX and SMU inmates both prior to and while in restrictive housing status are quite varied but include a



significant number of very serious rule violations. The Bureau has classified all of the possible violations into four levels of severity: greatest, high, moderate, and low. The 415 ADX inmates had accumulated about 4,500 infractions prior to being placed in ADX, of which 65 percent were in the "greatest" or "high" levels.

For ADX, of the 50 "killing" incidents that include attempts and aiding and abetting, 23 involved injuries that proved to be fatal. Of the four that occurred after placement in ADX, only one involved a fatal injury. For SMU, of the 24 "killing" incidents prior to placement, two involved injuries that proved to be fatal. Neither of the two that occurred after SMU placement resulted in a fatality. All 26 fatalities were inmates.

The 1,675 SMU inmates had accumulated 25,996 infractions of which 62% were also in the "greatest" or "high" severity levels. Since being in ADX and SMU, the accumulated numbers have declined as well as the proportions that are in the "greatest" and "high" severity levels. This decline is expected given that the time frame for the "before" period exceeds the time in SHU and ADX. And as noted earlier, when one controls for time frames (12 months before and after), the number and rate of DRs have not changed.

It should be emphasized that these results are largely descriptive in nature and not intended to test the impact of restricted housing on inmate conduct. That type of analysis was beyond the scope of this project and could not be supported by the data provided by the Bureau.

Table 16.    Types of disciplinary infractions by ADX inmates, as of November 23, 2013

|  | Before ADX placement | | During and after ADX placement | |
| --- | --- | --- | --- | --- |
|  | N | % of total | N | % of total |
| Total | 4,500 | 100% | 2,142 | 100% |
| Greatest severity / 100 level | 812 | 18% | 350 | 16% |
| Killing | 50 | 1 | 4 | <1 |
| Assault with serious injury | 191 | 4 | 13 | <1 |
| Escape | 10 | <1 | 0 | 0 |
| Setting a fire | 53 | 1 | 2 | <1 |
| Possessing dangerous weapon | 307 | 7 | 33 | 2 |
| Rioting | 4 | <1 | 0 | 0 |
| Encouraging riot | 6 | <1 | 0 | 0 |
| Possessing hazardous tool | 20 | <1 | 7 | <1 |
| Refusing drug or alcohol test | 95 | 2 | 278 | 13 |
| Introducing drugs or alcohol | 2 | <1 | 6 | <1 |
| Using drugs or alcohol | 41 | <1 | 3 | <1 |
| Possessing drugs or alcohol | 17 | <1 | 2 | <1 |



| | Before ADX placement | | During and after ADX placement | |
|---|---|---|---|---|
| | N | % of total | N | % of total |
| Other "greatest severity" | 16 | <1 | 2 | <1 |
| **High severity / 200 level** | **2,148** | **47%** | **697** | **33%** |
| Fighting with another person | 116 | 3 | 5 | <1 |
| Threatening bodily harm | 503 | 11 | 201 | 9 |
| Engaging in sex acts | 308 | 7 | 143 | 7 |
| Making sex proposal or threat | 34 | <1 | 17 | <1 |
| Interfering with security devices | 169 | 4 | 31 | 1 |
| Group demonstration | 28 | <1 | 2 | <1 |
| Destroying property over $100 | 156 | 4 | 79 | 4 |
| Possessing intoxicants | 117 | 3 | 24 | 1 |
| Refusing alcohol test | 31 | <1 | 46 | 2 |
| Assault without serious injury | 581 | 13 | 111 | 5. |
| Disruptive conduct---high | 50 | 1. | 13 | <1 |
| Other "high severity" | 55 | 1 | 25 | 1 |
| **Moderate severity / 300 level** | **1,490** | **34%** | **1,083** | **51%** |
| Possessing unauthorized item | 118 | 3 | 43 | 2 |
| Refusing work/program assignment | 111 | 3 | 78 | 4 |
| Refusing to obey order | 619 | 14 | 506 | 24 |
| Being insolent to staff | 165 | 4 | 63 | 3 |
| Failing to stand count | 86 | 2 | 180 | 8 |
| Destroying property $100 or less | 106 | 2 | 50 | 2 |
| Being unsanitary or untidy | 66 | 2 | 30 | 1 |
| Other "moderate severity" | 219 | 5 | 133 | 6 |
| **All "low severity" / 400 level** | **50** | **1%** | **12** | **<1%** |

Source: BOP/ORE.

Table 17.    Types of disciplinary infractions by current SMU inmates, as of November 23, 2013

| | Before SMU placement | | During and after SMU placement | |
|---|---|---|---|---|
| | N | % of total | N | % of total |
| **Total** | **25,966** | **100%** | **5,061** | **100%** |
| **Greatest severity / 100 level** | **4,733** | **18%** | **694** | **14%** |
| Killing | 24 | <1 | 2 | <1 |
| Assault with serious injury | 547 | <1 | 19 | <1 |
| Escape | 15 | <1 | 0 | 0 |
| Setting a fire | 161 | <1 | 23 | <1 |
| Possessing dangerous weapon | 2,405 | 9 | 233 | 5 |
| Rioting/encouraging riot | 24 | <1 | 0 | 0 |



| | Before SMU placement | | During and after SMU placement | |
|---|---|---|---|---|
| | N | % of total | N | % of total |
| Taking hostages | 3 | <1 | 1 | <1 |
| Possessing hazardous tool | 114 | <1 | 10 | <1 |
| Refusing drug or alcohol test | 300 | 1 | 305 | 6 |
| Introducing drugs or alcohol | 82 | <1 | 9 | <1 |
| Using drugs or alcohol | 541 | 2 | 7 | <1 |
| Possessing drugs or alcohol | 397 | 2 | 38 | <1 |
| Destroying/disposing of item during search | 45 | <1 | 30 | <1 |
| Interfering with staff—greatest | 12 | <1 | 1 | <1 |
| Disruptive conduct—greatest | 47 | <1 | 12 | <1 |
| Other "greatest severity" | 16 | <1 | 4 | <1 |
| **High severity / 200 level** | **11,402** | **44%** | **2,396** | **47%** |
| Fighting with another person | 1,289 | 5 | 257 | 5 |
| Threatening bodily harm | 1,471 | 6 | 467 | 9 |
| Engaging in sex acts | 2,254 | 9 | 460 | 9 |
| Making sex proposal/threat | 226 | 1 | 60 | 1 |
| Interfering with security devices | 937 | 4 | 217 | 4 |
| Group demonstration | 100 | <1 | 3 | <1 |
| Destroying property over $100 | 391 | 2 | 51 | 1 |
| Possessing intoxicants | 959 | 4 | 7 | <1 |
| Refusing alcohol test | 159 | <1 | 0 | 0 |
| Assault without serious injury | 2,498 | 10 | 451 | 9 |
| Interfering with staff—high | 100 | <1 | 35 | <1 |
| Disruptive conduct—high | 288 | 1 | 138 | 3 |
| Other "high severity" | 730 | 3 | 250 | 5 |
| **Moderate severity / 300 level** | **9,624** | **37%** | **1,967** | **39%** |
| Possessing unauthorized item | 1,015 | 4 | 245 | 5 |
| Refusing work/program assignment | 905 | 4 | 200 | 4 |
| Refusing to obey order | 3,144 | 12 | 613 | 12 |
| Being insolent to staff | 874 | 3 | 119 | 2 |
| Failing to stand count | 872 | 3 | 239 | 5 |
| Destroying property $100 or less | 422 | 2 | 205 | 4 |
| Being unsanitary/untidy | 153 | <1 | 31 | <1 |
| Other "moderate severity" | 2,239 | 9 | 560 | 11 |
| **All "low severity" / 400 level** | **207** | **<1%** | **4** | **<1%** |

Source: BOP/ORE.



# Recidivism rates of ADX and SMU inmates

To examine the question of how many inmates released from ADX or SMU subsequently return to restrictive housing, a cohort of inmates released in 2011 was created and recorded to determine whether they have returned to restrictive housing. Although the number of ADX and SMU releases are relatively small, the overall return to restrictive housing status are also low. Of the 66 ADX inmates released to the general population, only 9 percent returned to ADX. Of the 585 SMU inmates released, 19 percent have returned to SMU status (see table 18).

A much higher proportion of the releases do incur at least one additional disciplinary report during the follow-up period. Of the inmates released from SMU, 84 percent recorded another disciplinary report, with an average of 3.7 reports.

For the inmates released from ADX, the percentages are similar, 83 percent with a new disciplinary report, but for a much lower average of 1.6 reports.

It is beyond the scope of this report to explain the higher prison recidivism rates for the SMU releases. Clearly, there are substantial differences between the attributes of the two cohorts that are related to institutional misconduct. For, example the inmates released from SMU are younger than those released from ADX. Older inmates are less likely to become involved in misconduct, so the maturation effect may be greater for the ADX inmates. The small number of ADX inmates released does not permit a multivariate analysis that could adequately control for age and other factors possibly related to recidivism.

The larger number of inmates released from SMU makes it possible to examine the bivariate relationship between time in SMU and recidivism (table 19). Most of the releases are clustered in the 19–24 month range. The prison recidivism rates do not vary significantly by shorter or longer periods of SMU confinement. Those inmates who spent more than two years in SMU had a significantly higher rate of return to SMU but an equivalent rate of new disciplinary reports. Younger SMU inmates also tended to have shorter periods of SMU placement.

These data suggest that the amount of time in the SMU is not a strong predictor. In fact, longer periods of time in SMU are associated with higher in-prison recidivism rates. While the numbers are not large, they do raise the question of whether the current time frame of 18 months or longer for completing the four-phase SMU program is excessive. As noted in the literature review, some state systems have shorter step-down programs, and these data support a move to moderate the current length of the SMU program.



Table 18.    In-prison recidivism rates for inmates released from ADX and SMU

| Attribute | ADX | SMU |
|---|---|---|
| Releases | 66 | 585 |
| Average age at release | 44 years | 36 years |
| Average time in segregation | 6.8 years | 1.7 years |
| Median | 5.4 years | 1.6 years |
| Total (%) released directly to streets | 5 (8%) | 77 (13%) |
| % returned to segregation (ADX or SMU) | 9% | 19% |
| Average time to segregation return | 246 days | 469 days |
| % with DR | 83% | 84% |
| Average number DRs after release | 1.6 | 3.7 |

Table 19.    Prison recidivism rates for inmates released from SMU by time in SMU

| Length of Stay | Releases | % return | % new DR |
|---|---|---|---|
| 18 months or less | 146 | 16% | 69% |
| 19–24 months | 346 | 17% | 77% |
| 25 months or more | 93 | 29% | 75% |

Source: BOP/ORE.

## Trends in assault rates and lockdowns

To what extent have overall rates of inmate assaults and the use of lockdowns changed as the Bureau's segregation populations have increased? One of the key purposes of restrictive housing is to provide greater safety for inmates and staff as the more disruptive and violent inmates are incapacitated by removing them from the general population for extended periods of time.

Figure 3 compares the rise in the SMU population with the annual inmate assault rate. The assault rate, which is low at less than three assaults per 100 inmates, has remained stable since 2004. There has been a slight decline since the rapid increase in the SMU population.

However, while the overall assault rate has remained constant, there may have been a reduction in the high-security populations. Since most of the inmates placed in restrictive housing were classified at higher security levels and housed at the USPs, the reduction in assault rates may be limited to those facilities.

Table 20 shows that there has been a decrease in the assault rate at the Bureau's high-security prisons, suggesting that the rapid increase of the SMU population did have an incapacitation effect. Further, there has been a significant reduction in

(1) the number of lockdowns at the various Bureau prisons and (2) the total number of lockdown days (table 20). Again, no claim of causation can be made, as other external factors may be related to these trends.

Figure 3.    ADX and SMU populations and inmate assault rate, 2004-2013



Table 20.    Changes in ADX and SMU populations, assaults, and lockdowns, 2008–2013

| Year | SMU | ADX | Assaults per 100 inmates | Assault rates in high-security prisons | Lockdowns | Total lockdown days | Days per lockdown |
|---|---|---|---|---|---|---|---|
| 2008 | 100 | 471 | 2.5 | 10.5 | 148 | 1,210 | 8.2 |
| 2009 | 936 | 447 | 2.7 | 10.9 | 111 | 917 | 8.3 |
| 2010 | 1,398 | 433 | 2.6 | 10.4 | 129 | 877 | 6.8 |
| 2011 | 1,545 | 450 | 2.3 | 9.1 | 93 | 773 | 8.3 |
| 2012 | 2,042 | 434 | 2.4 | 8.7 | 86 | 526 | 6.1 |
| 2013 | 1,675 | 415 | 2.2 | 8.6 | 71 | 706 | 9.9 |

Source: BOP/ORE.

65



## Summary of major findings

Inmates placed in ADX, SMU, and SHU status represent a small proportion of the Bureau's prison population. They also differ from other BOP inmates on a number of key attributes. In particular, they are disproportionately male and older, and more of them are U.S. citizens. They tend to have been sentenced for a more serious/violent offense and assigned to higher custody levels, to be associated with a gang (either street- or prison-organized), and to have separation restrictions.

All three populations have substantial time left to serve on their sentences. However, there are over 2,000 inmates in restrictive housing who will be released within a year, which suggests the need for reentry services. Differences in sentence lengths, time served, and time left to serve are especially pronounced among the ADX and SMU inmates.

The majority of inmates in restrictive housing do not require any specialized medical treatment and are virtually identical to other Bureau inmates. Somewhat surprisingly, relative to mental health care level, the proportions of inmates that are reported in need of care or treatment are even lower and comparable to the mental health care levels of the nonrestrictive populations.

The SMU and ADX inmates have lengthy disciplinary records, which include repeated histories of institutional violence and other types of serious misconduct. It does not appear that initial placement in the SMU and ADX units has any impact on the rate of misconduct that was occurring prior to placement in restrictive housing.

The vast majority of ADX and SMU inmates released in 2011 were not returned to restrictive housing status, although most incurred another DR within two years. There was no strong or consistent relationship between time in SMU and in-prison recidivism rates, although inmates with the longest placement in SMU had a higher rate of return to restrictive housing. This may be due to the inmates' failure to comply with the SMU program for a substantial period of time and thus their higher risk of recidivism than that of inmates who complied and completed the program in a shorter period of time.

The Bureau's assault rate remained unchanged as the size of the SMU population dramatically increased. However, there has been an associated decline in the rate of assaults in the high-security prisons, the number of lockdowns, and the number of lockdown days.



# Chapter 4:    Due process

The project team conducted a comprehensive review of the application of inmate due process rights in the assignment and management of inmates in special housing at each site visited, including an evaluation of procedures to protect due process rights during referral, designation, and throughout the duration of placement within SHU, SMU, and/or ADX. This assessment reviews the application of the Bureau's disciplinary process and assesses its administrative remedy procedures.

The following documents were reviewed as part of the assessment:

- Applicable decisions of the United States Supreme Court and circuit and district courts

- P.S. 5212.07: Control Unit Programs

- P.S. 5217.01: Special Management Units

- P.S. 5270.09: Inmate Discipline Program

- P.S. 1315.07: Legal Activities, Inmate

- P.S. 1330.17: Administrative Remedy Program

- P.S. 5270.10: Special Housing Units

- Special Management Unit Handbook

As outlined earlier in this report, data collection and analysis focused on representative samples of inmates at selected facilities. The Bureau placed no restrictions on the team's access to inmate files. By closely examining the selected inmates through case file review, observations, and interviews, the project team developed a better understanding of the due process systems associated with placement into restrictive housing within the Bureau. The file reviews of the sampled inmates included a review of the basis of placement in restrictive housing, the review process involved in placement, inmates' progress through the programs, and the process used to determine either release or transfer to another facility.



A number of recent disciplinary cases were also reviewed at each facility to more fully understand the basis of disciplinary sanctions imposed and the compliance with due process standards in administering discipline. The number of disciplinary cases varied at each facility, but a review typically covered 30–50 of the most recently completed disciplinary cases. The project team reviewed each case along with all supporting documents, including the incident report and associated hearing documents.

The case file review was supplemented by interviews with inmates, disciplinary hearing officers (DHOs), and the administrative remedy coordinator at each facility. Staff at the Central Office who directly managed due process functions were also interviewed, as were staff at the Designations and Sentence Computation Center (DSCC).[82]

# Federal due process standards

The United States Supreme Court has held that prison inmates are entitled to certain procedural protections before they can be deprived of protected liberty interests. This is known as the right to due process. The Supreme Court holds that, when a protected liberty interest exists, for example in the case of good-time credits, certain minimum requirements are due to the inmate before this interest can be infringed upon.

The inmate's interest must, however, be considered in view of the fact that he is incarcerated and the environment is secure in nature. In *Superintendent v. Hill*, 472 U.S. 445, 454-55 (1985), the Court recognized that the safeguards of due process are to be considered in light of the "legitimate institutional needs of assuring the safety of inmates and staff, avoiding burdensome administrative requirements that might be susceptible to manipulation, and preserving the disciplinary process as a means of rehabilitation."

When a prison disciplinary action infringes on an interest protected by the due process clause (a protected liberty interest), the inmate must receive (1) advance written notice of the disciplinary charge, (2) an opportunity to call witnesses and present documentary evidence in his or her defense, and (3) a written statement by the fact finder of the evidence relied upon and the reasons for the action taken (*Wolff*

---

[82] The Designations and Sentence Computation Center (DSCC) is located in Grand Prairie, Texas and is responsible for the review of recommendations for designation to a specific facility, re-designation or transfer to a different facility, and also review the placement recommendations to SMU and the ADX General Population.



*v. McDonnell*, 418 U.S. 539 1974). If there is "some evidence" to support the decision, then due process is satisfied (*Superintendent v. Hill*). "Some evidence" means "any evidence on the record that could support the conclusion reached" (*Id.*)

In regard to timing, there must be at least 24 hours between the time the inmate receives the written charges and the hearing. This has been determined to be sufficient time to allow the inmate to prepare a defense.

The inmate has the right to call witnesses and present documents supporting his defense, as long as doing so is not hazardous to institutional safety. Prison regulations control when the hearing is held; if the hearing is not held within the time specified by the regulation, this failure is not in and of itself a violation of due process. In the court's view, the relevant inquiry will not concern whether the prison complied with its own regulations, but rather whether the inmate ultimately received all he or she was entitled to under the *Wolff* standard outlined above.

If an inmate needs legal assistance, the prison should provide access to a "reasonably adequate law library" for conducting legal research. The Supreme Court has declined to find that inmates have a right to counsel for disciplinary matters (*Wolff*, 18 U.S. at 570). The Court did indicate, however, that if an inmate is illiterate or suffers from a mental condition, legal assistance may be appropriate. However, that assistance need not be provided by an attorney.

In sum, as long as the prison ensures that the requirements of *Wolff* are met, due process is viewed as being satisfied.

Finally, even though an inmate may be able to file a grievance regarding a condition of confinement at any time for any reason, the mere fact that such a grievance process exists does not create a protected liberty interest. Most such "blanket" grievance processes are designed to comply with the *Wolff* standards and can serve as an additional fail-safe measure to protect against inadvertent violations of due process rights. However, if an inmate challenged the underlying decision in court, the court would first determine whether or not the particular issue the inmate raised implicated a protected liberty interest. If not, then the blanket grievance process would be unnecessary.

Decisions to place inmates in some type of special housing unit, such as segregation or restrictive housing, that may result in a deprivation of the inmate's liberty interest are protected by the Due Process Clause. Whether such placement amounts to a violation of a protected liberty interest requires an answer to the following question:



Does the segregation assignment impose an "atypical and significant" hardship on the inmate "in relation to the ordinary incidents of prison life?"[83]

It is important to remember that the act of confining an inmate to special housing is not, in and of itself, a violation of due process and therefore, the *Wolff* standard does not apply just because a transfer occurs. The transfer has to amount to an "atypical and significant hardship" in order to trigger due process protections. While an inmate may feel burdened by being placed in administrative segregation, if it is for a short time, this is not generally considered an "atypical and significant hardship."

On the other hand, courts have also held that even a minor hardship can amount to a deprivation of liberty if it is imposed for an extended period of time. As federal courts have applied this rule, it has become apparent that very few instances of administrative segregation, except those that clearly affect the total duration of the inmate's incarceration, will result in infringement of due process. A recent relevant ruling[84] held that if segregation leads ultimately to a longer prison sentence compared to those served by inmates in the general population, then the segregation may be "atypical and significant" and due process should be afforded.

# Inmate discipline

Inmate discipline within the Bureau is governed by *Program Statement 5270.09, Inmate Discipline Program*, as amended July 8, 2011. The provisions of the policy apply to all people in the custody of the Bureau including in Bureau contract facilities.

A May 2013, the Government Accountability Office report *Improvements Needed in Bureau of Prisons' Monitoring and Evaluation of Impact of Segregated Housing* included a simplified summary of the process outlined in *Program Statement 5270.09*, from staff observation of a potential prohibited behavior through the referral process for review of the allegation to conclusion of the hearing process. This summary is included in figure 4.

---

[83] *Sandin v. Conner*, 515 U.S. 472, 483 (1995).

[84] *Sandin v. Conner*, 515 U.S. 472, 483 (1995).



Figure 4.    Inmate disciplinary process



The key elements of the inmate discipline program as required by PS 5270.09 are summarized in the pages that follow.

The disciplinary process is initiated when a staff member believes the inmate has committed, or observes the inmate committing, a prohibited act. The resulting incident report must contain all known facts (except when there is information that must remain confidential). All people present during the incident are to be listed, as is any physical evidence. The staff member will issue the inmate the incident report within 24 hours of becoming aware of the incident. The incident report is then forwarded to the supervising lieutenant.

The 24-hour notice period begins at the point at which staff becomes aware of the incident or of probable cause to believe that the inmate was involved in an incident. For example, it would begin on the date that a probable-cause drug test came back positive, not necessarily on the date that the staff observed inmate behavior that gave rise to the test.

The lieutenant usually serves as the investigating officer and is responsible for completing the investigation and providing the inmate with formal notice of the charges as contained on the second page of the incident report. The investigating officer may informally resolve the incident report (except for those in the "greatest" and "high" severity levels). If not resolved informally or referred for external



investigation due to the nature of the incident, the incident report is forwarded to the unit disciplinary committee (UDC).

The UDC reviews both the incident report and the investigation results, and can render one of the following decisions:

- Determine the inmate committed the prohibited act or identify similar prohibited acts.

- Determine that the inmate did not commit the specified acts.

- Refer the incident report to the DHO for further review based on the nature of the charges (prohibited acts of "greatest" or "high" severity level are automatically referred to the DHO).

The following are examples of prohibited acts within each severity level:

- Greatest—killing, escaping from escort, manufacturing a weapon, rioting, assaulting any person, including sexual assault, taking a hostage, introducing or making any narcotics, drugs, alcohol, or related paraphernalia

- High—escaping from a work detail or other non-secure confinement, fighting, threatening with bodily harm, bribery, extortion, making sexual proposals or threats, engaging in sex acts, stealing, destroying government property

- Moderate—indecent exposure, misusing authorized medication, refusing to work or to accept a program assignment, violating conditions of a community program, insolence, gambling, possessing money, smoking where prohibited, communicating a gang affiliation

- Low—malingering, using obscene or abusive language, unauthorized physical contact, interfering with a staff member, conduct which disrupts or interferes with the security or orderly running of the institution or Bureau

The UDC is ordinarily composed of two or more unit staff members. It is required to review the incident report and hold a hearing within five working days. It can dispose of most charges with findings and sanctions, but must refer 100- and 200-level offenses to the DHO. To render findings and order sanctions for low-level offenses (300 and 400 levels), two members of the UDC must participate in the hearing. If the UDC renders findings and sanctions (on low-level offenses), the inmate has no due process rights, as the low-level sanctions available for such offenses do not implicate any liberty interest. Even so, inmates may appeal the decision of the UDC and, using the appropriate section on the incident report, the UDC provides the inmate with notice of appellate rights.



For minor (300- and 400-level) infractions, the program statement also provides an informal resolution process. In this process, after the inmate receives a copy of the incident report, and the unit team and inmate may agree to an informal resolution. Informal resolution of an incident report requires the consent of both the staff and the inmate but occurs at the sole discretion of staff. The incident report is placed in "pending informal resolution" status. If the inmate completes tasks that may be required of him or her, the status is changed to "informally resolved." If informal resolution fails for any reason, the disciplinary process starts again and the incident report is forwarded to the UDC.

Incidents that involve possible criminal behavior—those involving narcotics, weapons, assaults, or cell phones—must first be referred to the Federal Bureau of Investigation or other outside authorities for further investigation and possible prosecution prior to initiating the disciplinary process. Similarly, cases that require laboratory testing are deferred until the lab results are obtained. Accordingly, the incident report may not be fully completed or provided to the inmate until a later date. Incident reports may also be updated, supplemented, or rewritten and resubmitted after additional facts become known.

For a referral to the DHO, only one member of the UDC is required. The UDC is required to provide the inmate with its disposition/notice of charges at least 24 hours prior to the DHO hearing.

The policy lists the prohibited acts that may result in discipline.[85] The acts are divided into four categories based on severity: greatest, high, moderate, and low. The policy also includes a table that outlines the prohibited acts and indicates the available sanctions for each act. Sanctions are imposed either by the DHO or the UDC depending on the severity level.

Inmates have the right to select a staff representative to assist in preparation for the hearing and to serve as a representative during the hearing. This option was utilized frequently in the cases we reviewed, and in many instances continuances were granted to ensure the availability of the requested staff representative.

If evidence indicates that an inmate does not fully understand the nature of the process or the allegations or cannot assist in his or her own defense, the disciplinary hearing may be postponed until the inmate is competent to participate. The UDC or

---

[85] Table 1. Prohibited Acts and Available Sanctions, PS 5270.09



DHO will make this decision based on available evidence, including evidence presented by the mental health staff. [86]

Bureau policy allows for the possibility that an inmate who has been determined to be mentally ill may not be held responsible for his/her conduct. In that case, the inmate is cleared but the incident report is retained in the inmate's file for informational purposes only.

If the charges in the incident report are sustained, the hearing officer may impose sanctions that vary depending on the severity level and related circumstances of the incident as outlined below.

- Greatest severity level: forfeit or withholding of earned statutory good time and nonvested good conduct time up to 100 percent; disciplinary segregation up to 12 months; monetary restitution or a monetary fine; impoundment of property; removal from a program, group activity, or job; loss of privileges including visits, telephone, commissary, movies, and recreation

- High severity level: forfeit or withholding of earned statutory good time and nonvested good conduct time up to 50 percent or up to 60 days, whichever is less; disciplinary segregation up to six months; monetary restitution or a monetary fine; impoundment of property; removal from a program, group activity, or job; extra duty; loss of privileges including visits, telephone, commissary, movies, and recreation

- Moderate severity level: forfeit or withholding of earned statutory good time and nonvested good conduct time up to 25 percent or up to 30 days, whichever is less; disciplinary segregation up to three months; monetary restitution; monetary fine; impoundment of property; removal from program, group activity, or job; extra duty; loss of privileges including visits, telephone, commissary, movies, and recreation

- Low severity level: forfeit of up to 12.5 percent of good conduct time credit available for year (on second occurrence of same offense in six months), or forfeit of up to 25 percent of good conduct time credit for year (on third occurrence of same offense in six months); monetary restitution or a monetary fine; impoundment of property; removal from a program, group activity, or job; extra duty; loss of privileges including visits, telephone, commissary, movies, and recreation

---

[86] PS5270.09, Chapter 3, 541.6(b)

74



The maximum sanctions for disciplinary segregation for these levels are higher than the authorized levels applied in many state systems. Georgia limits disciplinary segregation to 30 days. In certain circumstances in Ohio, the 15-day segregation can be increased to 30 days.[87] Other systems limit segregation to 180 days; systems including those in Illinois, New York, and Kentucky limit segregation for a single offense to 12 months. However, most states allow consecutive segregation sentences, which can lead to very long periods of disciplinary confinement.

## Disciplinary process observations

In the course of this review, UDC and DHO hearings were reviewed and observed at each of the locations reviewed. DHO docket summaries were reviewed at each institution that was reviewed. The docket summaries included information on the violation code, location, and result of the hearing including the sanction imposed. The review also included interviewing staff involved in the UDC hearing process and the DHO assigned to each facility.[88] In addition, hearing documents for the most recent 40-50 DHO cases were reviewed. This included all related materials that were used in the hearing process, including the original incident report, results of the investigation of the incident, documentation of the UDC review and referral to the DHO, all materials associated with the DHO hearing, and the imposed sanctions. In total over 450 case files were reviewed in the course of the site visits.

The DHO staff members assigned to the facilities do not directly report to the local institution's warden or a designated staff. DHO staff members have autonomy to impose sanctions and do not consult with the operations staff when determining those sanctions. The DHO staff report up through the organizational structure to the Bureau's Correctional Programs Division. Regional DHO staff and central office staff provide direction, guidance, oversight, and training to the field-based DHO staff, but there is no direct reporting relationship to the administration of the institution where they are assigned. This is done in order to ensure the independence of the hearing process.

At all facilities visited (with the exception of USP Terre Haute, where the assigned DHO was located in the Kansas City Regional Office and hearings were conducted by

---

[87] Inmate Disciplinary Process, 56-DSC-01, effective December 10, 2009, Ohio Department of Rehabilitation and Correction.

[88] All DHO staff were interviewed at the facility assigned with the exception of USP Terre Haute where the DHO was based in the regional office. In this case the interview was completed telephonically.



video), the disciplinary hearings were held out of cell in a private location in the presence of the DHO, consistent with policy and best practices.

**FINDING: The DHOs and others involved in the disciplinary process were well versed in their duties. All appropriate notices and procedures were followed, and inmates responded respectfully to the process and the decision.**

Generally, the DHO at each facility had arranged for a staff representative to attend or postponed the hearing until the staff representative could be present. In two cases, although the paperwork clearly indicated that the inmates had been given appropriate notice and service of charges, when the inmates questioned appropriate notice and/or service, the DHO re-served the inmates and delayed the hearings.

**FINDING: Bureau disciplinary processes and procedures provide substantial and redundant assurances for due process compliance.**

At some facilities, the file review of DHO cases found that a significant percent of charges filed through incident reports were expunged as a result of the DHO hearing process (table 21). This is the equivalent of a dismissal or acquittal for the inmate.

Table 21.  Hearing dismissal rates

| Facility | Dismissal rate |
|---|---|
| USP Lewisburg | 12% |
| USP Allenwood | 12% |
| USP Florence | 22% |
| USP Hazelton | 6% |
| USP Victorville | 7% |
| FCI Butner II | 15% |

Source: BOP.

These dismissal rates are higher than rates observed by project team members at comparable facilities at the state level, which is an indicator that the process is valid and ensures due process in the review of charges and allegations. It is also significant given that the process has multiple review points where the charges can be dismissed prior to referral to the DHO.

Sanctions issued by the DHO were found to be consistently lower than the allowed level for each of the severity levels. For example, offenses in the "greatest" severity level carry a maximum time in disciplinary segregation of 12 months. Of all the case files reviewed, not one included a sanction of 12 months segregation. For 100-level offenses such as possession of a weapon the typical sanction included 30-45 days disciplinary segregation and in many cases was 15-20 days segregation. At USP Victorville, the typical sanction for an assault or a weapons offense was 30-60 days disciplinary segregation. At USP Tucson, a typical sanction for possession of a



weapon was 45 days, while an assault resulted in 60-90 days segregation. At USP Coleman, a weapons offense resulted in 30 days of disciplinary segregation.

Bureau DHOs use the restriction of privileges such as visiting, commissary, and telephone extensively as a sanction for offenses within all severity levels. Almost every sanction issued by the DHO at each of the facilities reviewed included a restriction of one or all of the above privileges. At USP Coleman, weapons offenses typically resulted in a sanction of 41 days loss of good conduct time; 15 days placement in disciplinary segregation; or 180 days restriction on visits, commissary, and telephones. Similar sanctions, with some variance in the amount of segregation time, were found in virtually all the institutions reviewed. In the cases reviewed, it was normal for the DHO to impose 180 days loss of commissary, telephone, and visits. The extensive use of restriction of privileges resulted in the accumulation of loss of privileges over an extended period. It was not unusual to find inmates who had lost visit privileges for more than one or two years. During one interview, an inmate reported that he had lost visit and phone access for seven years. This was confirmed through review of disciplinary records provided by the DHO. File reviews confirmed that similarly lengthy restrictions of privileges were common in the system. The use of these sanctions is an outgrowth of the attempt to find alternative sanctions to placement in disciplinary segregation.

Sanctions issued by the DHO are effective the date of the hearing and are not made retroactive to the date of the incident report or the date of referral by the UDC to the DHO. There is no time limit in policy that governs how quickly the DHO must hold a hearing after the investigation/UDC process is complete. Scheduling of hearings is at the discretion of the DHO.

The lack of time limits for completion of disciplinary hearings results in substantial variation among facilities in the amount of time served in restrictive housing for similar offenses, and can result in disproportionately long sanctions.

During our review we found institutions that had established informal internal requirements that the hearing be completed within 14 days of receipt by the DHO. Another facility had established a guideline of 20 days. In the course of this review, instances of hearings held more than 30 days after the incident date were not unusual. Longer delays occurred when cases were continued awaiting the results of drug tests or other information or referred for further investigation. For example, a sanction of 30 days in restrictive housing can extend to 90 days or longer since time served is not credited and the time frame of the sanction is not made retroactive to the date of original confinement in restrictive housing.

By comparison, most state systems have specific time requirements for conducting a hearing or issuing a continuance based on need for additional information (such as investigation results or availability of witnesses). Ohio policy requires that inmates



charged with a rule violation must be scheduled for a hearing as soon as practicable but no later than seven days, excluding weekends and holidays, after the alleged violation is reported—unless the hearing is prevented by exceptional circumstances, unavoidable delays, or reasonable postponements, which must be documented.[89]

**FINDING: Sanctions issued by the DHO are effective the date of the hearing and are not made retroactive to the date of the incident report or the date of referral by the UDC to the DHO.**

The result was that in many cases a sanction of 30 days segregation in actuality became a restrictive housing sanction of 90 day or longer since the time served in segregation was not credited to the sanction or made retroactive to the date of original confinement in a restrictive housing setting.

**RECOMMENDATION 4.1: Establish reasonable time frames in which the hearing must be scheduled while permitting reasonable continuances while awaiting investigation reports, drug test results, and other essential information.**

**RECOMMENDATION 4.2: Establish by policy that a sanction of segregation time should be issued retroactive to the date of original admission to restrictive housing, providing credit for time served.**

File reviews indicated that sanctions for similar offenses vary from institution to institution. The policy only specifies the maximum sanction for each severity level, thus providing the DHO only general guidance for determining appropriate sanctions. We were also informed that the Bureau has no systemic way to measure disparities in sanctions across this large system. Over the years, initial DHO training has reportedly been cut from two weeks to one week to the current three days.

In our visits to the selected facilities, we noted wide disparities in the type and severity of sanctions imposed for similar offenses. As noted, weapons offenses sanctions varied from 15 days of restrictive housing plus loss of privileges to 60 or 90 days of restrictive housing plus loss of privileges. The independence of the DHO staff in determining sanctions also results in some disparity in sanctions. The chief disciplinary officer of the Bureau[90] stated that the central office does not monitor sanctions for consistency. They do, however, have the ability to identify inconsistencies from hearing officer to hearing officer and can address those when necessary and appropriate.

---

[89] Inmate Disciplinary Process, 56-DSC-01, effective December 10, 2009, Ohio Department of Rehabilitation and Correction.

[90] Interview conducted on 11/14/2013.



**RECOMMENDATION 4.3: Establish a system for monitoring patterns and trends in the use of disciplinary sanctions among Bureau facilities.**

It was also noted through our review of individual cases that different DHOs have different philosophies about the use of specific types of sanctions. DHOs at some locations used monetary fines with great success in lieu of restriction of privileges or extended time in restrictive housing. However, this sanction was not universally used, and at some facilities appears not to have been used at all, based on the cases reviewed and the interviews with the DHO assigned to the unit.

PS 5270.09 authorizes the DHO to suspend any sanction for a period not to exceed six months. In the event a sanction is suspended by the DHO or the UDC, the effect of the sanction is waived unless the inmate receives a new incident report for a prohibited act during the period of the suspension. In the event of a new incident the DHO or UDC will act on the new incident report and retroactively determine and impose the sanction for the suspended case. Review of case files and interviews with the DHO indicated that this option is used extensively by some DHOs as a means of providing motivation to avoid committing future prohibited acts.

Overall, our findings show that DHO staff are adequately trained on the disciplinary processes and procedures, and that compliance with these requirements is consistent from facility to facility. The organizational independence of the DHO from the local administration is rare outside of the Bureau as only a small number of state systems use this option. This independence was apparent during interviews with staff both in headquarters and at the local institutional level. This, combined with the relatively high percent of dismissals and expunged cases as compared to what is observed in state systems, are indicators of the independent decision making of the DHO process. However, the review did note issues with consistency in the level of sanctions for similar offenses between facilities, hearing delays that resulted in prolonged stays in segregation, and loss of access to basic privileges (visits, telephone, and commissary) for extended periods of time.

# Special housing units

SHUs are housing units in Bureau institutions where inmates are securely separated from the general inmate population and may be housed either alone or with other inmates. SHUs help ensure the safety, security, and orderly operation of correctional



facilities, and protect the public, by providing alternative housing assignments for inmates removed from the general population.[91]

According to Bureau policy, placement in an SHU is a result of assignment to either administrative detention or disciplinary segregation status. Administrative detention is an administrative and nonpunitive status and can occur for a variety of reasons. Disciplinary segregation is a punitive status that can be imposed only by a DHO.

An inmate may, under Bureau policy, be placed in administrative detention for the following reasons:

- Pending classification or reclassification—for example, in the case of a new inmate or one whose classification is under review

- Holdover status during transfer to a designated institution or other destination

- Pending transfer to another institution or location

- Removal from general population, where it has been determined that placement poses a threat to life, property, self, staff, other inmates, the public, or the security or orderly running of the institution

- Being under investigation or awaiting a hearing on charges of violating a Bureau regulation or criminal law

- For protection, whether requested by the inmate or determined by staff to be necessary

- After completion of disciplinary detention when return to the general population would threaten the safety, security, and orderly operation of the facility, or public safety

## Placement

Each inmate who is placed in the SHU is notified of the basis of the placement when the lieutenant or other correctional supervisor prepares and issues an administrative detention order. A separate administrative detention order is required when an inmate's status in administrative detention changes.

---

[91] PS 5270.10, Special Housing Units, Effective date of August 1, 2011.



- Administrative detention status: When placed in administrative detention status, the inmate receives a copy of the administrative detention order within 24 hours detailing the basis for the placement. When an inmate is placed in administrative detention status pending classification or while in holdover status, an administrative detention order is not issued.

- Disciplinary segregation status: When an inmate is placed in disciplinary segregation status as a sanction for violating Bureau regulations, notice is provided to the inmate by the DHO at the end of the discipline hearing.

Placement in the SHU is reviewed by the segregation review official (SRO) based on the following requirements as outlined in PS 5270.10.

- Three-day reviews: Within three work days of placement in administrative detention status, not counting the day of admission, weekends, and holidays, the SRO will review the supporting records. Inmates in disciplinary segregation status do not receive this review.

- Seven-day reviews: Within seven continuous calendar days of placement in either administrative detention or disciplinary segregation, the SRO will formally review the placement status at a hearing that the inmate may attend. The inmate must sign a waiver if he or she does not want to participate in this face-to-face review. Subsequent reviews of the case records will be performed by the SRO every seven continuous calendar days thereafter.

- Thirty-day reviews: After every 30 calendar days of continuous placement in either administrative detention or disciplinary segregation, the SRO will formally review the placement status at a hearing that the inmate may attend. Again, inmates must sign a waiver if they do not want to participate in these face-to-face reviews.

## Placement of protection cases in administrative detention

Inmates may be placed in administrative detention as a protection case in the following circumstances:

- The inmate was the victim of an inmate assault, or was being threatened by other inmates.

- The inmate's safety is threatened because of providing, or being perceived as having provided, information to staff or law enforcement authorities regarding other inmates or people in the community.



- The inmate refuses to enter the general population because of alleged pressures or threats from unidentified inmates, or for no expressed reason.

- Based on available evidence, staff believe the inmate's safety may be seriously jeopardized by placement in the general population.

When an inmate is placed in administrative detention for protection, the warden or designee (ordinarily the captain) must review the placement within two business days to determine if continued protective custody is necessary. This review consists of:

- Staff investigation: Whenever an inmate is placed in the SHU as a protection case, whether requested by the inmate or staff, an investigation will occur to verify the reasons for the placement.

- Hearing: The inmate will receive a hearing conducted by the SRO according to the procedural requirements within seven calendar days of the placement.

- Periodic review: If the inmate remains in administrative detention status following the hearing, he/she will be periodically reviewed as an ordinary administrative detention case.

This review includes documents that led to the inmate being placed in protective custody status and any other documents pertinent to the inmate's protection. In addition, P5324.08 *Suicide Prevention Program* mandates that protective custody inmates be screened for suicidal ideation within 72 hours of being placed in SHU.

## Protective custody

Despite the very different purposes of the SHU, all inmates including those in protection status are exposed to the same security and operational restrictions as well as the same access to programs and privileges.

As shown in table 5, 15 percent of those housed in SHUs system-wide as of June 2014 were there based on protection needs. The percent varies from institution to institution, with the percentage in the USP SHUs being significantly higher. An additional portion of inmates in SHUs are unverified protection cases who refuse assignment outside of the unit. Some of the protection claims are the result of the inmate's own behavior, while others are not validated. However, a significant portion of these offenders have legitimate protection needs.

**FINDING: A disproportionate number of inmates are being housed in the SHUs based on protection claims.**



Often the reason for an inmate's request for protection is gang related. The number of inmates that have separatee issues (cannot be housed with specific other inmates) is significant and affects inmate management. The warden at USP Lewisburg advised the assessment team that of 748 inmates at that facility, 334 had separatee issues.[92]

This raises the question of the appropriate way to manage inmates with verified protection needs. Such inmates are presently housed in administrative detention, which is identified by Bureau policy as a nonpunitive status. However, they are assigned to the same housing unit as inmates in punitive segregation. Inmate movement procedures, including application of restraints, are the same; the frequency of recreation and telephone access is the same, as was the frequency of visits at all but two facilities visited. With the exception of minor differences in personal property allowed and in-cell programming opportunities, the day-to-day conditions of confinement were not much different. Considering that one status is nonpunitive and that some individuals are included strictly as a result of being verified as requiring protection, serious consideration should be given to reevaluating the day-to-day conditions of confinement for individuals who have been verified as needing protection.

**FINDING: The application of the same security and operational restrictions to the protective custody population as to others in administrative segregation is contrary to nationally accepted practices.**

This is a complex issue within the Bureau due to the extensive presence of security threat group members, even in the SHU. Many of those have verified need for protection as a direct result of their prior involvement with a security threat group, who are also victims or potential victims that need protection while assigned to the Bureau. These protection needs should be provided, but in a more normalized setting than what is presently provided in the SHU.

In numerous states, the conditions of confinement for protection cases have been altered to parallel that provided to other general population inmates. In these instances, inmates are housed in SHUs or similar units while the claim for protection is investigated. Once the need for protection is verified, they are moved to a separate unit that provides conditions of confinement that are similar if not identical to those provided to general population inmates. These units operate separately from other general population units and afford inmates the ability to function in a normalized prison environment while ensuring they are protected. Kentucky has done this successfully at the Eddyville facility, and Ohio operates units that replicate general

---

[92] Interview briefing with Warden, January 21, 2014



population conditions for protective custody inmates. The Bureau is moving in the same direction with the establishment of the reintegration housing unit (RHU) in Oakdale, Louisiana.

The RHU was activated in October 2013 with an objective to target male inmates who consistently refuse to enter general population.[93] The facility was opened with an initial capacity of 160 beds but was increased to 208 in February 2014; it has a potential future capacity of 320 beds. The actual population of the facility in September 2014 was 82. The criteria for placement include documentation that the inmate is classified as a protective custody case, an assessment from psychological services that the inmate is willing to participate in programming offered at the RHU, and the following additional criteria:

- The inmate has refused to enter general population and this fear is unsubstantiated (cannot be verified by staff).

- The inmate will have been housed in an SHU for more than 12 months.

- Medium and high security inmates are considered appropriate.

- Inmates whose SHU placement is based on a gang-specific security threat group assignment are ordinarily excluded.

- Those currently in disciplinary segregation are excluded.

- Those whose sex offender classification is the basis for placement in SHU will ordinarily not be assigned to the RHU.

- Inmates must be classified in medical and mental health care level 1 or 2.

- Inmates should normally have at least 6 months remaining to serve.

Sex offenders who require protection and who meet the established criteria have been designated for the Sex Offender Management Program at USP Tucson. This is a normalized general population program and allows this group of protection inmates to fully participate in programs. The Bureau reported that it operates nine Sex Offender Management Program facilities, all of which offer an environment which increases the likelihood a sex offender can remain in general population.

---

[93] Memorandum of October 18, 2013, FCC Oakdale – RHU Activation Procedures, authored by the Acting Assistant Director, Correctional Programs Division.



These are the only two general population options for verified protective custody inmates that the consultant team identified within the Bureau.

**RECOMMENDATION 4.4: Expand housing alternatives for inmates in verified protective custody status that have levels of programs and privileges that are equivalent to those for general population inmates.**

## Weekly review meetings

At all the Bureau facilities visited, SHU weekly review meetings were observed. These meetings are convened and directed by the warden of each facility and are attended by representatives of the warden's management team as well as representatives of each key discipline within the facility. This includes associate wardens, unit managers, directors of psychological services and medical services, investigative staff, case management representatives, and security and chaplaincy staff.

The purpose of the meeting is to review the status of each inmate held in the SHU and determine if continued placement in the SHU is appropriate or whether an alternative placement can be identified. The structure and approach to these meetings was similar at each location we observed.

The reviews are guided by a formatted document that contains all the key information on an inmate including name, reason for placement in the SHU, mental health status, any medical issues, unit team comments, and status of any program referrals or redesignations. Also included in the document is a picture of the inmate so all participants in the meeting can identify the inmate being discussed.

The participants in the review meeting systematically review the status of each inmate. A designated representative, usually a unit manager, summarizes the offender's status, including any changes or pending actions. These can include pending transfer requests, status of any investigation, mental health or medical actions, program participation or completion, and general adjustment to the facility and/or unit. A representative of each discipline presents updated information on the inmate where appropriate. After discussion, the group with the concurrence of the warden may take action on the case, such as releasing the inmate from SHU (we observed that this action occurs frequently), referring the inmate for redesignation, or accelerating the investigation into the inmate's case.

The formal discussion is normally followed by the entire group touring the SHU and addressing any informal or formal requests presented by inmates.



**FINDING: The conduct of weekly reviews of SHU placements in a formalized setting with the facility's entire management team is an exemplary practice that ensures ongoing review of the status of inmates and their placement options.**

The review team for this project has not observed anything similar to this practice in terms of frequency of reviews, breadth of participants, and level of discussion on each and every case as was observed in the facilities reviewed. This process ensures that inmates housed in the SHU are reviewed at the highest levels on a weekly basis and that their placement options are evaluated regularly.

## Segregation reviews

Policy requires frequent contact and review of those inmates placed in administrative segregation. Through the SRO reviews and the previously described SHU Weekly Review process, there is ongoing review of the status of each inmate in relation to his/her continued placement in the SHU. There is however, inconsistency in how the SRO reviews are conducted and the scope of these reviews. In some of the facilities reviewed, the SRO reviews are conducted cell-side and consists simply of an inquiry as to how things are going and if any problems exist that need to be addressed. This provides no privacy and little opportunity for the inmate to have a dialogue with staff on his situation and what may have precipitated the problems that resulted in his placement in the SHU. This is especially important given the prevalence of security threat group members housed in the same units as those with protection claims.

**RECOMMENDATION 4.5: Establish a policy standard requiring private, face-to-face interviews for the segregation review.**

The Bureau reports that Program Statement 5270.10 requires face to face meetings at the 7 and 30 day review. Three day reviews are paper reviews, seven day and 30 day reviews give the inmate an opportunity to attend the hearing. Those inmates who refuse to attend the hearing are required to sign a waiver stating they refuse. Some Bureau facilities provide the opportunity for the inmate to meet privately with the SRO outside of the cell area and in a private location where there can be an open discussion of the issues and concerns that the inmate may face. This should become the standard for the Bureau in conducting the SRO hearings. Other facilities do not encourage or facilitate the face to face meeting in a private location.

**FINDING: The SRO reviews at some of the facilities reviewed appeared perfunctory and lacked substance in contact and purpose.**

In these instances the SRO review becomes a situation of quickly doing "how are you doing and do you have any problems" rather than a review of the reasons for



placement, program needs, placement issues if any, and verifying that the inmate has access to medical, mental health issues, etc. It appeared that there was little formal structure to the purpose and content of the reviews.

The GAO segregation review report issued in May 2013 found that "...the facilities did not consistently document conditions of confinement and procedural protections as required under Bureau policy guidelines." The GAO reported deficiencies such as missing documentation, monitoring rounds not being consistently conducted, or inmate review policies not fully implemented.

**FINDING: The review of randomly selected inmate records found some omissions in the maintenance and content of inmate records documenting the placement rationale in the SHU.[94]**

At one facility reviewed, ten percent (10 percent) of the files reviewed had problems with filing of these documents in the inmate record file including the absence of required supporting documents and the existence of a backlog in filing these documents in the inmate record. This was only observed at one facility during the course of the review.

**RECOMMENDATION 4.6: Develop and deploy an electronic inmate record system to document SHU placement decisions.**

The missing documents were later found as they were available elsewhere, but the inability to maintain inmate records in a timely and accurate fashion illustrates the need for the Bureau to substantially improve their recordkeeping, including the use of electronic means.

**FINDING: The requirements that are contained in the policy and procedures that govern the placement and review of inmates housed in the SHU are consistent with national standards and afford inmates in these units with due process in relation to their placement in the units.**

The execution of these requirements could be improved through the use of private, face-to-face, reviews with the inmates of his/her status in the SHU. This is done in some facilities, but not consistently applied throughout the system.

---

[94] Documents examined and filed include *Incident Reports*, BP-AO298, *Inmate Rights at Disciplinary Hearing*, BP-293, *Administrative Detention Orders*, BP-308. The Bureau reported that in August 2014, the SHU application was upgraded to include a warning screen feature notifying staff when omissions from the records were noted. This upgrade resulted in no deficiencies for this step in any Correctional Services Program Reviews conducted during the last quarter



# Special management units

According to PS 5217.01, Special Management Units, assignment to a special management unit (SMU) is considered to be a programmatic assignment. PS 5217.01 states that SMU designation is nonpunitive, and may be appropriate for any inmate meeting the referral criteria outlined in the program statement.

The conditions of confinement for SMU inmates are more restrictive than for general population inmates. Inmates are expected to complete the four-level SMU program in 18 to 24 months, at which time they may be re-designated (transferred) to an appropriate facility. At the time of the initiation of this review SMU programs were functioning at USP Lewisburg, USP Allenwood, and USP Florence. During the course of the review, the Bureau began the phasing out of the SMU at USP Florence through the gradual transfer of inmates in the unit to USP Lewisburg.

## Referral and assignment

Per the program statement, designation to a SMU may be considered for any "sentenced inmate whose interaction requires greater management to ensure the safety, security, or orderly operation of Bureau facilities, or protection of the public." Placement to a SMU requires that the inmate meet any of the following:[95]

- Participated in disruptive geographical group/gang-related activity.

- Had a leadership role in disruptive geographical group/gang-related activity.

- Has a history of serious and/or disruptive disciplinary infractions.

- Committed any 100-level prohibited act, according to 28 CFR part 541, after being classified as a member of a Disruptive Group pursuant to 28 CFR part 524.

- Participated in, organized, or facilitated any group misconduct that adversely affected the orderly operation of a correctional facility.

- Otherwise participated in or was associated with activity such that greater management of the inmate's interaction with other persons is necessary to

---

[95] PS 5217.10, Section 2, effective 11/19/2008.



# Chapter 5:   Mental health assessment and treatment

One of key areas of concern in the use of restrictive housing and/or solitary confinement is the mental health status of the people who are assigned to such housing units. As suggested in the literature review, it has been found in other studies that large proportions of the segregated populations suffer from mental illnesses that either predate admission to restrictive housing and/or develop as a result of the restrictive housing experience. Regardless of the basis for the mental health illness, it is essential that inmates with a current mental health illness in restrictive housing be properly diagnosed and treated.

In this chapter, we review the Bureau's mental health population that is assigned to SHU, SMU or ADX facilities and units. As noted in the earlier chapter, only a small percent of the Bureau's restrictive inmate population has been identified with a significant mental illness of some kind. This figure likely represents an under identification of those inmates who are truly suffering from some form of a mental health illness.

The most recent mental health status data on state, local jails and the Bureau are based on a 2005 survey. As shown in table 25, large percentages of all three inmate populations were found to be diagnosed by the external researchers to have at least one recent history (past 12 months) of a mental health illness. In terms of current symptoms, the percentages are somewhat lower but still significant. For the Bureau the estimate was 31 percent of the inmates having current mental health illness . symptoms.

Also shown in table 25 are the November 2013 mental health care levels. Significantly, 93 percent of the population are in Care Level 1 which is the lowest care level available. This is not to say that some portion of these inmates have no mental health issues. The Bureau reported that under current policy, inmates assigned to Care Level 1 can and do have such symptoms but do not raise the level of elevated treatment beyond medication.



Table 25.    Symptoms of a mental health disorder among prison and jail inmates

| Symptoms in past 12 months or since admission | State prison | Federal prison | Local jail |
|---|---|---|---|
| Major depressive or mania symptoms | % | % | % |
| Persistent sad, numb, or empty mood | 32.9 | 23.7 | 39.6 |
| Loss of interest or pleasure in activities | 35.4 | 30.8 | 36.4 |
| Increased or decreased appetite | 32.4 | 25.1 | 42.8 |
| Insomnia or hypersomnia | 39.8 | 32.8 | 49.2 |
| Psychomotor agitation or retardation | 39.6 | 31.4 | 46.2 |
| Feelings of worthlessness or excessive guilt | 35.0 | 25.3 | 43.0 |
| Diminished ability to concentrate or think | 28.4 | 21.3 | 34.1 |
| Any attempted suicide | 13.0 | 6.0 | 12.9 |
| Persistent anger or irritability | 37.8 | 30.5 | 49.4 |
| Increased or decreased interest in sexual activities | 34.4 | 29.0 | 29.5 |
| Thoughts of revenge | 28.4 | 21.3 | 34.1 |
| Psychotic disorder symptoms | | | |
| Delusions | 11.8 | 7.8 | 17.5 |
| Hallucinations | 7.9 | 4.8 | 13.7 |
| Bureau mental health care levels | | | |
| Care level 1 | N/A | 93% | N/A |
| Care level 2 | N/A | 6% | N/A |
| Care level 3 | N/A | <1% | N/A |
| Care level 4 | N/A | <1% | N/A |

Source: *Survey of Inmates in State and Federal Correctional Facilities, 2004, and the Survey of Inmates in Local Jails, 2002.*

Nationally, the Bureau of Justice Statistics estimates that at least 15 percent of the state inmate population has symptoms of psychotic disorders as compared with the Bureau's percentage of 13 percent.[104] A very small percentage of the Bureau inmates with serious mental illnesses are transferred to specialized mental health treatment facilities located at the Atlanta, Butner, Springfield, Carswell, Devens or Rochester facilities. In addition, residential mental treatment units addressing a range of mental health conditions are located at Atlanta, Coleman, Danbury, and Terre Haute.

---

[104] Bureau of Justice Statistics, *Mental Health Problems of Prison and Jail Inmates,* September 2006, NCJ 213600.



The Bureau advised the project team that additional residential mental health treatment units are planned for activation in 2015 at Allenwood and Florence.

This assessment is intended to evaluate those inmates in the Bureau with a serious mental health problem to determine if the diagnosis and treatment plans prescribed by the Bureau are appropriate. Recommendations are made at the end of the chapter that would serve to improve the current mental health system within the Bureau.

## Assessment process

Two board-certified psychiatrists (Dr. Pablo Stewart and Dr. Roberta Stellman) were retained to conduct independent mental health assessments of inmates assigned to the various restrictive housing units within the Bureau. Each psychiatrist was given a structured interview form to be completed on each sampled inmate. The assessment was based on: (1) a brief review of the existing BOP mental health record retained at the BOP facility and (2) a face-to-face confidential interview with the inmate.

For each inmate taking part in the review process the CNA retained psychiatrist was asked to make the following assessments and opinions:

- Did the CNA psychiatrist agree with the Bureau mental health diagnosis?

  o If no, what was diagnosis is recommended by the CNA psychiatrist?

- Did the CNA psychiatrist agree with the Bureau prescribed treatment including medication and out of cell treatment?

  o If no, what is the recommended treatment for the inmate?

- Did the CNA psychiatrist believe the inmate was appropriate for placement in restrictive housing?

  o If no, what form of housing is recommended?

- Were there any other comments that pertained to this inmate's mental health status or treatment appropriate for this person?

For each selected facility, a list of inmates housed in restrictive housing and scheduled to be assessed was provided by CNA several days in advance of each visit. Inmates that were sampled were predominantly assigned to Mental Health Care Levels 2 and higher. As noted in Chapter 3, the specific definitions provided by the Bureau for the four care levels are as follows:

- CARE Level 1-MH—no significant mental health care

113



- CARE Level 2-MH—routine outpatient mental health care or crisis oriented mental health care

- CARE Level 3-MH—enhanced outpatient mental health care or residential mental health care

- CARE Level 4-MH—inpatient psychiatric care

In addition to the level of mental health care, the Bureau also provided the date the inmate was admitted to either SHU, SMU or ADX status in order to calculate the length of stay in restrictive housing. In sampling the cases, efforts were made to ensure that people who had experienced lengthy periods of time in restrictive housing were included in the sample. As such the sample is not a pure random sample but rather a purposeful sample that was designed to ensure inmates with various lengths of stay were captured.

CNA also sampled a small number of inmates who were a) assigned to Mental Health Care Level 1 and b) who had been in restrictive housing for extensive periods of time. These cases were sampled to determine if some levels of de-compensation in their mental health status had occurred since being assigned to restrictive housing.

Due to the inmate refusals there were some instances where additional inmates were evaluated simply based on their willingness to be assessed. These "nonsampled" cases were included in the overall evaluation to ensure a sufficient number of inmates were evaluated at each facility.

It is recognized that there has been considerable debate about the reliability of psychiatric diagnosis between psychiatrists. Previous studies have shown low level of inter-reliability when two psychiatrists are asked to assess the same mental health patient.[105] However, in this situation the project psychiatrists were not being asked to develop a full psychiatric assessment to formulate a diagnosis. Rather the task was to review the current diagnosis and treatment plan to determine whether the two were consistent with one another. This type of review is commonly done by supervising psychiatrists who oversee mental treatment units. Both of the project psychiatrists who conducted these reviews have considerable experience in this area.

---

[105] Aboraya, Ahmed, Eric Rankin, Cheryl France, Ahmed El-Missiry, and Collin John. "The Reliability of Psychiatric Diagnosis Revisited: The Clinician's Guide to Improve the Reliability of Psychiatric Diagnosis." Psychiatry, January 2006; 3(1): 41-50.



# Inmate interviews and case review trends

Table 26 summarizes the overall sampling results. The 12 facilities/housing units reviewed had a total of 2,683 inmates in restrictive housing shortly prior to each site visit. Of that population, only 297 (or 11 percent) were determined by the Bureau to have some mental health issue. Of these 297 inmates, 180 (or 61 percent) were interviewed and assessed. For some facilities, the number of cases evaluated exceeded the number of mental health care inmates at the facility. These higher numbers reflect inmates who were not designated with a significant mental health issue but were evaluated to assess the accuracy of the Level 1 mental health status.

Table 26.   Cases interviewed and assessed

| Facility | Population in restricted housing at time of site visit | Mental health care level 2 or higher | Inmates interviewed and assessed |
|---|---|---|---|
| Allenwood SHU | 116 | 20 | 20 |
| Atlanta SMU MH | 7 | 7 | 7 |
| Butner SHU | 70 | 4 | 9 |
| Coleman SHU | 171 | 21 | 14 |
| Florence ADX | 368 | 36 | 23 |
| Florence SMU | 493 | 41 | 22 |
| Florence SHU | 13 | 5 | 2 |
| Hazelton SHU | 24 | 6 | 11 |
| Lewisburg SMU | 779 | 47 | 25 |
| Terre Haute SHU | 200 | 32 | 16 |
| Tucson SHU | 221 | 39 | 13 |
| Victorville SHU | 221 | 39 | 18 |
| **Total** | **2,683** | **297** | **180** |

Source: Bureau/JFA

Table 27 shows the medical and mental health care levels for the interviewed inmates. The most frequent level of mental health care is Level 2 followed by Care Level 3. The 35 Care Level 1 inmates were those that had been assessed by the Bureau as not having a substantial mental health problem. However, the CNA psychiatrists concluded that 7 (or 20 percent) of the 35 cases had a significant mental health problem.

While the sample size is quite small and may not be completely representative of the entire Care Level 1 population, it raises the possibility that a proportion (20 percent) of the entire Care Level 1 population may have a significant mental health issue that

115



has been missed by the Bureau mental health system. This conclusion is supported by the non-mental health interviews where a significant proportion of the inmates reported being depressed and/or having medical symptoms related to depression and anxiety (e.g., loss of weight, inability to sleep).

The Medical Care Levels are also noteworthy with almost half of the sample having significant medical problems, which placed them in Care Levels 2 and 3. In terms of their time in restrictive housing at the time of the site reviews, the average overall time was 242 days. The ADX inmates had the longest average number of days in restrictive housing at 959 days.



Table 27.    Key health care attributes of assessed inmates

| Attribute | Frequency | % of Total |
|---|---|---|
| Total cases | 180 | 100% |
|  |  |  |
| Mental health care status |  |  |
| Mental health care 1 | 35 | 19% |
| Assessed as care level 1 | 27 | 77%* |
| Assessed as care level 2 | 4 | 11%* |
| Assessed as care level 3 | 3 | 9%* |
| Mental health care 2 | 114 | 63% |
| Mental health care 3 | 31 | 17% |
| Restrictive housing status |  |  |
| SHU | 49 | 27% |
| SMU | 108 | 60% |
| ADX | 23 | 13% |
| Medical care status |  |  |
| Care level 1 | 84 | 47% |
| Care level 2 | 69 | 38% |
| Care level 3 | 12 | 7% |
| Unknown | 15 | 8% |
| Average time in restrictive housing | 242 days | |
| SHU | 107 days | |
| SMU | 144 days | |
| ADX | 959 days | |

* Percentages based on the 34 care level 1 inmates. For one case there was no CNA assessment.

Finally, in general terms, the independent psychiatric review found considerable disagreement in the core areas of a mental health program. These include: initial mental health diagnosis, adequate psychiatric staff coverage and coordination with other mental health staff, provision of adequate out-of-cell treatment services based on individualized treatment needs, review/modification of prescribed medication, and the capacity to quickly remove an individual from a segregated environment and place them in a health services treatment unit for residential treatment.

**FINDING: Based on the review of the inmate mental health records and the inmate interviews, the reviewers disagreed with the BOP diagnosis in nearly two thirds of the cases reviewed. The review further indicated that the treatment being offered by the BOP was insufficient or inappropriate in over half of the cases reviewed.**



CNA believes that approximately one-third of the cases reviewed should not be assigned to restrictive housing and about 30 percent should be placed in a specialized mental health program or residential treatment unit similar to the one implemented at USP Atlanta and found in many state prison systems. These units are structured clinical environments that provide daily programming and a therapeutic milieu for individuals who cannot function in general population due to their mental illness and frequently receive disciplinary reports as a consequence. It is noted that the Bureau has indicated that, in 2015, the Atlanta program will be expanded with the establishment of a similar treatment program at USP Allenwood.

Table 28.    Key conclusions of independent psychiatric review

| Assessment item | Inmates | % |
|---|---|---|
| Total sample | 180 | 100% |
| Disagree with bureau diagnosis | 114 | 63% |
| Inappropriate treatment | 95 | 53% |
| Does not require restrictive housing | 65 | 36% |
| Needs mental health program | 53 | 29% |

# Clinical analysis and observations

The following section provides a more in-depth assessment of the current BOP mental health system as it is operating in the SHU, SMU and ADX restrictive housing environments. The intent is to better understand the statistical data presented earlier in this chapter and to identify problems that are restricting the delivery of effective mental health services to inmates in the SHU, SMU and ADX housing units.

## Mental health diagnostic process

As noted above, there was considerable diagnostic disagreement between the Bureau mental health staff (which is comprised mostly of psychologists) and the CNA psychiatrists. Some of the reasons for this level of disagreement are outlined in the following.

*Infrequent updates of initial mental health assessments*. The Bureau does complete a comprehensive psychological assessment at the time of admission to the Bureau. However, there is not a similarly comprehensive re-evaluation during the course of

118



their incarceration within the restrictive housing units other than monthly progress notes – and these are completed only for those on the Bureau mental health caseload. These assessments are usually based on brief, cell-front visits[106], which are part of the mandatory rounds mental health and medical staff must make on at least a weekly basis. At USP Hazelton when private interviews occurred, they were performed by psychology interns rotating through the psychology service as part of their graduate training. Although the use of interns can be beneficial to both the interns and the agency in terms of service, the use of such interns can lead to a lack of continuity in programming when the interns rotate off the service, as was reported by the staff at USP Hazelton.

**RECOMMENDATION 5.1: All inmates should be seen in a private setting for a comprehensive mental health evaluation prior to placement in any restrictive housing environment.**

The initial evaluations should assess the presence of a mental illness and the determination of whether the inmate can tolerate the conditions of restrictive confinement. They should also assess the presence of the potential for self-injury and active signs or vulnerabilities for significant mental health de-compensation.

It is acknowledged that a pre-screening procedure is in place at all Bureau facilities. Per 5324.08 Suicide Prevention Program, the Suicide Prevention Program Coordinator is to provide SHU staff with a list of inmates with mental health conditions who may become dangerous, self-destructive, or suicidal when placed into SHU. The Correctional Services Supervisor is to immediately notify Psychology Services if one of these inmates is placed in SHU. In addition P5310.16 mandates a comprehensive mental health evaluation, to include psychological testing, prior to placement at the ADX.

Many of the mental health inmates interviewed were in need of and were receiving psychotropic medications. However, the notes in the case file did not follow a differential diagnosis pathway. Rather it appears that the inmate receives a diagnosis, most often by a practitioner without specialty training in psychiatry, and is treated for that diagnosis alone without consideration that they may actually have another condition that manifests with similar symptoms but for which the treatment differs. There is little, if any, consideration of more than one diagnosis or evolving

---

[106] The revised Treatment and Care of Inmates with Mental Illness policy, issued May 1, 2014, now mandates private meetings with inmates classified as CARE2-MH and above. This policy change was aimed at addressing an identified concern with cell-front sessions. The policy was not in effect at the time of the site visits and thus was not assessed by the team.



consideration that the initial diagnosis was incorrect and perhaps the person suffers from another disorder entity requiring alterations in the treatment plan.

The concern is that modification to the initial set of prescribed medications and treatment plan may be needed due to (1) a comprehensive follow-up diagnoses, (2) consideration that the initial diagnosis was incorrect, and/or (3) that the person has developed an illness requiring alterations in the initial treatment plan.

**FINDING: The lack of on-going assessments can lead to the absence of a proper mental health status evaluation.**

For example, at USP Tucson there had been a recent suicide in the special housing unit. The inmate in the adjoining cell (diagnosed with depression and traumatic brain injury) was interviewed. He expressed significant difficulty in adjusting the death of his neighbor, which increased his own depression and suicidal ideation. After the loss, he requested to be put in the restraint cell and have the staff keep his medications. He was identified as being on the mental health caseload but, at the time of the site visit, was not being considered for transfer to a treatment unit or receiving additional mental health services.

**RECOMMENDATION 5.2: A complete re-evaluation of the mental health record should be performed by psychology and psychiatry staff every 30 days. Included in this review should be a face-to-face interview by a member of the mental health team in a private setting and the results of this interview included in the re-evaluation record.**

The re-evaluations should assess the presence of a mental illness and the determination of whether the inmate can tolerate the conditions for segregated confinement. They should also assess the presence of the potential for self-injury and active signs or vulnerabilities for significant mental health de-compensation.

It should be noted that after the completion of the site visits the Bureau issued a revised *Program Statement 5310.16, Treatment and Care of Inmates with Mental Illness.* The provisions of this modified program statement address in policy some of the issues observed during this review. Specifically, the policy states the following in Section 8a, Restrictive Housing:

Ordinarily, all critical contacts, regardless of an inmate's mental health care level, will, to the extent possible, be conducted in a private area. These include the following:

- Diagnostic assessments

- Suicide risk assessments



- Crisis intervention contacts

- Protective custody reviews

- Sexual assault prevention intervention

- Mental health treatment contacts as indicated by the treatment plan

- Any other service that addresses potentially sensitive issues or high-risk behaviors

Additionally, all inmates with mental illness in restrictive housing units (e.g., SHU, SMU, ADX) will receive, at a minimum, face-to-face mental health contacts consistent with the type and frequency indicated by their care level, to the extent feasible. These contacts take place in a manner that protects an inmate's privacy to the extent that safety and security of staff are not compromised. Contacts should be consistent with the goals of the treatment plan, and are in addition to any critical contacts or contacts required by policy (e.g., SHU Review).[107]

Due to the timing of the issuance of this program statement, the CNA team was unable to assess the impact of the requirements on the actual delivery of services to those in restrictive housing.

*Lack of close coordination between psychology and psychiatric staff.* Much of the treatment being provided to the inmates takes the form of psychiatric medications that can only be prescribed by a psychiatrist or a psychiatric nurse practitioner who are very familiar with the patient's symptoms and prior mental health history.

In the majority of the facilities inspected, the prescribing physician was not a psychiatrist, which further added to the problems of coordination with the psychology staff. The electronic medical record system also contributed to the diagnostic difficulties encountered. Psychology and medical services document in different electronic records so one must exit one software system and enter another to try and integrate the treatment for those with mental illness[108].

**FINDING: A number inmates in restrictive housing demonstrated significant symptomatology compatible with the presence of a serious mental illness, which was undetected by the psychology staff. This is based not only on the cases**

---

[107] Program Statement 5310.16, Treatment and Care of Inmates with Mental Illness.

[108] The Bureau has reported that as of April 2014, the electronic medical and mental health records have been integrated and all providers document in BEMR. Due to the date of implementation this was not verified.



interviewed by the CNA psychiatrists but also the larger number of Mental Health Level Care Level 1 inmates who were reporting symptoms of depression, lack of sleep and loss of weight, and anxiety.

**RECOMMENDATION 5.3: A vigorous quality improvement program should be established.**

The Bureau should ensure that the psychologists are adequately identifying all of the inmates who suffer from mental illness. The existing quality assurance measures in place, to include remote reviews of the mental health record conducted by the Psychology Services Branch should be included in an internal evaluation of the quality assurance programs.

*Assessments and contacts are not completed in private confidential settings.* A major system-wide deficiency is the practice of providing the vast majority of clinical mental health contacts in a nonprivate, cell-side rounds format. According to Bureau policy, the psychology staff is expected to complete a direct contact with every inmate in restrictive housing on the mental health caseload at least monthly and conduct weekly rounds on all inmates in restrictive housing[109].

**FINDING: Very few of the monthly mental health assessments occur in private settings on a face-to-face basis.**

Instead, these contacts typically occur through the cell door within the presence of a cellmate and within earshot of the inmates housed in adjacent cells. In this nonconfidential environment it is unlikely that an inmate will confide vulnerabilities including suicidality. Therefore, inmates with worsening mental illnesses or the onset of new symptoms can remain under-identified throughout the course of their restrictive housing incarceration.

An example of this situation was a young man interviewed at the USP Florence facility. He was actively delusional, isolative, and demonstrated a full complement of symptoms compatible with chronic paranoid schizophrenia. Psychology staff suspected he had a mental illness because of his poor hygiene; yet he had not been adequately interviewed in a private confidential setting for sufficient time to reveal his psychopathology.

---

[109] The Bureau noted that P5310.16 Treatment and Care of Inmates with Mental Illness issued May 1, 2014 mandates private, at least monthly sessions with CARE2-MH inmates and private, at least weekly sessions with CARE3-MH inmates. In addition, critical contacts, such as suicide risk assessments, are also to be conducted in a private setting.



Another example was encountered at USP Lewisburg, where an overtly psychotic inmate was assessed by the psychology staff as being antisocial and was not offered any mental health services.

*Lack of psychiatric staff.* Inmates who are identified as having a mental health issue treated by pharmacological methods are most frequently evaluated and followed by a general health practitioner (sometimes a physician but more often a physician's assistant) and not a board certified psychiatrist. There is a clear shortage of psychiatric physicians throughout the facilities that were visited.

**FINDING: The shortage of psychiatric staff in Bureau facilities leads to numerous problems in both diagnosis and treatment, particularly for the seriously mentally ill inmates.**

**Recommendation 5.4: Given the level of disagreement in the assessment and treatment plan formulation, the Bureau should conduct an inter-reliability test for its mental health staff to better determine the accuracy of the diagnosis and treatment plan process.**

Most facilities have limited psychiatry hours that are insufficient to assess and treat those inmates with mental disorders in the system, not just restricted to the SHU or SMU. Psychologists must prioritize psychiatric review to only a handful of the least stable mentally ill inmates on their caseloads. Table 29 summarizes current and vacant mental health treatment positions at reviewed Bureau facilities.

Table 29.   Mental health treatment staff at reviewed facilities

| Facility | Doctoral-level psychologist | Psychology interns/ postdoctoral residents | Treatment specialists | Social workers | Psychiatrists | Psychiatric nurse practitioners | Contract psychiatry or tele-psychiatry | Vacant positions as of October 30, 2014 |
|---|---|---|---|---|---|---|---|---|
| FCC Allenwood | 12 | 0 | 15 | 1 | 1 | 0 | Tele-psychiatry | 1 psychiatrist* 2 psychologists 1 social worker* |
| FCC Butner | 27 | 7 | 14 | 4 | 6 | 0 | N/A | 3 psychiatrists* 2 psychologists* 1 treatment specialist |
| FCC Coleman | 18 | 0 | 26 | 1 | 1 | 0 | Tele-psychiatry | 1 psychiatrist 1 psychologist 3 treatment specialists |
| FCC Florence | 15 | 0 | 12 | 1 | 0 | 1 | Contract and tele-psychiatry | 1 psychiatric nurse practitioner 1 psychologist* 1 social worker |
| USP/SFF Hazelton | 14 | 0 | 13 | 1 | 0 | 0 | Tele-psychiatry | 3 psychologists |
| USP Lewisburg | 8 | 1 | 11 | 0 | 0 | 0 | Tele-psychiatry | 1 postdoctoral resident 1 psychologist 2 treatment specialists |
| FCC Terre Haute | 12 | 4 | 11 | 0 | 0 | 0 | Tele-psychiatry | 3 psychologists |
| FCC Tucson | 9 | 0 | 8 | 0 | 1 | 0 | N/A | 2 psychologists 2 treatment specialists |
| FCC Victorville | 10 | 0 | 6 | 0 | 0 | 0 | Tele-psychiatry | 2 treatment specialists |

FCC = Federal Correctional Complex.
* Vacant position is newly allocated.

124





Psychiatric medications were observed in several cases to be prescribed in subtherapeutic or inadequate doses to treat the identified condition. At USP Terre Haute, a mid-level provider prescribed a tricyclic antidepressant to an inmate with serious depression despite this family of antidepressants being potentially lethal in an overdose situation. When medications were prescribed, inmates were not seen for review in a timely manner compatible with community and correctional standards of practice. One inmate at USP Florence had not been seen by any medical provider regarding his medications since 2012. Some sites, including USP Florence and USP Atlanta, had no psychiatric presence within the prison whatsoever. All psychiatric services were provided by tele-psychiatry at those facilities.

Wardens expressed their frustration with their (and the Bureau's) inability to recruit and retain psychiatrists. Tele-psychiatry is available at sites without a psychiatrist, but the hours provided are so limited that the referral system is delayed and insufficient to meet the health needs of the inmates.

For example, USP Florence has four hours per month of tele-psychiatry time available for 128 SMU inmates. Time is split between two psychiatrists, one of which has refused to staff cases with the psychology staff. On average, no more than six to eight inmates can be seen per tele-psychiatry session. The on-site physician assistant and nurse practitioner will not follow psychiatric patients. The facility physician sees inmates on psychiatric medications but frequently will not start medication if the inmate is not deemed to be "a perfect match for a DSM criteria" or put patients on drug holidays, a practice that is discouraged because of the likely risk of a relapse. The assessment team was told that the Bureau brought in their chief psychiatrist several months ago to try and catch up with inmate care. One inmate summed the situation up by saying that access to psychiatry at USP Florence was "impossible."

Similarly, USP Terre Haute has four hours of tele-psychiatry available every 4-6 weeks and only 23 percent of their SHU mentally ill have been seen by the psychiatrist.

At USP Hazelton, 16 hours of psychiatry services are available per month for 600 female inmates. Given the traditionally high degree of expressed psychopathology in female incarcerated populations, this amount of dedicated psychiatry time is insufficient to meet the needs of the population. Understaffing in this area leads to potential under diagnosis, inadequate treatment, and delayed referral because the psychiatrist only has time to see the most severely mentally ill inmates.

Tele-psychiatry should be a resource of last resort when there is no psychiatrist present in a facility. It should not be routinely relied upon for day-to-day psychiatric care.

For example, in one case at USP Terre Haute, the psychology staff noted there was a significant delay in the receipt of a progress note by the tele-psychiatrist. In that one case, no note has yet been received despite the inmate being seen six weeks ago.



At USP Florence, the sick call system was reported to be unreliable and not confidential – both of which are requirements by any national accrediting body and federal standards that require reliable access to care. This observation was also reported by inmates at USP Terre Haute.

While on site, the assessment team was notified that USP Tucson had hired a full time psychiatrist.

**RECOMMENDATION 5.5: Psychiatrists need to be more actively involved in the diagnostic and treatment process.**

Currently, the psychiatrists only get involved if a patient is brought to them for evaluation. The psychiatric staff needs to work more closely with the psychologists to ensure that all of the mentally ill inmates are properly identified and referred to treatment. The psychiatrist should also meet with the psychology staff on a monthly basis to review the medication and case management plan for each Mental Care Level 2 and 3 inmates housed in restrictive housing.

## Mental health treatment

_Lack of out of cell treatment_. Inmates in restrictive confinement rarely receive out of cell mental health programming within the Bureau. Instead, the primary form of treatment consists of written materials, such as cognitive behavioral handouts, delivered to the cell by psychologists.

For example, written homework assignments are passed out to the inmates who are expected to complete them in their cells and turn them within a few days. These assignments are then graded by the psychologist and the results are used to determine whether the inmate can progress to the next level in the SMU or ADX progressive programs. These workbooks do not constitute mental health treatment.

Efforts to provide out of cell group activities at the expanding USP Florence SMU were curtailed because of the timing of such activities had to conform to the Bureau's approved evidence based plan of approved group therapies. Psychologists at the site level have not been encouraged to implement innovative group services to fit the mental health needs of their inmate populations.

There are some notable exceptions that were positive in nature. For example, at USP Florence, one psychologist was conducting a weekly out of cell group in the SMU. Psychologists at the ADX Florence have recently begun seeing some of their patients



in out-of-cell settings.[110] USP Allenwood is another facility where the psychologists attempt to see their patients in out-of-cell settings. Another exception is the Level-III treatment program at the USP Atlanta. A very conscientious lead psychologist directed this program and saw to it that her patients participated in out of cell treatment activities.

**FINDING: Overall most restrictive housing units had no mental health programing and especially no out of cell programming for any inmates with or without mental illness.**

Some interviewed inmates reported little or no response by psychology to their requests for individual counseling. Exceptions to this practice were noted at the United States penitentiaries at Allenwood and Atlanta, as well as at the ADX. As noted above, facility staff reported they do not have adequate staffing in the facility to provide more than the minimum required weekly rounds and monthly cell front checks.

**RECOMMENDATION 5.6: A program of regular out-of-cell mental health treatment should be implemented.**

Specifically, it is generally accepted that inmates with serious mental illnesses in restrictive housing should receive a minimum of 10 hours of unstructured out-of-cell time and at least 10 hours of structured therapeutic activities. They also should receive weekly, out-of-cell clinical interviews by their assigned psychologist.

Some interviewed inmates with serious mental illnesses in restrictive housing, with the noted exception of USP Florence, described their conditions as worsening in confinement or not improving. These reports by inmates were especially prevalent at USP Lewisburg which houses the largest number of SMU inmates (almost 800) of whom approximately 50 are assigned to Mental Health Levels 2 and 3.

*Lack of sufficiently trained mental health staff to provide treatment to the segregated housing units.* A consistent finding of the assessment team was that access to mental health services is directly related to the level of professional expertise by the chief psychologist as well as the number of mental health staff available at each site. In several of the facilities reviewed, the project psychiatrist opined that the chief psychologist did not possess adequate experience or clinical skills to run a comprehensive mental health program. This is especially problematic in that the facility psychologists act as gatekeepers to psychiatric and mental health treatment.

---

[110] CNA was informed by the Bureau that this change has come about due to the ongoing litigation about mental health system inadequacies.



**FINDING: Almost all facilities reported a lack of mental health staff required to provide treatment services.**

USP Hazelton was down five psychology positions with no psychologist assigned to the SHU. USP Florence had only three psychologists and one psych tech for a 700-inmate population with no dedicated psychologist for the segregation unit. This duty was split among the psychologists on the staff. In most facilities, providing treatment services to the restrictive housing units was not the primary focus of the mental health staff, which has to provide care to the larger general population inmates with mental health needs.

It is acknowledged that in comparison the Bureau's mental health staffing levels exceed that found in many state correctional facilities. As noted previously, the Bureau employs a large number of doctoral level psychologists – more than 600, a higher doctoral level psychologist staffing rate than many state systems.

**RECOMMENDATION 5.7: The Bureau should complete a clinical staffing needs analysis.**

Based on the results of this clinical staffing needs analysis, the Bureau should then recruit and retain a sufficient number of psychiatrists to meet agency demands. No specific number for psychiatrists can be offered until the staffing analysis is completed. It is acknowledged that there are significant challenges associated with the recruitment and retention of psychiatrists. It is a fact that there are a decreasing number of training programs in psychiatry, a decreasing number of applicants for existing programs, and a decreasing number of graduates from programs - all at the time of a national shortage of psychiatrists.

*Improper assignment to restrictive housing.* As noted earlier, there were a number of interviewed inmates who had demonstrated serious and unstable psychiatric symptomatology, which should have excluded them from a restrictive housing setting.

**FINDING: This review identified inmates in restrictive housing whose mental conditions should have precluded them from assignment to these units.**

In some cases, the facility's lack of mental health treatment warranted a transfer to a specialized treatment program that did not require the level of security that was operating at the SHU, SMU or ADX units. It is acknowledges that legitimate security needs can be associated with a small, violent segment of the mental health population. A heightened level of security may be required for these inmates, even within a specialized treatment program. This complicates placement options for these inmates.



---

**RECOMMENDATION 5.8: A protocol needs to be established that identifies those inmates with serious mental illness who should be excluded from SHU, SMU or ADX housing.**

A similar review and re-assessment protocol should be implemented that facilitates the identification of those inmates who decompensate while in SHU, SMU or ADX housing.

## Other site-specific observations

*SMU programming*. Psychology contacts with SMU inmates are primarily a self-guided activity based on the delivery of written handouts and homework assignments. This does not constitute a treatment program driven by an individualized mental health treatment plan. This behavioral approach for inmates with only disciplinary problems might be adequate, but is insufficient for individuals with significant mental health conditions.

The SMU program does not take into account the inmate's mental illness in evaluating the inmate's progress or lack thereof with the four SMU program levels.

For example, one inmate (who would benefit from residential mental health treatment) had been assigned to the SMU for three years. He has an SMI diagnosis and a history of repeated self-injury and persistent suicidal ideation. He was almost to Level 3 in SMU when he overdosed on a potentially fatal antidepressant and was regressed back to Level 1. This exemplifies a case of someone with a serious mental illness/personality disorder being punished for his psychopathology, rather than treated for it. He reported to the CNA psychiatrist that he is only seen during the weekly rounds despite requesting more intensive counseling for over three years.

*Long-term segregation effects at ADX*. ADX Florence presented an interesting mix of mentally ill patients. While there were a significant number of seriously mentally ill individuals who required care at ADX, there were also a significant number of non-mentally ill inmates housed at ADX.

A majority of these inmates made it very clear that they wanted to remain in the ADX Florence and would commit a serious offense to ensure their ongoing housing in the facility. Several of the inmates interviewed said they would assault someone if they were told that they were going to be transferred to another Bureau facility. The reason given was their belief that the yards at the various USP's were exceedingly more dangerous and they knew that they would likely have to kill someone on the yard if transferred out of the ADX.

Among the interviewed inmates, none stated that they wanted to be transferred from the ADX, which was a tribute to the level of care the inmates are receiving.



It should be noted that part of the desire for these inmates to remain at ADX is the unique and often close relationship these men have with the staff. It was clear from our observations that ADX staff knew the inmates very well in terms of the basis for their placement in ADX but also they individual needs and interests.

**FINDING: The assessment team encountered no cases where an inmate's serious mental illness was due to their prolonged placement in the ADX.**

This reluctance to leave ADX Florence may be related to privileges such as reading materials, television, and recreation activities afforded inmates at ADX and the professionalism of the security and program staff assigned there. As noted above, the quality and quantity of the mental health care at ADX has recently improved.

*Delays in transferring inmates out of SHUs.* Inmates in SHUs can wait for many months for an opening in a program at another prison. During this time no additional mental health services are offered which potentially can have significant adverse effects while the inmate remains under segregation conditions.

**RECOMMENDATION 5.9: All inmates who are found to be decompensating from the effects of restrictive housing should be transferred to the most appropriate unit for treatment and observation.**

**RECOMMENDATION 5.10: Inmates with serious mental illness who are not excluded from restrictive housing should start participating in a treatment program.**

Such programming should consist of a minimum of ten hours of out-of-cell structured therapeutic activities and an additional ten hours of out-of-cell unstructured activities should as yard and dayroom time. Within these standards the treatment programming should be individualized to the inmate's specific condition and treatment needs.

*Large numbers of protective custody inmates who require mental health treatment but are not receiving it.* As indicated earlier in this report, these inmates are supposed to be receiving protection from other inmates by the Bureau. However, the restrictive nature of the SHUs makes it very difficult to afford any form of meaningful mental health treatment to these inmates. For example, at USP Coleman, there was an overrepresentation of protective custody inmates being housed in the SHU with only five hours per week of out-of-cell time.

**RECOMMENDATION 5.11: Inmates should not be housed in a SHU for protective custody but rather, should be in sheltered general population housing.**

*Innovation at Hazelton to enhance mental health services.* At USP Hazelton, the psychology staff has a "Hot List" which is a binder kept in the officers' station updated monthly that lists the inmate's name, diagnosis and the psychology staff's



concerns regarding the inmate's risk of behavioral disturbances. The staff there was also very active in a multidisciplinary meeting with security and classification to aid in expediting women being progressed out of the SHU. This best practice approach should be expanded to the other SHUs. It is our understanding that the Bureau has done so.



This page intentionally left blank.



The project team reviewed several videos at each facility to observe operational practices and to ensure there were efforts made by staff to de-escalate and achieve compliance before any force was used. In most cases staff followed standard procedures. In cases where procedures were not followed facility management personnel, the after action review team or regional team ensured corrective action would be applied.

## Use of force observations

The code of federal regulations clearly identifies the requirements as to when force can be applied. The regulations authorize the Bureau to use force only as a last alternative after all other reasonable efforts have failed. Programs Statements, facility supplemental statements and staff training are aligned with the federal regulations and are used by staff to clearly identify policy, procedures and expected practices. Based on the project team's review there was no indication that there is an ongoing practice by management to operate outside the federal regulations or program statements.

The project team did review documentation from isolated incidents where an individual staff member may not have followed policy and corrective action was taken.

The program statement includes the requirements for an extensive review process including several layers of management review to ensure incidents involving the use of force are examined by multiple staff. These requirements appeared to be met on a regular basis.

The project team reviewed over one hundred incident reports, policies were examined, videos were assessed and both staff and inmates were interviewed. As noted above, one concern was expressed by some inmates at USP Lewisburg or inmates who had previously been at USP Lewisburg. Several inmates referenced the operational practice of some staff to apply restraints in a manner inconsistent with policy. This practice was described as applying the restraints excessively tight often times after a previous incident.

## Use of force at USP Lewisburg

As indicated above, our review of uses of force and critical incidents at each facility showed few cases that were inconsistent with policy. However, as noted before, there was a concern shared by a significant percentage of the interviewed inmates, especially those housed at USP Allenwood who had previously been assigned to SMU Levels 1 and 2 at USP Lewisburg.

187



Several inmates reported that some of the staff at USP Lewisburg have a tendency to apply physical restraints tighter than necessary or tighter than normal. Inmates shared that this was often the practice by some staff either after an earlier challenging interaction with an inmate, previous experiences an inmate may have had with staff, a combination of the overall nature of events occurring throughout the day or for no apparent reason. In addition, several inmates at USP Allenwood reported that staff at USP Lewisburg used verbal and physical intimidation techniques against inmates routinely. No supportive evidence was presented to indicate this was the routine staff practice, however the high number of reported incidents were mentioned during inmate interviews suggests the need for further investigation by the Bureau.

The project team did not observe this practice directly, However, based on (1) the number of individuals that had expressed this concern and (2) the fact that many of the inmates were not currently at USP Lewisburg however had previously been there and shared this information was an issue that deserves mention and further review and evaluation by the Bureau.

## Conditions of confinement

The focus of this section of the report addresses the findings and recommendations related to the housing, services and activity levels provided to individuals housed in the three main types of restrictive housing units being analyzed: SHUs, SMUs, and ADX (with general population, step-down, control, and special security units). This section addresses the conditions of confinement rather than placement and procedural issues which will be discussed in another section as well as an assessment of educational programs.

To determine these conditions we examined several key factors:

- Regulatory requirements[131]

- Bureau program statements

- Facility supplemental statements

- Bureau program review reports

---

[131] Title 28 CFR Part 541.

188



- American Correctional Association standards and most recent facility reports

- Housing unit activity schedules

- Manual and electronic systems designed to document conditions of confinement

- On-site observations of operational practices;

- Staff interviews

- Inmate interviews

According to federal regulations and Bureau program statements, all three of the restrictive housing units are designed to help ensure the safety, security, and orderly operation of the Bureau facilities. The conditions of confinement are generally considered more restrictive than those found in the general population. Specific conditions of confinement for each type of segregation vary based on the unit and the inmates' classification level within each unit.

Program statements and facility supplemental statements related to conditions of confinement in segregation units have all been developed in-line with the statutory requirements identified in the federal regulations. In addition to the statutory requirements, the program statements and facility supplemental statements also identify policies, procedures and objectives regarding a specific area, including conditions of confinement.

These program statements for the most part serve as the core documents staff use to reference the minimum required conditions of confinement for individuals housed in each of the forms of restrictive housing units. To be in compliance with the program statements, housing unit activity schedules have been developed, staff post responsibilities have been established, staffing patterns have been designed, staff training implemented and personnel and performance oversight is currently provided.

The review team found that personnel were generally familiar with the program statements and the condition of confinement requirements. Activity schedules were in place, appropriately trained personnel were assigned to adhere to these requirements and oversight was being made. A general review is described in more detail below. Applicable federal regulations and Bureau program statements are referenced as well as the associated American Correctional Association standards. These references have all been italicized. In addition to the references the project team's general assessments are provided.



The conditions of the living quarters are the result of an ongoing physical plant maintenance program that evaluates and addresses issues related to maintaining nationally accepted environmental conditions for living quarters. Overall, the preventive and ongoing maintenance program appears to be a priority at the facilities visited. Most facilities maintained a high level of sanitation. Some of the facilities housing units were air conditioned while others were not. At USP Lewisburg, the most recent ACA accreditation review completed in 2011 indicated there was inadequate lighting (low) in the SMU cells.[132] This issue had since been corrected as reported in documentation provided and based on observation of the units. In October 2011, the Bureau Program Review Division reported that the sanitation condition of the SHU at USP Florence was below average and corrective action was required.[133] Again, based on supported documentation and on-site observations, an ongoing practice has been established to maintain appropriate sanitation conditions at USP Florence on a regular basis[134].

**FINDING: Overall the sanitation and physical plant maintenance programs in Bureau facilities are considered consistent with nationally recognized best practices.**

### Cell occupancy.

Living quarters ordinarily house inmates according to the design of the unit. The number of inmates assigned to a cell should not exceed the number for which the space was designated. Conditions may be altered by the warden as long as it meets applicable standards. *(28 CFR 541.31, P5217.01, P5270.10, ACA 4-4134, 4-4140, 4-4141.)*

Inmates are generally housed based on their status and level within each restrictive housing unit. At the ADX, all inmates were housed in single cells in the same housing unit as other inmates assigned to the same level of the program. All cells are designed for one inmate and include one bed, toilet, wash basin and a shower. The size of the cell is consistent with nationally recognized standards.

---

[132] Commission on Accreditation for Corrections Standards Compliance Intensive Reaccreditation Process Audit Federal Bureau of Prisons Lewisburg, Pennsylvania, August 2011.

[133] Bureau Program Review Division Memorandum dated October 27, 2011, Subject: Correctional Services Program Review FCC Florence.

[134] A Correctional Services program review conducted in October 2014 after the completion of the site visits of this project, the Bureau Program Review Division reported the condition of both SHU units were at a "high level of sanitation in common areas and cells."



The design of the SMU program is to have inmates housed according to their level within the program. Inmates assigned to Level 1 are either housed alone or with one other Level 1 inmate, inmates in Level 2 may be housed with one other Level 2 inmate and inmates assigned to Level 3 and four are designed to be housed with an inmate in the same level. At USP Florence and USP Allenwood, this policy appeared to be in practice. At USP Lewisburg, the operational practice observed was that inmates in Level 1 and Two may be housed together. In addition, at USP Lewisburg, the program was designed to house only inmates in Level 1 and Two at the time of the site visit. However, staff reported that – in part because of limited space at other sites including USP Allenwood – some Level 3 and 4 inmates were being housed at USP Lewisburg on the same ranges as Level 1 and 2 inmates. There were approximately 100 inmates in Level 3 or 4 housed at USP Lewisburg during the project team's site visit. The number of inmates assigned to the cells in SMU's did not exceed the number of beds in the cell. Most cells contained two beds. USP Lewisburg did have a few four-person cells containing four beds and the size of the cells were consistent with nationally recognized housing standards.

**FINDING: The size and furnishings provided in the cells in the SMUs were consistent with nationally accepted practices.**

In a SHU, inmates are assigned to either administrative detention or disciplinary segregation status. Administrative detention status inmates are generally not housed in the same cell as inmates assigned to disciplinary segregation status, however they are assigned to the same housing unit. Administrative detention is a nonpunitive status and disciplinary segregation is a punitive status.[135] Some facilities house disciplinary segregation inmates on a separate range (housing floor) from administrative segregation inmates, while others have both types of inmates on the same range however in different cells.

The average cell in a SHU contains two beds and the size of the cell is approximately 85 square feet with approximately 35 square feet of unencumbered space. The exact cell sizes vary to the physical plant configuration even within the same facility. In each SHU and SMU there are also a few cells designed to house one inmate. Some of

---

[135] 28 CFR 541.22 (a) Administrative detention is an administrative status which removes the inmate from the general population when necessary to ensure the safety, security and orderly operation of correctional facilities, or to protect the public. Administrative detention status is nonpunitive, and can occur for a variety of reasons. (b) Disciplinary segregation is a punitive status imposed only by a disciplinary hearing officer (DHO) as a sanction for committing a prohibited act(s).



these cells are normally used on a temporary basis to more closely observe an inmate.

**FINDING: The size and furnishings provided in the SHUs is consistent with nationally accepted practices when providing housing for the designed number of inmates. The fact that most cells in the SHUs contained showers exceeded national standards. However in one facility, the number of inmates housed in a cell exceeded the design capacity.**

At USP Victorville, the SHU consists of 120 cells of which 118 are designed for two inmates and two cells are designed for one inmate. Based on the overall SHU population level, facility staff reported they routinely found it necessary to house three inmates in a cell designed for two (contains two beds). This housing practice was confirmed by the warden, administrative personnel, housing unit staff and inmates. The third inmate is provided a mattress accompanied by appropriate bedding and is required to sleep on the floor of the cell.

The frequency in which this practice occurs was reported as routine when the population level exceeds or comes close to capacity. The length of time an individual is housed on the floor was not being tracked and staff interviewed were not aware of the average length of time an inmate is housed in a cell with two other inmates. The warden reported this most often occurs when issues arise with the transportation systems ability to move inmates. On those occasions inmates get backlogged awaiting movement.

On the second day of the on-site review, there were 35 USP inmates classified for SHU placement housed in the SHU at FCI Victorville I and 42 USP inmates housed at FCI Victorville II. There were no inmates being tripled-celled in the SHU at USP Victorville at the time of the on-site review.

It was reported by supervisory staff that five days prior to the review team's arrival, a number of inmates were transferred from the USP Victorville SHU to either the FCI I SHU or FCI II SHU. The warden reported there was no written policy or written procedure in place that identified the protocol to follow to determine when three individuals can be housed in a two-person cell, who can be assigned three to a cell, how long they can be assigned or when the FCI I or FCI II special housing units can be used to house USP SHU inmates. Once three individuals are assigned to a cell containing two beds and one individual is required to sleep on a mattress on the floor, unencumbered space is reduced and nationally recognized housing standards are no longer maintained.

*Clothing.* Inmates should receive adequate institution clothing, including footwear. Inmates have opportunities to exchange clothing or have it washed. *(28 CFR 541, P5580.08, P5217.01, P5270.10, ACA 4-4263.)*



Based on observation, interviews and policies reviewed appropriate clothing, footwear and the opportunity to exchange the clothing and/or have it washed is available on a regular basis. Additional limited clothing items may be purchased from the commissary for inmates in specific levels within each restrictive housing unit.

*Bedding.* Inmates should receive a mattress, blankets, a pillow, and linens for sleeping. Inmates have necessary opportunities to exchange linens. *(28 CFR 541, P5217.01, P5270.10, ACA 4-4263).*

Based on site observation, interviews and policies reviewed inmates generally receive a mattress with a built-in pillow, sheets, blanket and a towel. The sheets can be exchanged at least once per week.

*Food.* Inmates receive nutritionally adequate meals and may be required to eat all meals in their living quarters. *(28 CFR 541, P5217.01, P5270.10, ACA 4-4264, 4-4316, 4-4318, 4-4319, 4-4320).*

The Bureau provides a standard menu that applies to most facilities and is approved by a dietician and nutritionist. Inmates may receive medical and religious diets when considered appropriate and may request heart healthy meals. Substitutions may be made in segregation units when meat or poultry items containing bones are being served to the general population. Inmates receive three meals per day and all meals are consumed in the cell. The timing of the meals at some of the facilities reflected the breakfast meal was occasionally being served approximately 14 or more hours after the last meal of the previous day. Although this feeding schedule was not observed at every facility the scheduling and time of delivery of meals should be closely monitored to avoid extensive periods with no food services.

*Personal hygiene.* Inmates should have access to a wash basin and toilet. Inmates receive necessary personal hygiene items. *(28 CFR 541, P5270.10, P5217.01 ACA 4-4261).* Inmates should have the opportunity to shower and shave at least three times per week *(P5270.10, P5217.01, ACA 4-4262).* Inmates should have access to necessary hair care services *(28 CFR 541.21, P5270.10, P5217.01; ACA 4-4263).*

All cells contained a wash basin and toilet. Most of the cells in the SHU and control unit contained a shower within the cell. Those facilities where a shower was not located within the cell, staff provided the inmate with access to a shower at least three times per week. The cells located in the SMUs at USP Lewisburg, USP Florence, and USP Allenwood did not contain a shower, however multiple showers were located within the housing unit. Documentation over a period of several months was reviewed and reflected showers and the opportunity to shave were being provided in a manner consistent with federal regulations. Hair care services are also available at least once per month. Personal hygiene items are available to the inmate in the housing unit as well as through the commissary.



*Exercise.* SHU and SMU inmates have the opportunity to exercise outside their individual quarters for five hours per week, ordinarily in one-hour periods on different days. The warden may deny these exercise periods for up to one week at a time if it is determined that an inmate's recreation itself jeopardizes the safety, security, or orderly operation of the institution. However, recreation conditions specified here may not otherwise be limited, even as part of a disciplinary sanction imposed under P5217.01, P5370.11; ACA 4-4270. 28 CFR 541, P5270.10.

*Exercise and Recreation* The frequency of exercise outside the cell varies based on the type of segregation/program assigned and the inmates' level within the program.

**SHU exercise and recreation.** Inmates assigned to a SHU are generally provided the opportunity to exercise outside their cells five hours per week, ordinarily in one-hour periods five days per week. One facility scheduled recreation four days per week and provided inmates between one and one quarter and one and one half hours of recreation per day. The five hours provided is consistent with the minimum requirements cited in the federal regulations. Inmates in administrative detention status are generally not placed in the same recreation cage as an inmate in disciplinary segregation status; however, inmates in both statuses are provided the same amount of recreation time per week. Outdoor recreation is provided in individual recreation cages located adjacent to the unit. Each individual recreation cage may contain between one and four inmates based on the size of the cage and the number and type of inmates requesting access. No indoor recreation is provided.

The procedure for gaining access to recreation was found to be similar at most SHUs. Inmates are asked by an officer on each scheduled recreation day whether they are interested in recreation for that day. The request is generally made either before the breakfast meal or after the meal is served. No response or a negative response is considered a refusal and documented in the electronic file as the same. Recreation is generally provided first thing in the morning and at some facilities is completed by 0900. At other facilities, recreation continues until approximately 1600. The recreation scheduled varied at several facilities and was normally based on the number of inmates requesting recreation for that day.

The Program Review Division reported in October 2011 that at USP Florence the facility failed to properly complete documentation identifying recreation, meals and unit officer signatures in the SHU[136]. The project team reviewed both manual and automated reports for the most recent four months and found that the documentation indicated that inmate access to meals, recreation and unit officer signatures were being provided on a regular basis.

---

[136] The Bureau subsequently report that at the FCC Florence Correctional Services Program Review conducted in October 2014, revealed these issues were corrected.



Reports and documentation reviewed at several facilities reflected that a very small percentage of inmates were utilizing the recreation cages. Inmates interviewed expressed concerns that recreation requests occur only once per day, at approximately 0500 and that if the inmates are not standing at the cell door at that time they were not allowed to participate in recreation on that day. The requirement to stand at the door was not found to be a required practice at all facilities.

Project team members observed the practice at several facilities which consisted of the officer going to each cell and requesting whether the inmate wanted to go to recreation that day or not. Standing at the cell door was not a required procedure during the project team's observation. Staff reported that on average, 50 percent of the inmates in administrative detention status do not participate in recreation on any given day. A significant number of inmates in administrative detention status reported to team members that they chose not to participate in recreation because they feared being assaulted. Inmates in administrative detention status are not placed in the same recreation cage as an inmate in disciplinary segregation status, however in some facilities recreation may take place at the same time.

**SMU exercise and recreation.** Inmates assigned to the SMU program receive the opportunity to exercise outside their cells at least five hours per week, ordinarily in one-hour periods five days per week. SMU Level 1 and 2 inmates receive one hour of outdoor recreation, five days a week. SMU Level 3 and 4 inmates may receive up to 15 hours of indoor / outdoor recreation per week depending upon where they are housed. There is no difference in the amount of recreation time offered to Level 1 and 2 inmates or between Level 3 and 4 inmates, except for where they are housed. Inmates in Level 3 and 4 housed at USP Lewisburg were not provided indoor recreation. As a result, they were limited to approximately five hours of outdoor recreation per week based on weather conditions. Overall, however, practices were consistent with minimum federal regulations.

**ADX: exercise and recreation** Inmates assigned to the ADX program receive the opportunity to exercise outside their cells at least seven hours per week. This practice is consistent with federal regulations. ADX General Population inmates receive two hours per day out of cell five days a week for a total of ten hours. Control inmates receive 1.5 hours a day four days per week and one hour one day for a total of seven hours per week out of cell. The ADX Step-down inmates normally receive 1.5 hours inside and 1.5 hours outside cell seven days a week for a total of 21 hours per week.

*Personal property.* Inmates may have reasonable amounts of personal property. Personal property may be limited for reasons of fire safety, sanitation, or available space *(28 CFR 553, 28 CFR 541, P5270.10, P5217.01; ACA 4-4261, 4-4265, 4-4292).*

In administrative detention status an inmate may ordinarily be allowed a reasonable amount of personal property and reasonable access to the commissary. In



disciplinary segregation status an inmate's personal property will be impounded, with the exception of limited reading/writing materials, and religious articles. The warden may modify the quantity and type of personal property allowed. Personal property may be limited or withheld for reasons of security, fire safety, or housekeeping. Unauthorized use of any authorized item may result in the restriction of the item. Also, commissary privileges may be limited.

**SHU personal property.** Although administrative detention status is a nonpunitive status and disciplinary segregation is a punitive status, there are very few differences in conditions of confinement between the two groups. However, personal property is one area where there are a few minor differences. The two notable differences in personal property were inmates assigned to administrative detention were allowed to purchase a portable radio with ear buds and a limited amount of food items and coffee from the commissary. Inmates in disciplinary segregation were normally not allowed to purchase those same items.

Other noted differences between the two SHU statuses outside of personal property was that administrative detention inmates are to have access to educational programming while inmates in disciplinary segregation may have their programming suspended. In addition at two facilities, inmates in administrative detention received a two hour visit per week while inmates in disciplinary segregation received a one hour visit per week. No other significant differences in conditions were noted between the two statuses.

With respect to personal property, administrative detention status inmates according to the SHU program statement are ordinarily allowed to have the following: Bible, Koran, or other scriptures (1), books, paperback (5), eyeglasses, prescription (2), legal material (see policy on inmate legal activities), magazine (3), mail (10), newspaper (1), personal hygiene items (1 of each type) (no dental floss or razors*), photo album (25 photos), authorized religious medals/headgear (e.g., kufi), shoes, shower shoes, snack foods without aluminum foil wrappers (5 individual packs), soft drinks, powdered (1 container), stationery/stamps (20 each), wedding band (1), radio with ear plugs (1) and a watch (1).

**FINDING: There is very little difference between the personal property of inmates assigned to administrative detention and disciplinary segregation with the exception of noted commissary items. This is problematic given that at some facilities the majority of administrative detention inmates are on protective custody status.**

**SMU personal property.** Inmates are limited in the amount of personal property that may be possessed, purchased and maintained in their assigned cell. As participants progress through the program, more property privileges become available. Separate commissary lists are available and generally grouped into lists for inmates in Level 1 and two and those inmates in Level 3 and 4.



USP Allenwood, which does not house Level 1 or 2 inmates, primarily has one list and the difference in approved property between Level 3 and 4 inmates is that inmates in Level 4 may purchase one pair of sweat pants and one sweatshirt and inmates in Level 3 cannot. Other than the clothing mentioned there were no significant differences.

At USP Lewisburg the approved property list for SMU inmates is the same for each level,[137] although a separate commissary list is provided for inmates in Level 1 and 2 compared to Level 3 and 4. The primary difference between inmates in Level 3 and 4 and those in Level 1 and Two at USP Lewisburg is inmates in Level 3 and 4 have access to additional clothing and snack items. Inmates placed on commissary restriction will be able to purchase stamps and certain hygiene items (as specified by staff) based on their level.

At USP Florence, two separate commissary lists are provided, one for inmates in SHU and Level 1 and 2 of the SMU and one for inmates in Level 3 and 4 of SMU. The primary differences between the two lists are Level 3 and 4 inmates have access to more food items, clothing, miscellaneous items and additional options in each category.

**ADX personal property.** Property limitations including limitations on legal materials were found to be appropriate in volume and type to ensure safety and good order of the ADX. Personal property was being stored appropriately in the space provided. All general population, step-down, control unit, special security unit, and SHU inmates, with the exception of those inmates assigned to disciplinary segregation, are issued televisions. With the exception of inmates assigned to the SHU, each television has leisure viewing channels. Separate commissary lists are provided for each classification within the ADX and appeared appropriate based on the classification and security nature of the facility. Primary differences in the various commissary lists included the number of options available, access to additional clothing and food and snack items. Overall, access to property and commissary items is consistent with national standards.

*Correspondence and telephone use.* Inmates may correspond with persons in the community and use the telephone in accordance with *28 CFR 540.17* and Program Statements *P5217.01, P5264.08 and P5270.10.* Special mail and unmonitored attorney telephone calls are handled in accordance with *28 CFR 540.17. 28 CFR 540.17; ACA 4-4266, 4-4271, 4-4272. 28 CFR 540.16(b)* states, the warden shall permit an inmate in segregation to have full correspondence privileges unless placed on restricted general correspondence under *540.15. 28 CFR. 540.15(a)* states the

---

[137] USP Lewisburg SMU Handbook, page 51, Appendix B.



warden may place an inmate on restricted general correspondence based on misconduct or as a matter of classification. The warden shall permit an inmate who has not been restricted from telephone use as a result of a specific institution disciplinary sanction to make at least one telephone call each month.

*28 CFR 540.101(d) Procedures* states ordinarily an inmate who has sufficient funds is allowed at least three minutes for a telephone call. *28 CFR 540.103* states the warden may not apply frequency limitations on inmate telephone calls to attorneys when the inmate demonstrates that communication with attorneys by correspondence, visiting or normal telephone use is not adequate. *28 CFR 540.105(b),* Expenses of inmate telephone use, states that the warden shall provide at least one collect call each month for an inmate who is without funds. *28 CFR 540.17; P5217.01; ACA 4-4266, 4-4271, 4-4272, Program Statement P5264.08* states a local institution supplement is required and must include, in part, the following: a maximum length of telephone calls of 15 minutes.

The frequency and length of time of a social telephone call as cited in the Bureau's program statements is at least one telephone call per month for no more than 15 minutes, unless the inmate is placed on telephone restriction as a result of a disciplinary sanction.

**SHU correspondence and telephone use.** In the SHU's this is the general practice for both administrative detention and disciplinary segregation inmates. There is no difference in access to a telephone for inmates assigned to administrative detention or disciplinary segregation. The minimum frequency is provided and the maximum duration is set by the program statement. All other correspondence, including mail services are the same as those services provided to inmates assigned to general population, with the exception of email access.

**SMU correspondence and telephone use** In the SMU program opportunities to send and receive written correspondence and make telephone calls are subject to monitoring and analysis for intelligence purposes. Legal correspondence and calls are not subject to monitoring and analysis. Unless an inmate is on telephone restriction status, inmates assigned to Level 1 of the SMU are allowed to make two telephone calls per month. Inmates assigned to Level 2 are allowed to make up to four telephone calls per month. Telephone calls may last up to 15 minutes. Level 3 inmates can access telephones from the common area of their housing unit and may make up to 150 minutes of calls per month. Level 4 inmates may make up to 300 minutes of calls per month and participate in the electronic mail program (email). There is a program at USP Florence for inmates who have lengthy telephone restrictions of months or years to earn back telephone privileges by compliance with certain items. This was not found to be an incentive found in all facilities.

**ADX correspondence and telephone use** In the ADX General Population, Control and SHU inmates schedule legal calls through their assigned counselor. General



Population inmates can make (2) 15 minute telephone calls per month, Control inmates can make (1) 15 minute telephone call per month unless on disciplinary status then (1) 15 minute call every 90 days, SHU inmates receive (1) 15 minute personal telephone call per month on administrative detention status and (1) 15 minute telephone call if on disciplinary status. Control step-down unit inmates can receive (3) 15 minute calls per month. Incentive telephone calls can be earned. All inmate personal telephone calls must be live monitored by ADX staff.

All incoming and outgoing ADX inmate correspondence is inspected by Special Investigation Service technicians. Incoming and outgoing social mail is reviewed by SIS technicians and must be processed within 36 hours. Legal mail is picked up and delivered by the unit counselor which must be processed within 24 hours of receipt. .

*Visiting.* Inmates may receive visitors in accordance *with 28 CFR 540.40. 28 CFR 540.43, Frequency of visits and number of visitors, P5217.01, P5270.10 and P5267.08.* The warden shall allow each inmate a minimum of four hours visiting time per month. The warden may limit the length or frequency of visits only to avoid chronic overcrowding. Inmates may be provided noncontact visits, through the use of videoconferencing or other technology. *(P5217.01, P5270.10, P5267.08, ACA 4-4267.)* Title 28 CFR 541.17 states: "Ordinarily, an inmate in administrative detention or disciplinary segregation status may receive visits in accord with the same rules and regulations that apply to general population inmates, providing such visits do not pose a threat to the security or orderly operation of the institution. In such cases, the warden may authorize special visiting procedures to preclude such a threat."

**SHU visitation.** Generally an inmate retains their visiting privileges while in administrative detention or disciplinary segregation status. However, visiting may be restricted or disallowed when an inmate (while in administrative detention or disciplinary segregation) is charged with or was found guilty of a prohibited act related to visiting guidelines, or has acted in a way that would reasonably indicate a threat to security or order in the Visiting Room.

A minimum of four hours per month of visitation is required by statute and the program statement unless the length of time creates chronic overcrowding. At one facility, FCI Butner II, inmates assigned to the SHU received contact visits, however at all other SHUs, only noncontact visits were provided. The frequency and length of visit for both administrative detention and disciplinary segregation inmates at most facilities were generally the same, one visit per week for two hours. At USP Coleman I and FCI Butner II inmates in disciplinary segregation status received a one-hour visit. SHU inmates generally receive noncontact visits while general population inmates receive contact visits.

At USP Florence, the SHU inmates receive visits through video from a secure room within the SHU. Video visits at USP Florence may last two hours and there is a limit of five visits per month for SHU inmates. Few SHU inmates actually receive visits based



on information obtained during interviews. Legal visits are arranged upon request and take place in the general visiting room area either in a glass noncontact visiting booth or in private room designated for attorneys, depending on the circumstances.

*SMU visitation.* At USP Lewisburg and USP Florence, social visits are provided primarily through video technology. The inmates utilize the video visiting room located in their assigned housing unit, and their visitors utilize the video-visiting units located in the Visiting Room. Regular visitation for SMU inmates in Levels One, Two, and Three is only available to immediate family members, and the relationship must be verified. At USP Lewisburg, inmates in Level 3 are permitted noncontact visits in the visiting room and inmates in Level 4 are permitted contact visits in the visiting room and are not limited to immediate family members. SMU inmates are limited to a maximum of five social visits per month. This does not include legal visits. SMU inmates must submit a request, in writing at least one week in advance of the expected visit. As the availability of video equipment may be limited, visits may be limited to two hours per inmate at USP Florence and one hour visits at USP Lewisburg, although more time may be allotted based on availability of visiting booths.

At USP Allenwood, legal visits are allowed in a manner consistent with national practices. Social visits are noncontact visits and are ordinarily scheduled from 0830 to 1500 hours, Tuesday through Thursday. The social visits for these inmates are limited to immediate family members only. Level 3 inmates are allowed two one-hour visits per month and Level 4 inmates are allowed four one-hour visits per month. The frequency and duration allowed for each visit is reportedly limited due to the number of noncontact rooms available. There are four private noncontact visitation rooms. Staff at USP Allenwood reported the number of visits for SMU inmates was quite low because of several factors including the distances that most visitors have to travel in most instances.

The applicable federal regulation states: *"The Warden shall allow each inmate a minimum of four hours visiting time per month. The Warden may limit the length or frequency of visits only to avoid chronic overcrowding."*[138]

**FINDING: The frequency of visitation allowed for inmates in Level 3 at USP Allenwood is inconsistent with Bureau practices for the same level of inmate at other facilities and not representative of national best practices.**

At USP Florence, the frequency for Level 3 inmates was five visits per month for up to two hours per visit through the use of video technology. At USP Lewisburg, Level 3 inmates were allowed up to five one-hour noncontact social visits per month. When

---

[138] *28 CFR 540.43, Frequency of visits and number of visitors.*



comparing USP Lewisburg visitation policies with USP Allenwood visitation policies, inmates in the same level are allowed a difference of three hours in visits per month.

**RECOMMENDATION 7.1: A further review of the frequency and duration of visits should be conducted at USP Allenwood for Level 3 inmates. Serious consideration should be given to providing the allowance for additional time for those inmates in Level 3.**

Although the warden may limit the length of time or frequency of visits to avoid chronic overcrowding, there was no evidence presented to indicate the established frequency and duration for Level 3 inmates as identified in the facility policy should be less than four hours per month. In addition to the hours provided, there is an issue of consistency in the conditions of confinement for each level. Currently, an inmate housed at USP Allenwood in Level 3 is allowed up to two hours of social visits per month while the same inmate housed at USP Florence would receive ten hours of social visits per month.

Establishing a reference to "more time may be allowed based on availability" in the policy, expanding the number of days or hours visitation is allowed for Level 3 inmates, use of video technology and/or increasing the number of noncontact rooms should all be considered as viable options to provide more consistent visitation practices.

*ADX Visitation.* The legal visits for inmates confined at the ADX are scheduled through the housing unit counselor. ADX inmates can receive five general visits per month with each visit lasting as long as seven hours. Inmates are dressed in different clothing for visits; SHU-Orange Jumpsuits, Control-Yellow Jumpsuits, and General Population-White Jumpsuits. Hand restraints are removed from General Population and SHU inmates after the inmate is secured in the visitation booth with leg irons remaining in place. Control inmates remain in full restraints even after placement in the visitation booth. The ADX has ten noncontact visitation booths for general visits and four noncontact visitation booths for legal visits.

*Legal activity.* SHU inmates must submit a request to use the electronic law library located in a room in SHU. The equipment is available seven days per week. A review of the logbooks reflects that this equipment is frequently used. SMU Level 1 and 2 inmates submit a request to use the electronic law library that is located in their respective housing units. At USP Florence, there are two enclosures in each unit that contain the equipment and a printer. They were observed in frequent use during our review. SMU Level 3 and 4 inmates have open access to this equipment that is located in the common area of their units, which they can frequently access. That equipment was also observed in use during our review. Upon approval of the unit manager, an inmate may request another inmate to assist in legal matters / use of the equipment. This was also observed in action with Level 1 and Two SMU inmates. At USP Allenwood, the records reflected a minimum of one hour access and frequently more



than that. SMU inmates have a dedicated electronic law library in the common recreation area that may be used during recreation. An additional terminal is located in a room adjacent to the common area when a SMU inmate needs privacy or for noise considerations. The project team noted consistent access to the electronic law library throughout site visits.

*Access to medical care.* Inmates in restrictive housing units have limited capability to access and communicate to staff because of the nature of secure confinement. Nationally accepted best practice dictates that inmates are afforded daily access to medical care, or in more emergent circumstances immediately. Correctional institutions should have in place a method to allow for unimpeded access to medical care. This is particularly difficult to carry out in restrictive housing units, where the inmates are mainly locked in their cells 23 hours per day, seven days per week. This section of the report examines access to healthcare in the Bureau facilities assessed.

Title 28 Code of Federal Regulations, section 541.32 (a) addresses the provision of medical and mental health care in the SHU. The regulation specifies that a health services staff member will visit each inmate daily to provide necessary medical care, exclusive of emergency care, which is provided on an as needed basis.

The assessment team examined SHU sign-in records and logbooks, as well as making direct observations at each of the facilities assessed to determine the frequency that medical staff signed into the unit to make rounds of the cellblock ranges and also administer medication. The following findings are the result of that analysis.

- *USP Tucson.* Medical staff visit the unit two times per day. During the morning visit, healthcare staff observe each inmate in their cells and respond to inquiries. Also the medical staff receive formal written medical requests from the inmate. Evening medical rounds focus more on administering medication.

- USP Victorville. Records were reviewed for a 60 day period and the following was revealed. The average number of medical staff visits to the unit was two per day. In five of the 60 days medical staff signed into the unit one time. A medical staff member visited the unit at least once per day for all 60 days.

- USP Hazelton. At this facility, sign in records revealed that once per day a physician's assistant visited the unit to visually observe the inmates.

- *USP Florence.* Assessment team members observed medical staff traveling cell to cell to check on the inmates and make visual observations. Records revealed that medical staff entered the unit multiple times per day.

- *USP Terre Haute.* Sign in logs revealed that a registered nurse enters the unit a minimum of once per day and a medical staff person visits the unit multiple times each day.



- *ADX Florence.* SHU records revealed the presence of medical staff two times per day to conduct rounds and administer medication.

- *USP Allenwood.* In the SHU medical staff signed into the unit two times per day to conduct rounds and administer medication.

- *FCI Butner.* 90 days of sign in logs were reviewed and it was determined that medical staff visited the SHU multiple times per day administering medications, observing inmates, and collecting medical slips.

- *USP Coleman.* 62 days of sign in logs were reviewed revealing the presence of medical staff on a daily basis in the unit.

The ACA standards that address the provision of medical care in restrictive housing units call for, at a minimum, daily visits by qualified healthcare personnel and unimpeded access to prescribed medication.[139]

SMU healthcare access requirements are outlined in *Program Statement P5217.01, Special Management Units*, dated 11/19/2008. Section 5 (a) 15 regarding medical care reads: "...a health services staff member visits inmates daily to provide necessary medical care. Emergency medical care is always available either at the institution or from the community."

Three SMUs were visited during this assessment. At USP Florence, SMU sign in records and logs revealed that health care staff visited the unit one time per day, consistent with the requirements of the program statement.

The largest of the SMU programs is at USP Lewisburg. Logbooks, sign in sheets and observations revealed that health care staff enter the units at least one time per day to conduct their rounds. A spot check of sign in documents was conducted covering a six-week period to make this determination.

At USP Allenwood, which houses SMU inmates in Level 3 and Level 4, records revealed that health care staff visited the two SMU cellblocks, two times per day.

---

[139] 4-4258 Written policy, procedure, and practice provide that inmates in segregation receive daily visits from the senior correctional supervisor in charge, daily visits from a qualified healthcare official (unless medical attention is needed more frequently), and visits from members of the program staff upon request. 4-4261 Written policy, procedure, and practice provide that all inmates in segregation provide prescribed medication, including that is not degrading, and access to basic personal items for use in their cells unless there is imminent danger that an inmate or any other inmate(s) will destroy an item or induce self-injury.



ADX control unit healthcare personnel make rounds of the various control unit housing areas once per shift or two times per day. Section 541.67, of Title 28 Code of Federal Regulations requires that "...a medical staff member see the inmate daily and regularly record medical and behavioral impressions."

Bureau regulations and program statements provide clear direction with respect to inmate access to healthcare in segregated units. Inmates in these units have limited mobility and a limited capacity to communicate with staff. This has been recognized by the corrections profession and nationally accepted correctional standards, such as the ACA standards require that inmates be seen daily in the living unit and also have unimpeded access to their prescribed medications.

Bureau regulations call for a minimum of a daily visit by a qualified healthcare professional to these units. Our assessment process included a review of sign in or attendance records of health care staff entering the various segregated units. Our findings are outlined in the above paragraphs. These findings are supported by interviews with staff, interviews with inmates, and documentary evidence that revealed that health care staff meet and often exceed the minimum requirement of attending to inmates in segregated units.

This examination did not include a review of medical records or the quality of medical care that is provided, as this was beyond the scope of this analysis. A number of the inmates interviewed did express concern about the quality of the care they were receiving; however, there were few complaints that medical staff were unavailable to speak with inmates during medical rounds.

**FINDING: The presence of health care staff in the segregated units is ongoing at least daily, and often more frequently, consistent with Bureau policy and ACA standards.**

Health care staff administer medications to inmates and this is an ongoing process that takes place at different times during the day. In addition, the medical staff are required each day to visually observe all inmates, regardless whether or not they are receiving medication, as a wellness check to determine if they may need healthcare services. There were no examples that we detected where a medical staff person didn't make a visit to a segregated housing unit at least once per day.

# Adequacy and allocation of program space

The focus of this section of the report addresses the findings and recommendations related to program space available in the three main segregation units being analyzed: SHUs, SMUs, and ADX. The reported lack of space has been cited at several facilities by staff as one of the primary reasons why programming is provided for



most inmates individually in their cell using a self-study format. This section focuses more on the potential use of existing space available to provide small group programming for appropriate inmates rather than on specific programming opportunities, which are addressed in another section of the report.

According to federal regulations and applicable Bureau program statements, all three of the restrictive housing units are designed to help ensure the safety, security, and orderly operation of the Bureau facilities. Title 28 Code of Federal Regulations, section 544.81 Education states: "the warden shall ensure that an inmate with the need, capacity and sufficient time to serve has the opportunity to: Complete an Adult Literacy program leading to a General Educational Development (GED) certificate and/or high school diploma." The required access to program activities is based in part on the inmates' status and the type of restrictive housing unit in which they are housed.

## Statutory and Bureau requirements

*Special housing unit programs.* In administrative detention status, an inmate will have access to programming activities to the extent safety, security, orderly operation of a correctional facility, or public safety are not jeopardized. In disciplinary segregation status, participation in programming activities, e.g., educational programs may be suspended. *(28 CFR 541.31, 28 CFR 544.81, P5270.10).*

Inmates assigned to an SHU are either in administrative detention status (nonpunitive) or disciplinary segregation status (punitive). Based on federal regulations, inmates in administrative segregation status are allowed to have program access as long as it does not jeopardize safety. Inmates in disciplinary segregation status may have their program activities suspended.

Educational and religious program activities are provided on an individual basis normally while the inmate is in the cell and the staff member is outside the door. There is no small group programming provided with the exception of recreation where between one and four inmates may be placed in a single recreation yard. In most facilities, educational services were available however the services were considered limited and provided in a self-study format while the inmate remained in the cell.

At FCI Butner II, inmates enrolled in GED or ESL classes prior to being in the SHU were allowed to remain in those classes for 60 days and provided with appropriate instructional materials to continue their studies. Inmates in the SHU more than 60 days are dropped from those courses and placed on a waiting list to restart the courses upon their release from the SHU. A new education program with a series of classes on various topics was reported to have started in the SHU beginning February 17, 2014. The inmates are provided self-study materials to be completed in-cell.



Twenty-six courses are offered in six categories: Math (7 classes); Science (3); Reading (4); Social Studies (4); Writing (4); and Miscellaneous classes (4). The significant number of enrollees in the first week is a strong indication of the desire of SHU inmates to participate in programming. All of the inmates interviewed expressed a desire for more program offerings while in the SHU. An OASIS computer based course was being offered to inmates in the general population and could be offered to inmates in the SHU to complete in the SHU Law Library if approved. Most other facilities offered comparatively limited opportunities.

*Special management unit programs.* SMUs consist of four program levels and access to program activities generally increases as the inmate advances through the program. Progression through Level 1 is based upon the inmate's compliance with behavioral expectations as established by staff. Progression through Level 2 and Three is based upon the inmate demonstrating the "potential for" or positive "community" interaction. Progression from Level 4 to a general population facility is "based upon the inmate's ability to function in a general population setting with inmates of various group affiliations." P5217.01.

The project team found that a staff member representing the education department was assigned to each of the SMU programs and based on documentation reviewed frequently visited the units. Inmates in Level 1 and Two normally are involved in individual self-study programming which takes place in the cell. Staff primarily visit the inmate in front of their cell and communicate through the cell door. Inmates without a verified high school diploma or GED certificate are required to participate in a literacy program with the goal of improving their knowledge and skills through academic activities. At all three SMU programs daily schedules reflect educational personnel are scheduled to make rounds in the housing unit on a regular basis.

The opportunity for additional inmate interaction increases when the inmate reaches Level 3 and 4. Most programming for Level 3 and 4 inmates is individualized self-study however during the inmates' out-of-cell time they are allowed to seek assistance from the staff member. There is no formal group educational programming offered in the SMU program.

*ADX programs.* The federal regulations for the control unit program state that the warden shall assign a member of the education staff to the unit on at least a part-time basis to assist in developing an educational program to fulfill each inmate's academic needs. The education staff member is ordinarily a member of the unit team[140].

---

[140] 28 CFR 541.46, 28 CFR 544.81.



The ADX consists of several different program levels ranging from the general population, intermediate step of the step-down program, SHU, control unit, and special security unit. In each phase of the program the level of access to program activities changes. As an inmate progresses through the different program levels access to program activities increases. A staff member representing the education department is assigned to the each program. For those inmates in the control unit, the majority of programming is conducted in cell and on an individual self-study basis. Programming is also offered on the closed circuit TV within the inmate's cell. For those inmates in the ADX general population units, the majority of the programming is conducted in-cell on an individual self-study basis and programming is offered on the closed circuit TV within the inmate's cell. The ADX recently constructed five "therapeutic enclosures" in the gymnasium where five inmates in separate enclosures can participate in a group program. At the time of the on-site review, the psychology department was using the therapeutic enclosures to conduct a reentry preparation program. One 90-minute "group" is meeting once a week. Generally, inmates assigned to all of the ADX phases are provided self-study materials to be completed in their cell.

Program statements and facility supplemental statements related to program access in restrictive housing units are aligned with the regulatory requirements identified in the federal regulations. The review team found that personnel were generally familiar with the program statements and the program access requirements. Daily activity schedules were in place, appropriately trained personnel were assigned to adhere to these requirements and oversight was provided. The assessment team observed that almost all programming outside of recreation was provided on an individual basis while the inmate remained in their cell.

## Existing potential program space

The current practice observed by the project team reflected access to program activities for most of the inmates assigned to a segregation unit is provided individually while the inmate is in the cell and the staff member is outside the cell door. The federal regulations do not address how program activities are to be provided or the frequency in which they are to be provided. Outside of a few select cases or during recreation and the day room time provided for inmates assigned to an ADX transitional unit, or Level 3 and 4 of the SMU program, almost no formal group program activity is being provided. As indicated in other sections of the report, there had been recent initiatives including the building of multiple individual enclosures to provide some limited "group" programming.

Overall, access to program activities appears to be consistent with meeting the minimum requirements cited in the federal regulations. Most programming consists primarily of cell-side services. Staff interviewed during the review process reported

207



that individual in-cell programming was preferred primarily due to safety concerns and the lack of available small group space.

**FINDING: Based on an assessment of the physical plants and on-site reviews, there does appear to be an opportunity to provide properly scheduled small group programming for appropriate inmates in existing space at the facilities.**

Every facility the project team visited had space within the unit to provide small group programming for three to six inmates at a time. Based on site observations and staff interviews, all of the potential group programming space was not consistently being used during the day.

In the other facilities visited limited small group programming space located primarily on the front end of the range or unit that was being used primarily for interviews, hearings, storage or screening and could also be considered available programming space during select times. The project team identified limited space available to provide small group programming for appropriately screened inmates at all of the facilities visited.

The project team is not advocating group programming be provided to all inmates in the segregation units however some may be considered appropriate. For example, inmates who are in administrative detention status (nonpunitive) for the sole reason they have been verified by staff as requiring protection or inmates who have advanced in their assigned program to a higher level (SMU Level 3 or 4, ADX step-down, transitional and pre-transfer unit) structured small group programming should be considered an option as space appears to be available.

**FINDING: There are a limited number of potential small group programming spaces available at each facility.**

The location of the potential space was all in an area in the housing unit that was consistent with maintaining a secure environment for both the inmate and staff. Though the size of each space varied, the rooms appeared to be sufficient to accommodate multiple individuals for short periods of time. Currently, most programming is offered individually while the inmate remains in the cell.

The project team is not advocating all individuals assigned to a restrictive housing unit be provided access to small group programming, however some inmates with specific classifications should be considered when proper security precautions are applied. For example, those inmates who have been assigned to administrative detention status (nonpunitive) solely for protection and have been verified by Bureau staff as requiring protection, inmates in Level 3 and 4 of the SMU program, (the program statement states frequent group counseling, they currently recreate in a group setting and participate in day room activities as a group), and ADX Step-Down,



Transitional and Pre-Transfer inmates who currently recreate and share day room activities at the same time should all be considered for small group programming.

**RECOMMENDATION 7.2: Use of existing small group space should be seriously considered for inmates who have been properly screened.**

## Observations on conditions of confinement

**FINDING: The general conditions of confinement were found to be consistent with national regulations and standards. Establishing, maintaining and monitoring the conditions of confinement appeared to be a routine part of the daily operations of managing the Bureau facilities visited. Policies were in place, staff were familiar with the requirements, and post orders and job descriptions had been established to enforcing compliance in this area.**

The additional use of external monitoring and assessment through the Bureau's ACA efforts was considered a valuable management tool that provided quality feedback regarding general conditions of confinement. The project team found that areas of deficiency that were cited by the Program Review Division (PRD) and/or ACA were addressed and/or seriously considered by facility management staff. Every facility visited had received accreditation status by the ACA.

However, some areas of concern identified during this assessment were either not present at the time of the PRD or ACA review or had not been identified by the PRD and ACA reviews as concerns.

- *Triple-celling.* The practice of housing three individuals in a cell that is approximately 85 square feet in size and contains two beds should be eliminated. This practice is inconsistent with nationally accepted standards and creates an environment that threatens the safety of both inmates and staff. The absence of an established written policy that identifies proper procedures to follow before placing three individuals in a cell with two beds, including monitoring practices, inmate screening, time limits and authorization is inconsistent with national best practices.

- *Low levels of participation in out of cell recreation.* Many inmates do not take part in recreation due to access only at early hours (0500 wake up calls for recreation), fear of being assaulted, passing room inspection, and lack of equipment.

- *Lack of consistency in the conditions of confinement provided for individuals in the same level.* For example, and inmate in Level 3 housed at USP Allenwood is allowed up to 150 minutes in social telephone calls per month, two one-hour noncontact social visits per month and indoor and



outdoor recreation totaling approximately fifteen hours per week. The same inmate if housed at USP Lewisburg would be allowed twice the number of social telephone call minutes per month (up to 300 minutes), more than twice the amount of social visits per month (five one-hour social visits) and significantly fewer recreation hours per week (five hours of outdoor recreation). The differences in frequency, type, and the duration of conditions of confinement for an inmate classified at the same level in the same program while housed at a different facility presents concerns regarding the integrity and design of the level system.

- *Similarity in conditions of confinement for inmates in administrative detention and disciplinary segregation status.* Administrative detention is identified as a nonpunitive status while disciplinary segregation is identified as a punitive status. However, the inmates are assigned to the same housing unit, inmate movement procedures including application of restraints are the same, the frequency of recreation is the same, telephone access is the same and visits at all but two facilities visited were the same. With the exception of minor differences in personal property allowed and in-cell programming opportunities the day-to-day conditions of confinement were not much different. Considering one status is nonpunitive and includes in part individuals that are in administrative detention status strictly as a result of being verified as requiring protection serious consideration should be placed on reevaluating the day-to-day condition of confinement authorized for individuals in a nonpunitive status.

## Program reviews

The Program Review Division (PRD) is directly responsible for overseeing Bureau-wide performance reviews that are designed in part to examine facility operational compliance levels with applicable laws, rules, regulations, and policies. In addition, the division examines the adequacy of controls, the efficiency of operations, and effectiveness in achieving the desired program results. PRD is also responsible for ensuring an analysis of specific program performance patterns is completed and serves as the Bureau's liaison with most external audit agencies.

To provide personnel with consistent direction and guidance a comprehensive program statement[141] has been established that identifies the purpose, requirements

---

[141] *Program Statement 1210.23, Management Control and Program Review Manual,* dated 8/21/2002.

210



and procedures associated with meeting review responsibilities. As a result, *local operational reviews* are required to be conducted by facility personnel at least once every 10 to 14 months. These *operational reviews* are commonly considered facility self-audits. In addition, a comprehensive *program review* managed by central office is conducted and completed by external Bureau personnel at least once every three years.

Throughout the review process the project team examined the operational and monitoring practices and found that both program and operational reviews were normally being completed on a scheduled basis. Facility personnel were familiar with the process, documentation was available and dedicated personnel were assigned to each facility that were held accountable for monitoring local compliance levels.

## Program review observations

Policy and review schedules have been established that are consistent with federal requirements and have been designed to ensure that both the operational and program reviews are conducted in a manner that best addresses the requirements of the Bureau. The division normally schedules the external *performance reviews* based on specific areas being analyzed and the location of the facilities. For example, either a correctional services or facilities management *program performance* review is scheduled for a prison complex and will include an examination of several subject areas to be reviewed within the complex. In most facilities specific guidelines have been established to ensure certain policies and procedures are reviewed.

At the Federal Correctional Complex Tucson a facilities management review was conducted on February 12-14, 2013, which included the Federal Correctional Institution, USP, and the satellite work camp. Guidelines were established by PRD that identified specific policies to be reviewed including policies impacting both general population and SHUs at each of the facilities. The scope of coverage and format used during the Tucson review was typical of what the project team observed in evaluating other PRD reports.

A typical performance review normally does not focus strictly on a particular housing type or specific subject matter, but analyzes and provides a report that identifies the overall complex performance findings and trends. *Program reviews* are not designed to examine each requirement identified in every policy in every housing type. However, *program review* guidelines have been established to ensure specific protective policies, conditions and procedures that are reviewed, include general population, SHUs and SMUs. Additionally, to provide further observation of SHU operations, each institution's program review (all disciplines) includes the reviewer-in-charge conducting a comprehensive tour of the SHU, promptly reporting findings as appropriate, and including the findings in the final report.



For example, inmate access to recreation may be examined complex-wide and by policy a sample number of general population, SHU and SMU files will be required to be reviewed. If there are specific concerns identified in this area those concerns are generally noted in a subsection entitled "general comments" or "deficiencies" in the PRD report. Bureau policy states that the reviews include an examination of a select percent or number of general population, SHU and/or SMU files. What is excluded in the review is the same level of examination of conditions for the ADX. The Program Review Division at the time of the project team's assessment did not have specific monitoring requirements for ADX policies as was the case for the SHUs and SMUs. Operational reviews and performance reviews were being conducted at the ADX as evidenced by documents provided, however specific guidelines ensuring select areas were reviewed had not been established.

**FINDING: Specific conditions of confinement and protective policy compliance levels are monitored locally by facility personnel and in some areas by central office personnel that are not assigned to the Program Review Division.**

The lack of these specific guidelines for the ADX creates the potential for possible omissions in examining areas that require ongoing review.

**RECOMMENDATION 7.3: Guidelines that identify specific conditions of confinement and protection policies consistent with applicable federal regulations and national standards should be developed and included as part of the Program Review Division performance review process[142].**

## Reporting

In addition to a review of the specific policies and conditions examined by the Program Review Division, an assessment of the performance reports was completed. Program Review Reports from 2011 to 2013 were reviewed as well as *Program Statement 1210.03, Management Control and Program Review Manual*. Each report identified the dates the review was completed, overall rating, response requirements, if applicable, reviewer assurance statement, background information, general comments (concerns, if any) and deficiencies.

In examining the documents from 2011 to 2013, there were several program review reports that identified concerns in the restrictive housing units that required a response from facility personnel. Some of the concerns noted in the reports included such areas as: inadequate cell search procedures; consistent documentation of staff

---

[142] The Bureau has reported that ADX-specific program review guidelines were developed and became effective June 13, 2014.



rounds; consistent documentation of inmate access to services; proper application of restraints; and below average sanitation conditions. The positive aspect of the reviews was that the Program Review Division was identifying concerns during their review and requiring facility personnel to provide a written response and corrective action plan for each.

A few of the concerns cited in the 2011 – 2013 reports were consistent with the review team's observations in 2014. Policies were in place that required activities and service delivery to be documented when provided, however observations reflected there were occasions when incomplete documentation was being provided. The frequency of the omissions was few. The addition of the new automated software program designed to document inmate service delivery was in use at several of the facilities. The system allowed routine activities to be recorded electronically such as meals delivered, recreation, and shower access. This procedural upgrade was viewed by staff and the project team as a significant improvement over the manual system. Staff were familiar with the automated system and procedures were in place to ensure select service activities and conditions were documented and inputted into the system.

## Operational review observations

The Program Review Division (PRD) is an essential part of the Bureau tasked with the responsibility of overseeing Bureau-wide performance reviews that are designed in part to identify facility operational compliance levels with applicable laws, rules, regulations, and policies. Policies and procedures have been developed, qualified staff are assigned and site reviews are conducted on a regular basis consistent with applicable regulations.

**FINDING: Both program and operational reviews served a vital role in the overall positive operations of the Bureau's facilities.**

Appropriate adjustments and revisions were being implemented to refine the system and Bureau personnel reported additional modifications are being considered. In line with the approach of continued growth and refinement, the project team has identified a few recommendations in this area:

**RECOMMENDATION 7.4: Establish a separate program performance review for the USP Florence ADX that includes in part a comprehensive evaluation of specific policies and procedures that are unique to the ADX.**

The current review includes three facilities: Federal Correctional Institution; USP Florence High, and USP Florence ADX with a separate satellite work camp. The benefit of providing a separate review with specific guidelines focused on the unique



operations of the ADX can only assist in meeting the established mission of the Bureau.

Specific guidelines to be reviewed have not been established for the ADX and should be considered. These guidelines should reflect federal regulations, Bureau policies and national standards. Based on the uniqueness of the program, including the ADX's operations and conditions of confinement a separate review may provide for a more detailed assessment of the facilities overall compliance levels with established policies and regulations.

**RECOMMENDATION 7.5: Enhance the external oversight of the local operational reviews that are being conducted no less than on an annual basis.**

External program performance reviews appear to be identifying a number of issues that should be addressed and corrected as a result of the local operational reviews that are conducted by the facility. Written responses are required and provided on concerns identified in the operational review, however reported corrective action may not always resolve the deficiency. Exploring the expanded use of announced or unannounced follow-ups and or requiring repeated assurances over a period of time regarding the effectiveness of the correction action should be considered.

**RECOMMENDATION 7.6: Reassess the performance review rating system.**

A number of program reviews resulted in an overall rating that may not have been consistent with the findings or definitions identified in the applicable program statement. Based on the project team's observations and review of documents, the team did not identify any facilities that warranted an overall rating of "deficient" or "at-risk," and none of the reports indicated the same. Re-evaluating the overall performance rating designation and ensuring an accurate rating is provided essential to solidifying the integrity of the review process.



# Chapter 8: Summary of conclusions

The following summarizes the major findings and recommendations that were presented in the previous chapters of this report.

## Extent of segregation

The Bureau experienced an increase in the use of restrictive housing that began in 2009 by rapidly implementing its existing SMU program. Data indicates that the ADX population has remained quite stable over the same time period.

Only a limited amount of information is known about the SHU population in terms of historic trends as the Bureau did not retain data on the number and type of inmates placed in the SHU status - protective custody, investigation and disciplinary segregation. More recent data indicates that the size of the SHU population has been steadily declining since 2011. The Bureau was able to provide detailed SHU population statistics beginning in February 2013. At that time, the count was 10,262 in over 100 facilities and has steadily declined since then reaching 8,939 by June 2014. This is a significant reduction from the self-reported count of the SHU population of over 13,000 in 2011.

The decline can be attributed to several factors as reported by staff at all levels and confirmed and observed by the CNA project team. The process of conducting weekly reviews of SHU placements has been in place for some time and is a key factor in the decline. These reviews are held in a formalized setting with the entire management team of the facility participating in a review of the status of each inmate in SHU. The review includes an assessment and evaluation of all placement options including release from SHU. Staff noted that in the last three years the process has been re-emphasized as a means to ensure that inmates are managed in the least restrictive setting given their risk to the system.

As of November 2013, approximately 5 percent of the entire Bureau's inmate population was being housed in one of these three restrictive housing populations with the vast majority in the SHU status. From a state prison population perspective, this number is neither high nor low, but more in the middle.



However, this review indicates that there are excellent opportunities to significantly lower the SHU and SMU populations by adopting the recommendations outlined in this report. Specifically, we estimate that the current SMU and SHU populations can be lowered significantly by adopting the following approaches:

As of 2014, there were 4,252 inmates in some form of investigation status. This is partially a result of the lack of a policy requirement that investigation be limited to a specified maximum time period, absence a rationale for continuing the inmate on investigation beyond the specified time period. Presently, investigations can linger for months without resolution:

- Related to the investigation time period, once the investigation is completed and the case heard by the DHO, the sanction issued is not retroactive to the original date of placement in the SHU. As a result, if the investigation continues for 180 day and the inmate is found guilty of the infraction and issued disciplinary time of 30 days, the sanction and disposition is in reality 210 days as it is not retroactive to the original placement date. Giving the option for credit for time served will reduce the bed days in segregation significantly given the size of the investigation population.

- It was reported that in November 2013, there were 1,437 protection cases in special housing with an additional 172 housed in special housing but pending placement back into the general population. As noted in the report, many states have removed protection cases from administrative segregation and created specialized housing that is secure but replicates the conditions of confinement and programming of a general population unit. Not all of those in protection status would qualify for such placement as those whose protection is related to their own behavior could be excluded as they represent an ongoing risk to others. This option would, however, remove a significant number of offenders from the SHU. The Bureau is already utilizing this option to a small degree with the establishment of the RHU in Oakdale, Louisiana.

- The Bureau should continue to utilize a process of careful review of all referrals for placement to the SMU program. As noted in this report a recent snapshot of the review process indicates that 22 percent of the referrals initiated at the institutional level have been denied placement. This recent level of denials are an increase over prior measured levels and will assist in controlling any future growth as the SMU beds are reserved for only those who require such placement.

- It is recommended that the time period for completion of the SMU program be reduced from the present 18-24 months to 12 months and also the four levels be compressed to three levels by combining Level 3 and



Level 4 and allowing more differentiation between the condition of confinement between the levels.

Implementation of these recommendations will significantly reduce the present restrictive housing population, while ensuring that mechanisms are still in place to maintain the safety and security of the institutions.

# Conditions of confinement

In general, we found the housing units, cells, and furnishings provided in the cells to be adequate to accommodate either single or double celling of the ADX, SMU and SHU populations. Lighting, ventilation, access to showers and recreation areas were also nonproblematic. Some concern is noted with recreation, as a significant portion of the restrictive population decline to use scheduled recreation periods. Interviews with inmates with few exceptions validated our on-site observations. The quality of food provided to inmates was rarely cited as an issue by inmates.

Virtually all of the inmates in SMU and SHU are double-celled. Inmates do have regular access to showers and recreation but the vast majority of their time is spent in their cells with their cellmates (with the exception of the Level 4 SMU inmates). Security staff, case managers, medical and mental health staff make regular visits to the housing units. However, direct out-of-cell contact with staff is very limited. When such contacts occur, they are brief and in front of the cells doors.

Establishing, maintaining and monitoring the conditions of confinement appeared to be a routine part of the daily operations of managing the Bureau facilities visited. Policies were in place, staff are familiar with the requirements and post and job descriptions had been established to help in enforcing compliance.

A typical week for the inmate in restrictive housing consists of a few hours of recreation, limited visits, and no phone calls (primarily due to the restriction issued by the DHO as part of the disciplinary hearing process), and no participation in out of cell treatment programs. Based on the information obtained by the prisoner interviews, although inmates are afforded opportunities for out of cell activities, portions of the SHU and SMU populations never leave their cells each week.

Administrative detention is identified as a nonpunitive status while disciplinary segregation is identified as a punitive status. However, the inmates are assigned to the same housing unit, inmate movement procedures including application of restraints are the same, the frequency of recreation is the same, telephone access is the same and visits at all but two facilities visited were the same. With the exception of minor differences in personal property allowed, number and duration of phone calls, and in-cell programming opportunities the day-to-day conditions of



confinement were basically equivalent. Considering one status is "nonpunitive" and includes individuals who are in administrative detention status for protection, serious consideration should be placed on reevaluating the day-to-day condition of confinement authorized for individuals in a nonpunitive status.

The Bureau needs to increase the amount of out-of-cell activities and continue its ongoing efforts to reduce the overall size of the restrictive housing population.

# Impact of the "separatee" status

The SHU situation is complicated by the fact that a high percentage of inmates residing in SHUs have requested protection from other inmates, often due to gang related issues. Many inmates in the system have what are termed as "separatees." A separatee is an inmate who for security and safety concerns cannot be housed with specific inmates in housing units where they may congregate with one another. The number of inmates that have separatee issues is significant and impacts inmate management in the agency. For example, the warden at USP Lewisburg advised the assessment team that of 748 inmates at that facility, 334 of them had separatee issues. Some individual inmates had as many as 14 separatees. Keeping in mind that these inmates can't congregate with one another, bed management in the general population and segregation units is very complicated.

In the SMU at USP Allenwood, where inmates in Level 3 and Level 4 are allowed to congregate, the lieutenants and unit management staff have to carefully place inmates according to their gang or group designation.

The gang issue in the USPs that was assessed impacts the management of the SHU as it creates separatee issues and likely increases the number of inmates requesting protective custody, resulting in them being housed in restrictive housing. This observation was confirmed through interviews with staff and inmates who indicated that many of the segregated inmates were unable to live in general population because of the influence, harassment, intimidation, and threats of violence from members of gangs and "cars" (Prison based gangs in the facilities).

Difficulties in the management of the gang problem exacerbate the protective custody problem, thus causing a high incidence of inmates leaving general population by their own request and being placed in segregation units after being threatened in general population. There is no simple solution for this issue but its impact is significant throughout the Bureau. Through its investigation units and its gang management unit the Bureau is aggressively attacking the problem. The wide spread presence of the gang factions, especially in the United State Penitentiaries, significantly impact the presence and size of the restrictive housing units.



# Investigation, protective custody, and pending transfer inmates in SHU

The SHU population needs to be understood in terms of the major statuses that one can be assigned. Those assigned for disciplinary sanctions purposes are inmates who have been found guilty by a well-functioning disciplinary process for serious violations of prison rules and conduct. However, the much larger number of inmates held administrative detention for investigation, protective custody, and pending Bureau actions under restrictive conditions of confinement for extensive periods of time deserves further discussion and scrutiny.

The largest number of inmates being held in SHU are either there for investigation or protective custody. Although the Bureau states in its policy that both statuses are "nonpunitive," this is clearly not the case when examining the units from an operational and program standpoint. Inmates in protective custody and investigative status are housed in SHU experience the same living conditions as those placed in what is an explicitly punitive environment. As of 2014, there were 4,252 inmates in some form of investigation status and another 1,361 inmates in some form or protective custody. Further another 1,802 inmates in the punitive SHUs awaiting some action by the BOP to either have a hearing for discipline, or transfer to ADX or SMU status or some other location. Thus, over 80 percent of the SHU inmates have not been found guilty of disciplinary conduct.

As noted previously, investigations should be completed in a more timely manner. It is suggested that a limit of 45 days be established, with provisions for an extension of this time limit when circumstances exist that require additional time.

Also noted previously, there needs to be a clear difference in the conditions of confinement from those in punitive segregation, those in investigation or protection status, and those simply awaiting an administrative action of some kind.

# Inmates awaiting administrative actions

Somewhat related to inmates under investigation status are those awaiting some final action by the Bureau's central office. This population is excessive and needs to be reduced. The reasons for delays in transferring inmates from SHU either to SMU/ADX or back to the general population is complicated by lack of space and the number of separates. Little can be done about the number of separatees but, as noted later, much can be done about the lack of bed capacity.



SHU inmates who have pending transfer actions should be transferred out of SHU within ten working days once their status for placement in SHU has expired.

# Protective custody inmates in special housing units

Housing protective custody inmates in a punitive setting clearly contradicts best correctional practices. States that have been found to do so have suffered from on-going litigation and court ordered reforms. Many states have developed specialized protective custody housing units where inmates are provided the same level of basic privileges and access to rehabilitative programs and even work assignments as general population inmates. The one exception is that they are assigned to specially designated housing units within a prison or a specialized facility.

It was reported that in November 2013 there were 1,437 protection cases in special housing with an additional 172 housed in special housing but pending placement back into the general population. In October 2013, the Bureau issued a memorandum that provided field staff with procedures and criteria for placement of inmates in the reintegration housing unit (RHU) located at the Federal Correctional Complex at Oakdale, Louisiana.

The target population for the RHU consists of male inmates who "consistently refuse to enter general population at multiple locations" and those who have been designated through the classification process as protective custody.

The question then becomes 'what is the appropriate manner to manage inmates who have verified protection needs?' such inmates are presently housed in administrative detention, which is identified by Bureau policy as a nonpunitive status. However, the inmates who are verified protection cases are assigned to the same housing unit as punitive segregation inmates, inmate movement procedures including application of restraints are the same, the frequency of recreation is the same, telephone access is the same and visits at all but two facilities reviewed were the same. With the exception of minor differences in personal property allowed and in-cell programming opportunities, the day-to-day conditions of confinement were not much different. Considering one status is nonpunitive and includes in part individuals that are in administrative detention status strictly as a result of being verified as requiring protection, serious consideration should be placed on reevaluating the day-to-day condition of confinement authorized for individuals who have been verified as needing protection.

This is a complex issue within the Bureau due to extensive presence of security threat group members even in the SHU. Many of those have verified protection as a



direct result of their prior involvement with a security threat group. But many are also victims or potential victims who need protection. These protection needs should be provided but in a more normalized setting than what is presently provided in the SHU.

In numerous state departments of correction, the conditions of confinement for protection cases have been altered to parallel that provided to other general population inmates. In these instances inmates are housed in SHU or similar units while the claim for protection is being investigated. Once the need for protection is verified they are moved to a separate unit that provides conditions of confinement that are similar if not identical to that provided to general population inmates. These units operate separate from other general population units and afford the inmate the ability to function in a normalized prison environment while ensuring they are protected. Kentucky has done this successfully at the Eddyville facility while Ohio also operates units that replicate general population conditions for protective custody inmates. It should be noted that the Bureau is moving in this same direction with the establishment of the RHU in Oakdale, Louisiana.

The Bureau should to establish nonpunitive protective custody housing units that have equivalent levels of programs and privileges as general population inmates.

# The special management unit program

The Bureau has developed a much-needed step-down program for inmates removed from the general population. The criteria for such removals are objective and reasonable (only inmates who have committed serious acts of violence or pose a threat to the safety and welfare of the other 95 percent of the inmate general population).

The conditions of confinement for SMU inmates are more restrictive than for general population inmates. SMU inmates are expected to complete the four-level SMU program in 18 to 24 months, at which time they may be re-designated (transferred) to an appropriate facility. At the time of the initiation of this review, SMU programs were functioning at USP Lewisburg, USP Allenwood, and USP Florence. During the course of the review the Bureau began the phasing out of the SMU at USP Florence through the gradual transfer of inmates to USP Lewisburg.

Documentation provided by the DSCC indicated that a total of 5,435 inmates had been submitted for SMU placement from January 2009 to June 6, 2014. Of the inmates referred, 1,057 (19.5 percent) had been denied placement by the DSCC. This does not include denials/rejections that occurred at the regional offices as those records were not readily available.



A more recent picture of the validity of the referral and review process was obtained by reviewing the number of referrals by month that have been submitted since January 2013 through February 2014 and the number of these by month that have been rejected by either the DSCC or the regional director. Table 21 summarizes these decisions.

This more recent snapshot of the review process indicates that 22 percent of the referrals have been denied placement.

What is uncertain is the need for four levels and overall time to complete all four levels before an inmate can be returned to the general population. Currently, the total minimal amount of time required to complete all four levels is approximately 18 months. We say "approximately," because in the Bureau the levels are designated by policy as six to eight months and two to four months in each level.

As noted in chapter 2, most of the reviewed state prison step down programs allow for only three phases of confinement, which tend to last 90 days each. Many have implemented a program that has a minimum stay exceeding 12 months. Nor is there any research basis for extending the minimum amount of time in segregation for fully compliant inmates beyond nine months or for that matter any length of time.

It was also discovered that SMU inmates who have completed a particular phase of the program are not promptly transferred to the next program phase location. This was a problem at USP Lewisburg for inmates who had completed Level 2 and were scheduled to advance to Level 3. These backlogs in inmates awaiting transfer to the next program level negate the intent of the program design and decrease the motivation to change behavior.

Finally, relative to program content, much of the program elements of the status (with the exception of Level 4) consist of in-cell written assignments that are not testing the prisoner's ability to return to the general population. In order for the program to be more effective, the Bureau should examine whether to develop a range of structured out-of-cell contacts and activities beginning at Level 2 and expanding at Level 3/4.

As a result of this review, it is recommended that the Bureau modify the current SMU program to have a stay of 12 months and only three levels and increase the amount of structured out of cell activities for SMU inmates especially for those in Level 2.

# Mental health services

In general, each of the restrictive housing units is providing mental health services to the inmates assigned to the units. Mental health staff routinely visit the housing units as required by Bureau policies. There are sufficient nonpsychiatric mental



health staff assigned to the units to provide sufficient mental health services. Monthly mental health records are being updated on a regular basis as required by Bureau policy. Inmates in special housing being monitored for having suicidal tendencies in specially designed cells under direct supervision is consistent with best correctional practices.

However, our review of the mental services found a number of areas that the Bureau needs to significantly improve upon. The issues raised can be separated into three separate subcategories:

1. Proper mental health diagnosis

2. Effective treatment

3. Sufficient psychiatric staffing

Relative to diagnosis, based on the Bureau's four level mental health rating system, only about 10 percent of the segregated populations were assigned to Care Levels 2, suggesting minimal need for mental health care treatment beyond limited psychotropic medications. However, our review of randomly selected Care Level 1 cases by two experienced psychiatrists found a number of inmates exhibiting significant mental health symptoms which suggest their care level should be increased to Care Level 2 or higher. A contributing factor to this issue is that very few of the monthly mental health assessments occur in private settings on a face-to-face basis.

The majority (between 68 and 72 percent) of restrictive housing inmates have been classified by the Bureau as healthy or only having simple chronic medical care, and not requiring any specialized medical treatment (see table 11). These proportions are virtually identical to the other Bureau inmates (also 72 percent). Of those requiring medical care, the level of care is mostly at the lowest threshold (between 26 and 30 percent at "Care Level 2 –Stable, Chronic Care").

Somewhat surprisingly, relative to mental health care level, the proportions in need of care or treatment are even lower with the vast majority assigned to Care Level 1. The ADX has the highest proportion of Mental Health Care Levels 2 and 3 but they only represent ten percent of the entire ADX population. These proportions are comparable to the mental health care levels of the nonrestrictive populations.

Based on the assessment of the project psychiatrists the review further indicated that the treatment being offered by the Bureau was insufficient or inappropriate in over half of the cases. In particular, there was little evidence of structured out of cell treatment services occurring for those in need of services beyond medication.

Much of the "treatment" being provided to the inmates takes the form of psychiatric medications that can only be prescribed by a psychiatrist or a psychiatric nurse



practitioner whom is familiar with the patient's symptoms and prior mental health history. There is a significant lack of coordination between the psychology staff who cannot prescribe these medications and psychiatric staff who are prescribing the psychotropic medications. A significant number of the inmates which the review found had been misdiagnosed and/or were receiving inadequate treatment should be transferred from the SMU or SHU to a comprehensive mental health program directed by a psychiatrist. It is acknowledged that mental health clinicians frequently disagree on diagnoses and that doctoral level psychologists are most certainly capable of directing a mental health program.

The shortage of psychiatric staff in Bureau facilities leads to numerous problems in both proper diagnosis and treatment, particularly for the seriously mentally ill inmates at the large segregation units. For example, at most facilities, the prescribing physician was not a psychiatrist, which further added to the problems of coordination with the psychology staff.

As a result the following recommendations are submitted:

- All inmates should be seen in a private setting for a comprehensive mental health evaluation prior to placement in any segregated setting.

- A complete re-evaluation of the mental health record should be performed by psychology and psychiatry staff every 30 days which would require a face to face interview in a private setting.

- Additional full time psychiatric staff are needed at the major restrictive housing units (in particular USP Lewisburg).

- A complete review of all inmates assigned to ADX, SMU and SHU should be completed by the Bureau to identify all inmates who should be transferred to a secure mental health program similar to the one being developed at the USP Atlanta and USP Allenwood.

# Crowding and segregation

As has been noted earlier, the ability of the Bureau to place inmates who are being returned to general population from restrictive housing and housing inmates within the SMU and SHU's which are largely double-celled is often hampered by the number of separatees that each inmate may have. As noted in chapter 3, virtually all of the ADX and SMU, and 2/3rds of the SHU inmates have at least one other inmate they must be separated from. Even within the nonsegregated population, 40 percent have separation orders. Many of these separation orders are related to conflicting gang affiliations.



In general, inmates with separation orders cannot be transferred to general population in facilities where separatees are currently located. This in turn produces delays in the transfer of inmates from segregation status back to the general population.

A final complication is the level of crowding that permeates the Bureau's facilities. As of 2013, the Bureau was operating at 137 percent of its rated capacity and even higher at its high (154 percent) and medium (144 percent) security facilities. Only two options exist to reduce these exceedingly high crowding levels – add more and expensive high security general population beds or reduce the current Bureau population.

These two factors (high numbers of separatees and prison crowding) contribute to the number of inmates in SHU who are awaiting transfer back to the general population.

## Due process

Sanctions issued by the DHO were found to be consistently lower than the allowed level for each of the severity levels. For example, offenses in the Greatest Severity Level carry a maximum time in disciplinary segregation of 12 months. Of all the case files reviewed, not one included a sanction of 12 months in restrictive housing. For 100 level offenses such as a weapon, the typical sanction included 30 – 45 days disciplinary segregation and in many cases was 15 – 20 days segregation. At USP Victorville, the typical sanction for an assault or a weapon offense was 30 or 60 days disciplinary segregation. At USP Tucson, a typical sanction of possession of a weapon was 45 days while an assault resulted in 60 – 90 days segregation. At USP Coleman, a weapons offense resulted in 30 days disciplinary segregation.

It was apparent from interviews and case file reviews that the DHO's have made extensive use of the loss of access to basic privileges (visits, telephone, and commissary) for extended periods of time as a disciplinary sanction. The use of these sanctions is an outgrowth of the objective to find alternative sanctions to the placement of the offender in disciplinary segregation.

The Bureau DHO's use the restriction of privileges such as visiting, commissary, and telephone extensively as a sanction for offenses within all severity levels. Almost every sanction issued by the DHO at each of the facilities reviewed included a restriction of one or all of the above privileges. At USP Coleman, weapons offenses typically resulted in a sanction of 41 days loss of Good Conduct Time, 15 days placement in disciplinary segregation, 180 days restriction on visits, commissary and telephones. Similar sanctions with some variance in the amount of segregation time were found in virtually all the institutions reviewed. In the cases reviewed, it was a



normal practice for the DHO to use the restriction of 180 days loss of Commissary, Telephone, and Visits.

The extensive use of restriction of privileges resulted in the accumulation of loss of privileges over an extended period. It was not unusual to find inmates who had lost visiting privileges for in excess of one or two years. During one interview, an inmate reported that he had lost visiting and phone access for a period of seven years. This was confirmed through review of disciplinary records provided by the DHO. File reviews confirmed that similarly lengthy periods of restrictive privileges was common place in the system.

Sanctions issued by the DHO are effective the date of the hearing and are not made retroactive to the date of the incident report or the date of referral by the UDC to the DHO. There is no time limit in policy that governs how quickly the DHO must hold a hearing after the investigation/UDC process is complete. Scheduling of hearings is at the discretion of the DHO.

The lack of time parameters for completion of disciplinary hearings results in substantial variation among facilities in the amount of time served in restrictive housing for similar offenses, and can result in disproportionately long sanctions.

During our review, we found institutions that had established internal informal requirements that the hearing be completed within 14 days of receipt by the DHO (USP Coleman). Another facility had established a guideline of 20 days. In the course of this review, instances of hearings held more than 30 days after the incident date were not unusual. Longer delays occurred when cases were continued awaiting the results of drug tests, when cases where referred for further investigation, and when cases were continued for further information. The result was that, in many cases, a sanction of 30 days segregation in actuality became a sanction of 90 days segregation or longer since the time served in segregation was not credited to the sanction or made retroactive to the date of original confinement in segregation.

By comparison most state systems have specific time requirements for conducting the hearing or issuing a continuance based on need for additional information (investigation, availability of witnesses, etc.). Ohio policy requires that inmates charged with a rule violation must be scheduled for a hearing as soon as practicable but no later than seven days, excluding weekends and holidays, after the alleged violation is reported, unless the hearing is prevented by exceptional circumstances, unavoidable delays, or reasonable postponements. The exceptional circumstances, unavoidable delays, or reasonable postponements must be documented.



# Reentry

There is no formal Bureau-wide reentry preparedness program specific to restrictive housing. Each facility visited seemed to have their own unique programming that they tried to offer within the confines of the restrictive housing unit. Most staff interviewed did not appear to recognize the need for programming beyond self-help packet programs and no facility was able to provide data on the number of inmates actually being released from restrictive housing. The mindset that it is okay and preferable to discharge from a SHU needs to change.

The issue of inmates releasing from restrictive housing with little or no reentry preparation is significant. The magnitude of the issue is not fully known since no data was available on the frequency of this practice and limited research on the effectiveness of reentry programs. One staffer reported that they do not need to track that information since their goal is to minimize the time an inmate spends in restrictive housing. While the goal of shortening the time in restrictive housing is correct and will help this situation, it ignores the reality that inmates are still releasing from restrictive housing.

Facilities do not provide step-down planning to transition an inmate from restrictive housing to general population and subsequently to their eventual release. The prevailing practice is to keep inmates in restrictive housing until such time as they discharge to an RRC or directly to the community.

With the exception of assigned completion of self-study activities related to reentry, inmates transition from often extended stays in restrictive housing to an abrupt release to general population or the community without any meaningful step down programming. Many of the staff interviewed found this completely acceptable and indicated that it was preferable to release inmates from the SHU, SMU or ADX rather than first transitioning to general population due to the risk of violence to the general population. While this may be a sound decision for institutional security, it can hardly be in the interests of the communities where these inmates are being released. Inmates spending extended periods of time in close confinement with little social interaction or skill-building programming are seriously unprepared for reentry and re-socialization.

As can be seen from these examples, inmates in Bureau restrictive housing have very limited access to reentry programming. Services are generally limited to providing basic information on identification and benefit issues, and referrals to community programs and services. This stands in stark contrast to range and depth of reentry programming provided to Bureau general population inmates. It is the restrictive housing population that is in the most need of programs and poses the greatest potential risk in their transition back to the community.



# Information system needs

The report has noted the difficulties in tracking the number and movement of inmates within the restrictive housing units. For the SMU population, it was not possible to track which level of the SMU program the inmate was assigned to and how long he had been assigned to that level. The lack of such data was even more pronounced for the much larger SHU population. If the Bureau is to develop more effective forms of restrictive housing intervention, it will need to significantly enhance its information data system and its capabilities to effectively analyze trends within this population.

# Summary of findings and recommendations

## Statistical analysis of restrictive housing

FINDING: There are over 2,000 inmates in restrictive housing who will be released within a year, which suggests the need for reentry services. The differences in sentence lengths, time served, and time left to serve are especially pronounced among the ADX and SMU prisoners.

FINDING: The majority of inmates in restrictive housing do not require specialized medical treatment and are virtually identical to the other Bureau inmates. Somewhat surprisingly, relative to mental health care level, the proportions reported in need of care or treatment are lower than and comparable to the mental health care levels of the inmates in general population housing.

FINDING: SMU and ADX inmates have lengthy disciplinary records that include histories of repeated institutional violence and other types of serious misconduct. It appears that these rates of misconduct significantly decline while in restrictive housing status and after release from restrictive housing.

FINDING: The vast majority of ADX and SMU inmates released in 2011 were not returned to restrictive housing status, although most incurred another disciplinary report within two years. The average number of disciplinary reports declined sharply after released from either ADX or SMU.

FINDING: The Bureau's information system cannot directly provide the most basic data on the number of inmates admitted and released from restrictive housing, the current restrictive housing population, and the status of inmates assigned to restrictive housing.



RECOMMENDATION: The Bureau information system needs to be modified so it will directly measure the movement of restrictive housing placements and removals as well as the basis for and current status of each placement.

FINDING: The use of four SMU levels that last at least 18 months is not consistent with other, state programs, which typically require only two or three levels and a minimum period of confinement ranging from 9 to 12 months.

FINDING: There was no strong or consistent relationship between time in SMU and prison recidivism rates, although inmates with the longest placement in SMU had higher rates of return to restrictive housing.

RECOMMENDATION: The current required minimum length of stay for SMU inmates should be reduced from 18 months to 12 months and the number of levels consolidated from four to three.

## Due process

FINDING: The DHOs and others involved in the disciplinary process were well versed in their duties. All appropriate notices and procedures were followed, and inmates responded respectfully to the process and the decision.

FINDING: Bureau disciplinary processes and procedures provide substantial and redundant assurances for due process compliance.

FINDING: The lack of time parameters for completion of disciplinary hearings results in substantial variation between facilities in the amount of time served in restrictive housing for similar offenses, and can result in disproportionately long sanctions.

FINDING: Sanctions issued by the DHO become effective on the date of the hearing and are not made retroactive to the date of the incident report or the date of referral by the UDC to the DHO.

**RECOMMENDATION 4.1: Establish reasonable time frames in which the hearing must be scheduled, while permitting reasonable continuances when waiting for investigation reports, drug tests, etc.**

**RECOMMENDATION 4.2: Establish by policy that a sanction of restrictive housing time should be issued retroactive to the date of the original admission, providing credit for time served.**

**RECOMMENDATION 4.3: Establish a system for monitoring patterns and trends in the use of disciplinary sanctions among Bureau facilities.**

FINDING: A disproportionate number of inmates are being housed in the SHUs based on protection claims.



FINDING: The application of the same security and operational restrictions to the protective custody population as those applied in administrative segregation is contrary to national accepted practices.

**RECOMMENDATION 4.4: Expand housing alternatives for inmates in verified protective custody status to provide levels of programs and privileges equivalent to those provided for the general population.**

FINDING: The conduct of weekly reviews of SHU placements in a formalized setting with the entire management team of the facility is an exemplary practice that ensures ongoing review of the status of inmates in SHU and evaluation of placement options.

**RECOMMENDATION 4.5: Establish a policy standard requiring private, face-to-face interviews for the restrictive housing review.**

FINDING: The SRO reviews at some of the facilities reviewed appeared perfunctory and lacked substance in contact and purpose.

FINDING: The review of randomly selected inmate records found omissions in the maintenance and content of inmate records documenting the placement rationale in the SHU.

**RECOMMENDATION 4.6: Develop and deploy an electronic inmate record system to document SHU placement decisions.**

FINDING: The requirements that are contained in the policy and procedures that govern the placement and review of inmates housed in the SHU are consistent with national standards and afford inmates in these units due process in relation to their placement in the units.

FINDING: The Bureau has established policies and procedures that afford due process protections to inmates in the referral and assignment to SMU.

FINDING: The significant level of SMU placement request denials indicates that the review process provides a valid and independent assessment beyond the institution level of the necessity of the SMU placement.

FINDING: Scheduled SMU conditions reviews were in some cases not conducted in a private setting, consistent with professional practices, and were not reflected in the official inmate records in a timely manner.

FINDING: Current backlogs in inmates awaiting transfer to the next program level negate the intent of the program design and decrease the motivation to change behavior. Further it is inconsistent with the program's objectives to hold graduates of Level 2 in a unit that operates with that level's restrictions rather than receiving the benefits of advancement to Level 3.



FINDING: SMU operational practices at the facilities fail to meet the standards set by the Bureau's program statement.

FINDING: There is a lack of consistency in the conditions of confinement for an inmate classified at the same level in the same program but housed at a different facility. This presents concerns regarding the integrity and design of the level system.

**RECOMMENDATION 4.7: Reexamine the SMU levels as they currently operate, their corresponding conditions of confinement, the length of time at each level, and their compliance with the SMU program statement. The program should be consolidated from four levels to three and the minimum length of time to complete the program adjusted accordingly.**

## Mental health

FINDING: Based on the review of the inmate mental health records and the inmate interviews, the reviewers disagreed with the Bureau diagnosis in nearly two thirds of the cases and found in over half of the cases that the treatment being offered was insufficient or inappropriate.

**RECOMMENDATION 5.1: All inmates should be seen in a private setting for a comprehensive mental health evaluation prior to placement in any segregated setting.**

FINDING: The lack of ongoing assessments can lead to the absence of a proper mental health status evaluation.

**RECOMMENDATION 5.2: A complete reevaluation of the mental health record should be performed by psychology and psychiatry staff every 30 days. Included in this review should be a face-to-face interview by a member of the mental health team in a private setting, and the results of this interview should be included in the reevaluation record.**

FINDING: Many inmates in restrictive housing demonstrated significant symptomatology compatible with the presence of an SMI, which was as yet undetected by the psychology staff.

**RECOMMENDATION 5.3: A vigorous quality improvement program should be established for the provision of mental health.**

FINDING: Very few of the monthly mental health assessments occur in private settings on a face-to-face basis.



FINDING: The shortage of psychiatric staff in Bureau facilities leads to numerous problems in both diagnosis and treatment, particularly for seriously mentally ill inmates.

**Recommendation 5.4: Given the level of disagreement in the assessment and treatment plan formulation, the Bureau should conduct an inter-reliability test for its mental health staff to better determine the accuracy of the diagnosis and treatment plan process.**

**RECOMMENDATION 5.5: Psychiatrists need to be more actively involved in diagnosis and treatment.**

FINDING: Overall, most restrictive housing units had no mental health programing and especially no out-of-cell programming for any inmates with or without mental illness.

**RECOMMENDATION 5.6: A program of regular out-of-cell mental health treatment needs to be implemented.**

FINDING: Almost all facilities reported a lack of mental health staff required to provide treatment services.

**RECOMMENDATION 5.7: The Bureau should complete a clinical staffing needs analysis.**

FINDING: Our review identified inmates in restrictive housing whose mental conditions should have precluded them from assignment to these units.

**RECOMMENDATION 5.8: A protocol needs to be established that identifies those inmates with serious mental illness who should be excluded from SHU, SMU, or ADX housing.**

FINDING: The assessment team encountered no cases in which an inmate's serious mental illness was due to prolonged placement in the ADX.

**RECOMMENDATION 5.9: Any inmates who are found to be decompensating from the effects of restrictive housing should be transferred to a mental health unit for treatment and observation.**

**RECOMMENDATION 5.10: Inmates with SMI who are not excluded from restrictive housing should start participating in a treatment program.**

**RECOMMENDATION 5.11: Inmates should not be housed in a SHU for protective custody but rather should be in sheltered general population housing.**



## Reentry

FINDING: No data were available at any of the facilities visited that identified the number of inmates scheduled to be released directly to the community from restrictive housing within the next 180 days.

RECOMMENDATION 6.1: On a monthly basis, track and monitor the numbers of inmates who are scheduled to be released within 180 days and are being released directly from restrictive housing at each facility.

FINDING: Facilities do not provide step-down planning to transition an inmate from restrictive housing to general population and subsequently to their eventual release. The prevailing practice is to keep inmates in restrictive housing until they are discharged to an RRC or directly to the community.

RECOMMENDATION 6.2: Establish a policy whereby only under extraordinary circumstances would an inmate be discharged directly from a SHU, SMU, or ADX.

RECOMMENDATION 6.3: Develop a step-down program with increasing incentives, more out-of-cell opportunities, and increasing opportunities for congregate programming.

RECOMMENDATION 6.4: Ensure that when inmates complete psychology self-help programs—for example on anger management, coping, or drug and alcohol abuse—completion is documented so that case managers and counselors are aware of it during reentry planning.

RECOMMENDATION 6.5: Develop and provide coordinated, comprehensive, targeted, specialized cognitive reentry programming specifically designed for inmates in restrictive housing.

RECOMMENDATION 6.6: Provide programming that identifies and addresses most significant areas of need for high-risk inmates in order to assist them in successfully reintegrating into the community.

RECOMMENDATION 6.7: Educate staff about the need for inmates in restrictive housing to receive formal reentry programming if being released from restrictive housing.

RECOMMENDATION 6.8: Establish and maintain a culture among all BOP staff, employees, and contractors that recognizes the need for meaningful reentry programs for all inmates in the Bureau of Prisons, including those in restrictive housing, beginning at new officer and staff training and continuing in every annual in-service training.



**RECOMMENDATION 6.9: Review the practice of keeping inmates at the ADX until halfway house release or release directly to the community.**

## Conditions of confinement

FINDING: The management structure of the Bureau facilities is staffed with sufficient personnel to provide management and oversight of its segregated units.

FINDING: Each facility reviewed had sufficient staff to manage the segregation units.

FINDING: The presence of a correctional services team working alongside a unit management team appears to be an effective management approach and provides sufficient personnel to manage a difficult-to-manage inmate population.

FINDING: The Bureau's commitment to staff training is outstanding and consistent with best practices in corrections.

FINDING: The training curriculum used by Bureau facilities is consistent with best practices, providing a range of topics that meet industry and ACA standards.

FINDING: SHU training is not consistent throughout the Bureau in terms of delivery, content, hours of instruction, schedule, or mandatory attendance.

FINDING: The observation of inmates in special housing and those that are being monitored as having suicidal tendencies in specially designed cells under direct supervision is consistent with best practices and in compliance with ACA standards.

FINDING: Difficulties in the management of the gang problem exacerbates the protective custody problem, thus causing a high incidence of inmates leaving general population at their own request and being placed in segregation units after being threatened in general population.

FINDING: Bureau post orders are extremely comprehensive documents that meet national standards and requirements and are considered a best practice.

FINDING: The Bureau has established a comprehensive program statement that clearly identifies the step-by-step requirements associated with managing potential use of force and critical incidents consistent with nationally recognized standards.

FINDING: Overall the sanitation and physical plant maintenance programs in Bureau facilities are considered consistent with nationally recognized best practices.

FINDING: The size and furnishings provided in the cells in the SMUs were consistent with nationally accepted practices.



FINDING: The size and furnishings provided in the SHUs were consistent with nationally accepted practices when providing housing for the designed number of inmates. The fact that most cells in the SHUs contained showers exceeded national standards. However, in one facility, the number of inmates housed in a cell exceeded the design capacity.

FINDING: There is very little difference between the personal property of inmates assigned to administrative segregation and disciplinary segregation, with the exception of noted commissary items. This is problematic given the fact that at some facilities the majority of administrative segregation inmates are on protective custody status.

FINDING: The frequency of visitation allowed for inmates in Level 3 at USP Allenwood is inconsistent with Bureau practices for the same level of inmate at other facilities and not representative of national best practices.

**RECOMMENDATION 7.1: A further review of the frequency and duration of visits should be conducted at USP Allenwood for Level 3 inmates. Serious consideration should be given to allowing additional time for inmates in Level 3.**

FINDING: Health care staff are present in the segregated units at least daily, and often more frequently, consistent with Bureau policy and ACA standards.

FINDING: A limited number of potential small-group programming spaces are available at each facility.

**RECOMMENDATION 7.2: Use of existing small-group space should be considered for inmates who have been properly screened.**

FINDING: The general conditions of confinement were found to be consistent with national regulations and standards. Establishing, maintaining, and monitoring the conditions of confinement appeared to be a routine part of the daily operations of managing the Bureau facilities visited. Policies were in place, staff were familiar with the requirements, and post and job descriptions had been established to enforce compliance in this area.

**RECOMMENDATION 7.3: Guidelines that identify specific conditions of confinement and protection policies consistent with applicable federal regulations and national standards should be developed and included as part of the PRD performance review process.**

**RECOMMENDATION 7.4: Establish a PRD review for the ADX that is separate from the rest of the Florence Complex.**

FINDING: Both program and operational reviews served a vital role in the overall effective operation of the Bureau's facilities.



RECOMMENDATION 7.5: Establish a separate program performance review for the USP Florence ADX that includes a comprehensive evaluation of policies and procedures that are unique to the ADX.

RECOMMENDATION 7.6: Enhance the external oversight of the local operational reviews that are being conducted on at least an annual basis.

RECOMMENDATION 7.7: Reassess the performance review rating system.



# Appendix: Research team bios

Project Directors Ken McGinnis and Karl Becker and Program Manager Tammy Felix were responsible for overseeing all work on this project. Mr. McGinnis was primarily responsible for making decisions on the direction of research activities and operational analysis, while Ms. Felix and Mr. Becker were responsible for monitoring progress on the project work plan and assuring the quality and timeliness of all products. Below we provide a list of the core team members, their role in the development of this report, and a brief summary of their background and experience.

**Ken McGinnis, Project Director (CGI).** Mr. McGinnis directed all project analysis and the development and delivery of the final report to the Bureau. Mr. McGinnis worked in, managed, assessed, and developed plans for the use of restricted housing units over the course of his 30-year career in corrections. He has served as the Director of the Michigan Department of Corrections and the Illinois Department of Corrections. He also has worked as a warden in maximum, medium, and minimum security institutions and received a number of national awards for his contributions to the field of corrections, including the Walter A. Dunbar Award in recognition for his contributions to the development of professional standards for correctional facility operations. Mr. McGinnis has conducted operational reviews of correctional systems and facilities across the country. He is a recognized expert in security and management issues and has directed operational assessments for the Arizona, Colorado, Florida, Kentucky, Louisiana, Massachusetts, Mississippi, North Dakota, Oklahoma, Texas, Virginia, and District of Columbia correctional systems.

**Dr. James Austin, Research Team Lead (JFA).** Dr. Austin has over 30 years of experience in criminal justice planning and research. He directed several DOJ-funded research and evaluation programs. He has also assisted numerous state and local correctional agencies design, implement and validate prison and jail classification and risk assessment systems. With regard segregation, Dr. Austin was assigned to the Illinois Department of Correction in one of the nation's first specialized segregation units in the early 1970s. More recently he has conducted comprehensive assessment of the administrative segregation units in the states of Ohio, Mississippi, Colorado, Illinois New Mexico, Oklahoma, and Maryland. He has conducted this work through the JFA Institute (Ohio, Mississippi, Colorado), as the lead consultant for



Vera Institute (Illinois, Maryland, and New Mexico), and in support of CNA (Oklahoma).

**Karl Becker, Project Director (CGI).** Mr. Becker was responsible for project logistics, work plan implementation, and quality assurance. He provided additional oversight of the development of project findings and the project report. Mr. Becker brings experience in managing more than 50 major consulting engagements that have included performance reviews, organizational assessments, and program evaluations for correctional systems. Mr. Becker has more than 25 years of experience working with federal, state, and local criminal justice agencies. He specializes in management, health care, and financial administration of correctional systems and has extensive expertise in institutional and departmental staffing assessments. Mr. Becker directed program services, planning, and finance for 12 years as the Deputy Director of Administration and Planning for the Illinois Department of Corrections. Over the last 12 years as a consultant specializing in correctional system management, Mr. Becker has worked with senior correctional officials, governor's office staff and legislative appropriations staff on correctional system performance reviews and operational assessments in Colorado, Florida, Illinois, Indiana, Kentucky, Massachusetts, Oklahoma, and Virginia.

**Larry Fields, Operations Reviewer (CNA).** Larry Fields has over 40 years of experience in the field of correctional administration and leadership. He has demonstrated skills in facility management, community corrections and probation and parole. His expertise has been further enhanced by a background that includes work with juvenile offenders, psychiatric patients, and county jail operational reviews. In addition to serving as Director of the Oklahoma Department of Corrections, Mr. Fields has also served as Deputy Director of Institutions, Regional Director, Warden, Deputy Warden, and Community Corrections Superintendent. His government experience has been supplemented by his extensive experience providing consultant services in correctional management and administration issues nationally for the last 16 years.

**Michael Lane, Operations Reviewer (CNA).** Michael Lane has 35 years' experience in law enforcement and corrections. As Inspector General for the Illinois State Police, Mr. Lane directed sworn and civilian staff responsible for financial, compliance, and management audits of all Illinois State Police divisions, as well as ensuring compliance with standards established by the Commission on Accreditation for Law Enforcement Agencies. Mr. Lane was Director of the Illinois Department of Corrections from 1981 to 1990, the longest tenure of any Corrections Director in the history of the state. He administered a budget of more than $528 million and managed a staff of 11,000 who supervised 38,000 adults and juveniles in prison or on parole. Mr. Lane supervised a massive $500 million expansion program to meet an adult inmate population that grew from 12,500 to 24,700. He established written, standard policies and procedures for the state correctional system and implemented



a highly effective auditing compliance system. Mr. Lane's career includes experience managing all adult prisons in Illinois as an Assistant Director, as Warden of the largest maximum security prison in the state, the Menard Correctional Center, and as regional administrator of adult parole.

**Mike Maloney, Operations Reviewer (CNA).** Mr. Maloney completed a 30-year career with the Massachusetts Department of Corrections in 2004. Since beginning his career in 1974, he served as a Social Worker, Director of Classification Deputy Superintendent, Superintendent, Deputy Commissioner, and Commissioner from 1997 to 2004. Throughout his career he has had operational responsibility over segregation units and high-security facilities. While a Deputy Superintendent in the largest medium security institution in Massachusetts, he was responsible for the daily operation of a 100-man segregation unit, which included a 30-man protective custody unit. As the Superintendent of Walpole Prison, the maximum security facility in Massachusetts, he was responsible for all aspects of the operation of the Department Segregation Unit, a department unit designed to hold the most violent and disruptive inmates in the Massachusetts system and also supported the design of the high-security unit, modeled after the Control Unit at U.S. Penitentiary Marion, that replaced the DSU. Mr. Maloney was directly responsible for overseeing the process to develop policy and procedures for the unit, to which inmates were assigned based on a departmental disciplinary hearing. Mr. Maloney was the Commissioner's designee to approve or deny placement in the unit, and to act upon appeals. As Deputy Commissioner, part of Mr. Maloney's responsibility was to ensure that all superintendents with segregation units within their facilities adhered to departmental policy regarding the operation of segregation units.

**Mary Marcial, Reentry Reviewer (CNA).** Mary Marcial has 25 years of service with the Connecticut Department of Correction. She began her career as a Correctional Counselor in Addiction Services and in Classification and Case Management. In 1992 she was appointed as Warden of the state's DWI unit and later that year was tasked with activating a new institution, which included developing the facility's policies, procedures, post orders, staffing plans, and program mission. In 1995 she was selected to be the first female Warden of the state's reception and high-risk offender special management unit, which at that time also served as the state's Super-Max facility. While there, she initiated a High Bond unit for the state's pretrial offenders and established the state's Chronic Discipline Unit, developing policies, procedures, and post orders for those high-risk offender units. In March 2003, Ms. Marcial was selected to serve on the Commissioner's executive team as Director of Programs and Treatment. In that capacity she was responsible for numerous divisions including Reentry Services, Education, Religious Services, Victim Services, Volunteer and Recreation Services, Program Review and Development, Correctional Enterprises, Health and Addiction Services, and Offender Classification and Population Management. She currently works with ASCA's Reentry Committee managing a



reentry information-sharing grant and has recently conducted an assessment of the Virginia Department of Correction's Reentry and community diversion programs.

**Robert May, Reentry Team Lead (CNA).** Mr. May is Assistant Director of Program and Technology Services with the IJIS Institute where he oversees the Institute's work in Corrections/Reentry, Justice to Health, Gang Information Sharing, and Statewide Automated Victims Information and Notification System Technology Assistance and Procurement Reform. Mr. May most recently was a principal with the Criminal Justice Institute where he also served as the Associate Director of the Association of State Correctional Administrators (ASCA). He has over 37 years of experience in the fields of criminal justice, law enforcement, substance abuse treatment programming, correctional health care, alternatives to incarceration, and substance abuse program design and implementation. Mr. May serves as ASCA's representative on the Second Chance National Reentry Resource Center (NRRC) Steering Committee and as vice chair of the NRRC's Pre-Release Planning and Post-Release Supervision Subcommittee. He has experience in treatment programming and alternatives to incarceration and has conducted alternatives assessments and reentry work for state correctional systems and counties. Mr. May directed ASCA's Reentry Information Sharing projects funded by the Bureau of Justice Assistance (BJA) with pilot sites in Maryland, Rhode Island, and Hampden County, MA Sheriff's Department. The main goals of these projects were to leverage corrections information for reentry purposes and enable effective sharing of information among corrections and various social service agencies and service providers to improve reentry of offenders back into the community.

**Jon Ozmint, Due Process Team Lead (CNA).** Mr. Ozmint is an attorney who began his legal career in the U.S. Navy Judge Advocate General's Corps, where he served in various capacities in the criminal justice system. Mr. Ozmint later served as prosecutor in the Tenth Circuit Solicitors Office, where he served as General Counsel to the South Carolina State Department of Labor, Licensing and Regulation until 1994, when the Attorney General appointed him Deputy Attorney General and Chief Prosecutor for the Statewide Grand Jury. In 2003 Mr. Ozmint was appointed Director of the South Carolina Department of Corrections, where he served until 2011. Mr. Ozmint has served as chairman of the Staff Safety Committee for the American Correctional Association and of the Legal, Legislative and Policy Committee of the Association of State Correctional Administrators (ASCA). His experience as a practicing attorney, member of the Judge Advocate General's Corp, and former director of corrections provides him with unique skills, abilities and knowledge that will enable CNA to conduct a thorough and comprehensive review of the due process issues within the special housing units of the Bureau.

**Tom Roth, SHU Operations Lead (MGT).** Tom Roth has more than 27 years of experience in the field of corrections. He has been involved in virtually every facet of correctional management including central office leadership, facility management,



accreditation, training, and education. Mr. Roth has served as Deputy Chief of Administration for the Illinois Department of Corrections, warden of multiple correctional institutions, and accreditation auditor for the American Correctional Association for nine years. He led the creation and implementation of an agency-wide strategic plan for the Illinois Department of Corrections.

**Emmitt Sparkman, Operations Reviewer (CNA).** Emmitt Sparkman, the current Deputy Commissioner of Institutions for the Mississippi Department of Corrections, brings extensive experience in the analysis of restricted housing as a tool in correctional system management. Mr. Sparkman has overseen all of the state's correctional institutions for the last ten years and has also served as Warden and Deputy Warden in a career that spans more than 35 years in the operation of state correctional facilities. He has been a key figure in the development of capacity plans for the state of Mississippi that have managed the growth in the overall inmate population without new prison construction. More recently, he has participated in a study of the use of administrative segregation practices in the Colorado and Oklahoma correctional systems.

**Dr. Roberta Stellman, Mental Health Reviewer (CNA).** Dr. Stellman is a board-certified psychiatrist and Distinguished Fellow of the American Psychiatric Association. She provided clinical psychiatric services to the inmate population of the New Mexico Department of Corrections from 1983 to 2006. She has since served as a consultant in correctional mental health treatment for the state of Delaware, served as the federal court monitor for an agreement on the delivery of correctional mental health services between the state of Delaware and the Justice Department, and participated in a comprehensive outside review of mental health services in the Massachusetts Department of Correction.

**Dr. Pablo Stewart, Mental Health/Medical Service Team Lead (CNA).** Dr. Stewart was the Senior Attending Psychiatrist for 4 years at the Forensic Unit of San Francisco General Hospital, with administrative and clinical responsibility for a 12-bed, maximum-security psychiatric ward. He was appointed as the Psychiatric Expert for the U.S. Federal Court in the Gates v. Deukmejian case and Madrid v. Gomez, which addressed the quality and availability of psychiatric care provided to the inmates at Pelican Bay State Prison. He has worked extensively on correctional mental health issues as a consultant for the United States Department of Justice, Civil Rights Division in both juvenile and adult systems.

**George Vose, ADX/SMU Operations Lead (MGT).** Mr. Vose has more than 30 years of experience in the corrections field. He has served in a number of positions within the Massachusetts Department of Corrections, including the director, deputy director, and as superintendent of two facilities. He also served as the Commissioner of the Rhode Island Department of Corrections. Through these positions, he has been responsible for the development and allocation of programs and resources, as well as determination of agency objectives, goals, and internal organizational structure. He



also served as first-in-command regarding correctional issues affecting public safety and was responsible for the safety and security of all state correctional facilities. Mr. Vose has provided consulting services and technical expertise to numerous state departments of correction including Arizona, Maryland, New Mexico, and Wyoming, as well as local government correctional systems in Bristol County, New Jersey, and the City of Philadelphia. He served as the Project Manager for the NIC project, "Assessing Prison Culture," working with the consultant team and NIC to develop a protocol for assessing prison culture and to administer the protocol in correctional facilities throughout the U.S. He also was a consultant on a project for the Maryland Department of Corrections to conduct an organizational analysis of Central Office functions and staffing, and as a consultant on an assessment of the Vermont Department of Corrections organizational structure for the NIC.

**Tammy Felix, Program Manager (CNA).** Ms. Felix was responsible for the overall delivery of the project and served as the single point of contact for project coordination and technical direction with the Bureau. She also provided project updates and coordinated/ensured the delivery of the final report to the Bureau. Ms. Felix has over 14 years' experience performing analytical and research support work for a variety of safety and security projects focusing on emergency management, homeland security, and law enforcement issues. As the manager of a project assessing the New York City Police Department's (NYPD) implementation of vertical patrol tactics in New York City Housing Authority facilities, Ms. Felix provided oversight and analytic support for the review of the NYPD's Housing Bureau Policies, procedures, rules, training and practice, transcripts, review of other Expert Reports, analysis of the conformity of practice with the policies and whether these policies reflect professional standards within policing. She has also supported site visits in Colorado and Massachusetts state prisons.



# The CNA Corporation

This report was written by CNA Corporation's Safety and Security (SAS) division.

SAS's work helps improve decision-making during crisis operations and fosters innovative answers to challenges in the areas of first response; emergency management; public health and agriculture; homeland security; risk-management policy development and operations; and response and recovery capabilities at a national level.



IRM-2014-U-009563



CNA Corporation is a not-for-profit research organization
that serves the public interest by providing
in-depth analysis and result-oriented solutions
to help government leaders choose
the best course of action
in setting policy and managing operations.

*Nobody gets closer—*
*to the people, to the data, to the problem.*



www.cna.org • 703-824-2000

3003 Washington Boulevard, Arlington, VA 22201