UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

<u>United States of America</u>

      v.

<u>Joshua Fields</u>

Criminal No. 14-cr-074-LM
Opinion No. 2021 DNH 120 P

# O R D E R

Joshua Fields moved for compassionate release after it became apparent that the Bureau of Prisons ("BOP") had—for four and a half years—ignored this court's order to correct Fields's misclassification as a sex offender.  In short, the criminal history section of Fields's presentence report ("PSR") contained a stray reference that caused BOP to incorrectly classify Fields a sex offender.[1]  Because of his classification, Fields suffered repeated physical abuse from other prisoners and significant damage to his already fragile mental health.  In an order dated December 1, 2016, this court ordered probation to issue a new PSR (which it did)

---

[1] This case is a lesson in how little it takes for BOP to classify a prisoner as a sex offender.  As explained in detail <u>infra</u>, the original PSR summarized a domestic assault conviction and described Fields as having "groped" the victim's "left breast." The police report did not, however, include the word "groped" to describe the assault.  The report made it clear the assault was physical in nature; there was no indication it was for purposes of sexual gratification.  For reasons that remain unclear, the word "groped" was added to the PSR by the probation officer.  And there is no dispute that the phrase "groped the victim's left breast" caused BOP to classify Fields as a sex offender.  There is nothing else in Fields's history to remotely suggest he could properly be classified as a sex offender.  Upon review of the original PSR and the police report, the government and probation agreed the phrase should be removed from the original PSR.

and provide that new PSR to BOP (which it did).  The court further ordered BOP to remove and expunge the original PSR, replace it with the corrected PSR, and remedy Fields's misclassification as a sex offender.  BOP did not comply with the court's order.  Fields continued to suffer harm as a result.

This motion for compassionate release (doc. no. 60) followed four and a half years of Fields unsuccessfully attempting to alert the court of BOP's noncompliance and his continued suffering.  On May 13, 2021, the court held a video hearing on Fields's motion for compassionate release.  At that hearing, neither the government nor probation objected to Fields's request for immediate release from BOP custody. The court granted Fields's motion orally during the hearing and ordered that he be released from BOP custody on that date (doc. no. 66).  This written order explains in detail the basis for the court's oral order.

## ANALYSIS OF THE COMPASSIONATE RELEASE STATUTE

A court may grant a sentence reduction, known as "compassionate release," to a prisoner under 18 U.S.C. § 3582(c)(1)(A) upon a motion filed by BOP or the prisoner.  The statute provides in relevant part:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

2

> (i)     extraordinary and compelling reasons warrant such a
>         reduction;
> . . .
>
> and that such a reduction is consistent with applicable policy
> statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A).

Thus, once a motion is properly before a court, the statute imposes several requirements for granting a motion for compassionate release. First, there must be "extraordinary and compelling reasons" for a sentence reduction. 18 U.S.C. § 3582(c)(1)(A). Second, a sentence reduction must be "consistent with applicable policy statements issued by the Sentencing Commission." Id. (emphasis added); see U.S.S.G. § 1B1.13 (Sentencing Commission's policy statement on compassionate release). Third, the court must "consider[ ] the factors set forth in section 3553(a) to the extent they are applicable." 18 U.S.C. § 3582(c)(1)(A).

An unresolved question in the First Circuit is whether step two, consideration of the Sentencing Commission's policy statement—which applies to a motion filed by BOP—also applies when a prisoner files a motion for compassionate release. This is an important question. If step two applies to a prisoner's motion, then a court may reduce a prisoner's sentence only for reasons consistent with the Sentencing Commission's policy statement. If step two does not apply, then a court may exercise broad discretion in determining appropriate reasons for a sentence reduction. See United States v. Long, 997 F.3d 342, 355 (D.C. Cir. 2021).

For the reasons explained below, this court finds that step two does not apply when a prisoner files the motion for compassionate release. After finding that a prisoner has exhausted administrative remedies, the court need only consider whether there are "extraordinary and compelling reasons" for a sentence reduction and the applicable sentencing factors set forth in section 3553(a).

I.      History of the Statute

Courts are "generally prohibited from modifying a term of imprisonment"; however, the compassionate release statute, 18 U.S.C. § 3582, is a limited exception. United States v. Vigneau, 473 F. Supp. 3d 31, 33 (D.R.I. 2020). Under this statute as originally enacted, "compassionate release was available only if [BOP] filed a motion requesting it." United States v. Fox, No. 2:14-CR-03-DBH, 2019 WL 3046086, at *1 (D. Me. July 11, 2019).

As noted, the statute provides that a court may reduce a prisoner's sentence if it finds that "extraordinary and compelling reasons warrant such a reduction" and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). But the compassionate release statute does not define the phrase "extraordinary and compelling reasons."

In 1984, Congress directed the Sentencing Commission to "describe what should be considered extraordinary and compelling reasons" for compassionate release and to include "the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). The Sentencing Commission responded to that directive 22 years

later by issuing a policy statement.  U.S.S.G. § 1B1.13; see Vigneau, 473 F. Supp. 3d

at 34.  The Commission's 2006 policy statement largely mirrors the compassionate

release statute.  It states:

> Upon motion of the Director of the Bureau of Prisons under 18 U.S.C.
> § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may
> impose a term of supervised release with or without conditions that
> does not exceed the unserved portion of the original term of
> imprisonment) if, after considering the factors set forth in 18 U.S.C.
> § 3553(a), to the extent that they are applicable, the court determines
> that—
>
> (1)(A) Extraordinary and compelling reasons warrant the reduction; or
>
> (B) the defendant (i) is at least 70 years old; and (ii) has served at least
> 30 years in prison pursuant to a sentence imposed under 18 U.S.C.
> § 3559(c) for the offense or offenses for which the defendant is
> imprisoned;
>
> (2) the defendant is not a danger to the safety of any other person or to
> the community, as provided in 18 U.S.C. § 3142(g); and
>
> (3) the reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13.

The commentary to this policy statement elaborates on what constitutes

"extraordinary and compelling reasons":

> (A) Medical Condition of the Defendant.—
>
> > (i) The defendant is suffering from a terminal illness (i.e., a
> > serious and advanced illness with an end of life trajectory). A
> > specific prognosis of life expectancy (i.e., a probability of death
> > within a specific time period) is not required. Examples include
> > metastatic solid-tumor cancer, amyotrophic lateral sclerosis
> > (ALS), end-stage organ disease, and advanced dementia.
> >
> > (ii) The defendant is—
> >
> > > (I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family Circumstances.—

(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

U.S.S.G. § 1B1.13 Commentary: Application Notes.[2]

---

[2] BOP seldom exercises this power: "BOP approved only 6% of 5,400 compassionate release applications received between 2013 and 2017." United States v. Jones, 980 F.3d 1098, 1104 (6th Cir. 2020) (citing Christie Thompson, *Frail, Old and Dying, but Their Only Way Out of Prison Is a Coffin*, N.Y. TIMES (Mar. 7, 2018), https://www.nytimes.com/2018/03/07/us/prisons-compassionate-release-.html (referencing data provided by BOP)).  And the rate of release has only decreased during the COVID-19 pandemic.  "[BOP] approved less than 1%" of 10,940 compassionate release requests during the first three months of the pandemic, 156 applicants were approved by prison wardens and BOP issued final approval for only 11.  Keri Blakinger and Joseph Neff, *Thousands of Sick Federal*

In 2018, Congress passed the First Step Act.  See Pub. L. No. 115-391, 132

Stat. 5194, 5239 (2018).  One of its many components amended the compassionate

release statute to "increase the use and transparency of compassionate release."

Vigneau, 473 F.Supp.3d at 34; see also 164 CONG. REC. S7774 (daily ed. Dec. 18,

2018) (statement of Sen. Ben Cardin) ("The bill expands compassionate release . . .

and expedites compassionate release applications.").  Section 603(b) of the First

Step Act—titled "Increasing the Use and Transparency of Compassionate

Release"—amended the compassionate release statute to allow a prisoner to file his

own motion for a sentence reduction.  The revised statute, as described by the Sixth

Circuit, "ousted the BOP from its preclusive gatekeeper position."  United States v.

Jones, 980 F.3d 1098, 1105 (6th Cir. 2020).

As a result of the First Step Act, the compassionate release statute now reads

in relevant part as follows:

> [T]he court, upon motion of the Director of the Bureau of Prisons, *or
> upon motion of the defendant after the defendant has fully exhausted
> all administrative rights to appeal a failure of the Bureau of Prisons to
> bring a motion on the defendant's behalf or the lapse of 30 days from
> the receipt of such a request by the warden of the defendant's facility,
> whichever is earlier,* may reduce the term of imprisonment (and may
> impose a term of probation or supervised release with or without
> conditions that does not exceed the unserved portion of the original
> term of imprisonment), after considering the factors set forth in section
> 3553(a) to the extent that they are applicable, if it finds that—
>
> > (i) extraordinary and compelling reasons warrant such a
> > reduction;

*Prisoners Sought Compassionate Release. 98 Percent Were Denied.*, THE MARSHALL
PROJECT (Oct. 7, 2020), https://www.themarshallproject.org/2020/10/07/thousands-
of-sick-federal-prisoners-sought-compassionate-release-98-percent-were-denied
(referencing data provided by BOP).

. . .

and that such a reduction is consistent with applicable policy
statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A) (italics added to show new language from First Step Act).

Although the First Step Act changed the language of Section 3582(c)(1)(A),
the Sentencing Commission has not yet modified their corresponding policy
statement and "is unlikely to do so soon, since it lacks a quorum of members."
United States v. Fox, No. 2:14-CR-03-DBH, 2019 WL 3046086, at *3 (D. Me. July
11, 2019); see also United States v. Brooker, 976 F.3d 228, 234 (2d Cir. 2020);United
States v. Trenkler, No. CR 92-10369 WES, 2021 WL 1811652, at *5 (D. Mass. May
6, 2021).  As a result, the Commission's policy statement continues to refer only "[to
a] motion of the Director of the Bureau of Prisons . . . ."  U.S.S.G § 1B1.13.


II.   <u>Recent Analysis of the Statute</u>

Since Congress passed the First Step Act, eight of the nine circuits to address
the role of the Sentencing Commission's policy statement have held that the policy
statement "does not apply to cases where an imprisoned person files a motion for
compassionate release."  United States v. Jones, 980 F.3d 1098, 1109 (6th Cir. 2020)
(internal quotation omitted); see also United States v. Long, 997 F.3d 342, 355 (D.C.
Cir. 2021); United States v. Aruda, 993 F.3d 797, 801 (9th Cir. 2021) (finding the
policy statement is not binding but could be a useful guide); United States v.
Shkambi, 993 F.3d 388, 392-93 (5th Cir. 2021); United States v. Maumau, 993 F.3d

821, 836-37 (10th Cir. 2021); United States v. Gunn, 980 F.3d 1178, 1180 (7th Cir. 2020) (finding that the policy statement is not binding but could be a useful guide); United States v. McCoy, 981 F.3d 271, 284 (4th Cir. 2020); United States v. Brooker, 976 F.3d 228, 234 (2d Cir. 2020).  Thus, eight circuits agree that courts may consider any of a defendant's arguments for compassionate release.  Only the Eleventh Circuit has held otherwise.  See United States v. Bryant, 996 F.3d 1243, 1252 (11th Cir. 2021) (Martin, J., dissenting) ("Today's majority opinion establishes the Eleventh Circuit as the only circuit to limit an inmate's ability to get compassionate release from incarceration solely to those 'extraordinary and compelling' reasons that are pre-approved by [BOP].").

Although the First Circuit has not yet weighed in, several district courts within the First Circuit (Massachusetts, Rhode Island, Maine, and New Hampshire) have found that the Sentencing Commission's policy statement does not apply to a prisoner's compassionate release motion.  In a recent case, Judge William E. Smith, sitting by designation in the District of Massachusetts, found that "[t]he plain text of [the policy statement] does not apply to defendant-filed motions for compassionate release."  Trenkler, 2021 WL 1811652, at *5.  Judge Smith held that the policy statement "pertains only to motions filed by the Director of [BOP]."  Id. at *6.  Like almost every circuit court to have decided the issue, Judge Smith concluded that when a prisoner files a motion for compassionate release "the court may skip step two . . . and have full discretion to define 'extraordinary and

compelling' without consulting the policy statement."  Id. at *7 (citing Jones, 980 F.3d at 1109) (internal quotations omitted).

Likewise, Chief Judge John J. McConnell of the District of Rhode Island found the Sentencing Commission's policy statement "outdated" after the First Step Act.  Vigneau, 473 F. Supp. 3d at 35.  Chief Judge McConnell held that he "need not follow" the policy statement, which is "contradictory to federal law," and instead can "determine whether extraordinary and compelling reasons exist without the need for a prior determination by the Director of [BOP]."  Id.  As Chief Judge McConnell noted: "Considering the [First Step Act] provision entitled 'Increasing the Use and Transparency of Compassionate Release,' the Court is hard pressed to find a clearer indication of Congress's intent to expand the court's implementation of compassionate release."  Id. (citing The First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, 5239).

Judge D. Brock Hornby of the District of Maine also recently found that the Sentencing Commission's policy statement is not binding on a trial court's determination of compassionate release.  See Fox, 2019 WL 3046086, at *3.  Judge Hornby held that the First Step Act "did not change the statutory criteria for compassionate release, but it did change the procedures" such that BOP "is no longer an obstacle to a court's consideration of whether compassionate release is appropriate."  Id.  While the policy statement may be a helpful guideline, Judge Hornby ruled that "BOP discretion to identify other extraordinary and compelling reasons" is "assigned now to the courts."  Id.

10

In this district, Judge Paul J. Barbadoro has repeatedly concluded that the court is not bound by the Sentencing Commission's policy statement. See United States v. Garcia, No. 09-CR-88-03-PB, 2021 WL 2689217, at *1 (D.N.H. June 30, 2021); United States v. Manning, No. 16-CR-148-PB, 2021 WL 77149, at *1 (D.N.H. Jan. 8, 2021); United States v. Dufresne, No. 16-CR-75-1-PB, 2020 WL 5803224, at *1 (D.N.H. Sept. 29, 2020). He has held that the policy statement "provides helpful guidance on the factors that support compassionate release, although it is not ultimately conclusive given the statutory change" to section 3582(c)(1)(A) after the First Step Act. Garcia, 2021 WL 2689217, at *1.

The sole discordant opinion from the Eleventh Circuit is unpersuasive. See United States v. Bryant, 996 F.3d 1243, 1252-55 (11th Cir. 2021). In that case, the majority opinion focused on the dictionary definition of "applicable" in the statute. Id. at 1252-53; see 18 U.S.C. § 3582(c)(1)(A) ("such a reduction is consistent with applicable policy statements issued by the Sentencing Commission") (emphasis added). The majority reasoned that the unmodified policy statement is "capable of being applied" to compassionate release motions and therefore must be "applicable" within the meaning of 18 U.S.C. § 3582(c)(1)(A). Id. at 1253. But that opinion overlooks the opening words of the policy statement, "Upon motion of the Director of the Bureau of Prisons," which do not include the First Step Act's addition of compassionate motions filed by the prisoner himself. U.S.S.G. § 1B1.13(1)(A). The text of the policy statement plainly applies only "[u]pon motion of the Director of the Bureau of Prisons." Id. As noted by the D.C. Circuit when disagreeing with Bryant,

"that opinion's reliance on dictionary definitions of 'applicable' misses the forest for a tree. The decision ignores all of the other words in Section 1B1.13 that already state in plain and clear terms when the policy statement applies: 'Upon motion of the Director of the Bureau of Prisons.'" Long, 997 F.3d at 355 (D.C. Cir. 2021). Judge Martin in dissent from the Eleventh Circuit decision persuasively explained that "the majority's dictionary-based theory about when a policy statement may be 'applicable' flies in the face of the statement's plain text that tells us when it is actually 'applicable.'" Bryant, 996 F.3d at 1269.  For the reasons explained by the D.C. Circuit and the dissenting opinion in Bryant itself, the court declines to follow the Eleventh Circuit.

        Thus, the overwhelming majority of courts that have addressed the issue (eight circuit courts and four district courts within the First Circuit) have found that the First Step Act empowers courts to decide what qualifies as an extraordinary and compelling reason when a prisoner files a motion for compassionate release.  These rulings are consistent in their reasoning and with the plain language of the compassionate release statute as modified by the First Step Act.  The court adopts the reasoning of these cases and therefore holds that—when a prisoner files a motion for compassionate release—courts are not limited by the policy statement in determining what constitutes an extraordinary and compelling reason.

        To summarize, then, where a prisoner (rather than BOP) properly files a motion for compassionate release, the statute imposes two requirements before

granting his motion.  First, there must be "extraordinary and compelling reasons" for a sentence reduction.  18 U.S.C. § 3582(c)(1)(A).  At this step, the court has "broad discretion to determine what constitutes an extraordinary and compelling reason under § 3582(c)(1)(A)" and may consider "any" of the defendant's reasons for release.  Trenkler, 2021 WL 1811652 at *7 (internal citations omitted).[3]  Second, the court must "consider[ ] the factors set forth in section 3553(a) to the extent they are applicable."  18 U.S.C. § 3582(c)(1)(A).  And, in applying the analysis, the defendant bears the burden of showing he is entitled to a sentence reduction.  Trenkler, 2021 WL 1811652 at *7; United States v. Hilow, No. 15-CR-170-JD, 2020 WL 2851086, at *3 (D.N.H. June 2, 2020).

## BACKGROUND

The story begins with Fields's original sentencing hearing in 2014, followed by his resentencing hearing in 2016.  After his 2016 resentencing, Fields filed a series of motions to bring the issue of his continued misclassification (and resulting harm) to the court's attention.  Unfortunately, his repeated efforts fell on deaf ears.  It was not until his most recent filing—this compassionate release motion—that he achieved success.  A summary of Fields's journey follows.

The original sentencing hearing in Fields's case took place on October 14, 2014.  Fields pleaded guilty to one count of Possession of a Firearm by a Convicted

---

[3] The statute prohibits a court from considering rehabilitation alone.  See 28 U.S.C. § 994(t).

Felon.  See 18 U.S.C. § 922(g)(1) and 924(c)(1).  Because of his criminal record,
Fields qualified as an Armed Career Criminal.  He pleaded guilty pursuant to a
stipulated agreement to the minimum mandatory sentence of 180 months
incarceration.  Although Fields's guideline range was 235 to 293 months, the court
accepted the terms of the binding plea pursuant to Federal Rule of Criminal
Procedure 11(c)(1)(C) and sentenced him to 180 months.

The court varied down to 180 months because of Fields's dual diagnoses: his
mental health needs coupled with his long-term and significant substance abuse
history.  Although Fields had a significant criminal history and committed violent
offenses (domestic assaults), he had no prior firearms convictions.  Fields had a
long-term, significant, and untreated substance abuse history.  The government
conceded that Fields's criminal history was largely a result of his untreated
substance abuse.  Fields began abusing drugs as a child at age 9, when his father
introduced him to marijuana.  At age 12, and in the aftermath of his mother's
suicide attempts, Fields started taking Percocet to cope with depression and
anxiety.  By age 16, he was using copious amounts of heroin and cocaine and
became addicted to opiates.  As of the date of his sentencing hearing, Fields had
received no treatment for his severe drug addiction.  He had also been diagnosed
with numerous mental health issues including post-traumatic stress disorder,
anxiety and depressive disorders, and bipolar disorder.  Doctors determined that
Fields's mental health issues left him totally disabled.  The court believed Fields
would benefit from the mental health and substance abuse treatment programs he

14

would receive from BOP. For these reasons, the court accepted the stipulated agreement and imposed the minimum mandatory 180-month sentence.

A year later, as a result of Johnson v. United States, 576 U.S. 591, 596-97 (2015), Fields no longer qualified as an Armed Career Criminal. On November 17, 2016, the court resentenced him to 120 months incarceration. At that hearing, Fields brought to the court's attention a serious issue: BOP had classified him as a sex offender despite no criminal history suggesting that he had ever committed a sex-related offense. Fields described suffering harassment, seclusion, threats, transfers, and other hardships because of the misclassification. Importantly, he described being unable to begin any treatment programs because of his constant placement in secure housing units for his own protection and his repeated transfers to different facilities. Fields's testimony in this respect was undisputed; neither the government nor probation offered any evidence to refute his version of events. At the hearing, the court stated: "I'm concerned [about the misclassification] because he needs mental health treatment. He needs drug treatment. He needs help. And if he is going to be classified in this way incorrectly, it may hamper his ability to benefit from the treatment he so desperately needs." Doc. no. 41 at 14-15.

After the hearing, the court issued the following order and attached it to the amended judgment:

> At a hearing on November 17, 2016, the court resentenced Joshua Fields. During this hearing, defense counsel and Mr. Fields made the court aware that, after his original sentencing, the Bureau of Prisons classified Mr. Fields as a sex offender. As a result of that classification, Mr. Fields credibly described harassment, seclusion,

15

threats, transfers and other hardships that the court finds may well impede any efforts at his rehabilitation while in prison.

Defense counsel argued that the sex offender classification is an error and must be corrected. According to defense counsel, the classification was the result of a narrative description of a domestic assault conviction contained in Mr. Fields's original PSR at paragraph 57 (page 19). Specifically, defense counsel attributed the classification to a specific line in that narrative (within the second full paragraph) that described Mr. Fields as having "groped" the victim's left breast" during the assault. The court reviewed the police report of that incident and the report does not contain the word "groped." It is clear from the police report that the assault was violent in nature, but the report does not suggest that Mr. Fields assaulted the victim for purposes of sexual gratification. Moreover, while Mr. Fields's criminal record is lengthy, troubling, and includes domestic assaults, he has no convictions for sexual assault or sex-related conduct.

The court's paramount concern with respect to Mr. Fields is that, while in prison, his chances of rehabilitation (for his mental health and drug addiction) are maximized. Without successful rehabilitation, Mr. Fields's release will place public safety at risk. The government offered neither evidence nor argument to the contrary and did not object to defense counsel's efforts to correct the PSR and assist in having the Bureau of Prisons reclassify Mr. Fields.

Accordingly, the court issues the following order as an addendum to the judgment and conviction in Mr. Fields's case:

> A brand new, corrected PSR is being issued as a result of Mr. Fields's resentencing. Upon receipt of that new PSR, the Bureau of Prisons shall destroy any and all copies of Mr. Fields's original PSR within its possession and reclassify Mr. Fields based on the new PSR and without reference to any portion of the original PSR.

Doc. no. 30.

At the resentencing hearing, the government's attorney and defense counsel anticipated that BOP would abide by the court order. They were wrong. BOP ignored the court order.

16

Fields made several pro se attempts to bring BOP's noncompliance to the court's attention.  Fields first filed, on July 5, 2017, a motion to find BOP in contempt for its failure to abide by the court's order (doc. no. 42).  Fields attached paperwork attempting to show that BOP still classified him as a sex offender.  <u>See</u> doc. no. 42-5.  The government argued that BOP had complied with the order and attached a document (provided by BOP) showing that BOP had made a change to Fields's classification after the date of the order.  <u>See</u> doc. no. 45-1.  Relying on that document, the court found that Fields had failed to meet its burden and denied the motion.

More than two years later, on October 11, 2019, Fields filed a further attempt to alert the court to BOP's noncompliance (doc. no. 51).  His letter asked for a transfer to a different facility closer to his family.  He wrote about being in fear for his life in BOP custody.  Fields reported that in October 2019 his cellmate punched him in the head, knocking him out.  When Fields regained consciousness, the cellmate was kicking him in the head and calling him a "chomo," which Fields alleged is slang for a sex offender.  Fields attempted to shield himself, but the cellmate kicked and broke Fields's hand.  Fields's left eye was swollen shut from the assault, and he needed a cast and stiches.  This assault occurred while Fields was housed in a secure housing unit, a unit designed to protect Fields from such attacks.  Because of Fields's vulnerability to attacks like this, BOP often housed him in secure units.  According to Fields, he was thereby limited in his ability to access the mental health and substance abuse treatment that the court recommended BOP

provide to him.  The court construed Fields's letter as a motion to transfer him from a prison in Kentucky to a prison closer to his family in New Hampshire, found that the court lacked jurisdiction over the request, and dismissed the motion without prejudice to Fields's ability to refile the motion in Kentucky (the state where he was being held).

On January 4, 2021, Fields sent the court a letter and again laid out his claim that BOP had never complied with the court's 2016 order (doc. no. 53).  Fields alleged that because of the misclassification he continued to suffer physical abuse at the hands of other prisoners who targeted him for being a "sex offender"; he continued to experience multiple transfers from one prison facility to another (10 in total); and he continued to be placed in segregated housing units (with 24-hour lockdowns) for his own protection (doc. no. 53).  This letter finally got the court's attention.  It began: "Your honor, I am writing to you because [BOP] continues to violate [the] order that you issued to [BOP] in 2016 to destroy my original [PSR]."

In response to that letter, on February 16, 2021, the court issued the following order:

> A hearing via video shall be scheduled on [Fields's recent filings].  The court asked Chief Probation Officer Hurtig to investigate this matter for the court.  Chief Hurtig shall be prepared to explain on the record the results of his investigation, and to place any relevant documents into the record.  The court is interested in the reasons that BOP did not comply with the court's order, and whether BOP can provide some remedy to Mr. Fields to address his ongoing concerns.

Endorsed Order of February 16, 2021.

At the March 1, 2021 hearing, Officer Hurtig summarized his investigation into Fields's situation. BOP told Officer Hurtig that: BOP continued to use Fields's 2014 PSR to classify him as a sex offender; BOP had both Fields's 2014 and 2016 PSRs; and BOP had the court's order to remove the classification in Fields's file. In other words, BOP had all the relevant information regarding Fields's classification and still failed to follow the court's order. Fields had also appealed within BOP to the regional director and—despite the court order—BOP upheld their original classification on November 25, 2019. The BOP regional director wrote simply, "[b]ased on our review, your Public Safety Factor is appropriate." See doc. no. 54. After Officer Hurtig explained the history, a BOP representative apparently apologized and removed Fields's classification. But BOP also said that, because of COVID-19 and Fields's security level, BOP could not transfer Fields to lower security facility where he would face fewer threats of violence.

After that hearing, the court issued the following order:

> On today's date, the court held a video conference in this case. Attorney Seth Aframe appeared for the government, Chief Probation Officer Jonathan Hurtig appeared at the court's request, and Mr. Joshua Fields appeared on his own behalf via telephone. At today's conference, Mr. Fields made an oral request for the court to transfer him to the Strafford County House of Corrections or alternatively to order his immediate release on home confinement. The court construes his request as a motion for compassionate release. See 18 U.S.C. § 3582(c)(1)(A); United States v. Brooker, 976 F.3d 228, 231-34, 236 (2d Cir. 2020). An in-person hearing on Mr. Fields' motion is scheduled for March 18, 2021, at 9 a.m. Counsel for Mr. Fields shall be appointed on an expedited basis. A transcript of today's hearing shall be prepared on an expedited basis so that Mr. Fields attorney shall have access to it as soon as possible.

Endorsed Order of March 1, 2021.

On April 26, 2021, Fields's appointed counsel filed a motion for compassionate release to which the government assented.  On May 13, 2021, the court held a video hearing on the motion.  At the time of the hearing, Fields was being held at the Strafford County House of Corrections.  Fields appeared on the video screen with a red face and black eye, explained that his orbital bone had been fractured by a prisoner at the jail who had discovered through an internet search that Fields was classified by BOP as a "sex offender."  Like the cellmate who attacked Fields in 2019, this prisoner called him a "chomo" as he assaulted Fields.  Fellow prisoners likely learned of Fields's BOP designation as a sex offender while doing online legal research.  Many of Fields's pleadings are available on the internet because his motions attempting to correct his misclassification are not sealed.  Additionally, an internet search for Fields's name yields the pro se motion he filed to correct the misclassification.  The Strafford County facility is investigating the incident and has identified the perpetrator.

Fields's formal motion for compassionate release, like his prior pro se motions, argued that he suffered physical attacks, mental harm, and lack of rehabilitative programming due to BOP's misclassification (doc. no. 60).  Fields, to his credit, sought release to a residential treatment facility as he recognized that he had yet to receive any treatment for his serious drug addiction and knew that he needed such treatment before returning to society.

After the video hearing, the court issued the following order:

> Fields moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A) based on the Bureau of Prison's (BOP) failure to follow the court's

previous orders, thereby causing serious harm to Fields's physical and
mental health and preventing his participation in rehabilitative
programming (doc. no. 60).  The government assents to Fields's motion
(doc. no. 64).  After careful consideration, Fields's motion is granted.
The court will issue a subsequent order explaining its reasoning.

Doc. no. 66.

Had Fields's incarceration proceeded as expected, his projected release date
would have been July 30, 2023.  He would have been eligible for release with
electronic monitoring on January 30, 2023.  But pursuant to the court's May 13,
2021 order, the court released Fields to Hampshire House Residential Reentry
Center that same day.  As of the date of his release, Fields had served more than
eight years of his ten-year sentence.

## DISCUSSION

The analysis of Fields's motion for compassionate release follows.  As a
threshold matter, BOP did not respond to Fields's request for a sentence reduction
within 30 days, so his motion is properly before the court.  See 18 U.S.C.
§ 3582(c)(1)(A).  Because Fields (rather than BOP) filed this motion for
compassionate release, the court considers: (1) whether there are extraordinary and
compelling reasons for a sentence reduction; and (2) whether early release would be
consistent with applicable sentencing factors under § 3553(a).  Id.

I.   Extraordinary and Compelling Reason

Fields contends that BOP's misclassification and his resulting harm are
"extraordinary and compelling reasons" for a sentence reduction.  See 18 U.S.C.

§ 3582(c)(1)(A).  Specifically, Fields alleges that: (1) BOP failed to follow the court's previous orders rescinding the 2014 PSR and substituting the 2016 PSR, thereby placing Fields in danger; (2) BOP's noncompliance caused Fields to suffer multiple physical assaults and BOP could not keep Fields safe; (3) BOP's noncompliance caused Fields to be subjected to unusually harsh conditions of confinement, including extended solitary confinement, resulting in harm to Fields's mental health; and (4) as a result of BOP's noncompliance, Fields was unable to participate in rehabilitative programs that would have benefited him upon release and made him eligible to earn time credits toward a sentence reduction pursuant to the First Step Act.[4]

Although the court has not identified a case similar to this one, many courts have found that sentencing errors constitute an extraordinary and compelling reason for early release.  For example, Judge Smith found in <u>Trenkler</u> that there is "no question that [a] Court may conclude that a legal error at sentencing constitutes an extraordinary and compelling reason and reduce the sentence after conducting an individualized review of the case." Trenkler, 2021 WL 1811652, at *13.  Other courts have similarly found that sentencing errors are extraordinary and compelling reasons.  <u>See</u> <u>United States v. Lopez</u>, No. 11-CR-568 (PKC), —— F.Supp.3d ——, —

---

[4] The First Step Act provides that a prisoner who participates in rehabilitative programming may earn time credits that they can put toward a transfer to prerelease custody, such as a halfway house or home confinement.  <u>See</u> 18 U.S.C. § 3632(d)(4).  Most imprisoned people may earn 10 to 15 days of credit for every 30 days of "successful participation" in recidivism-reduction programming.  <u>Id.</u>  Fields was eligible to earn these time credits but was limited in his ability to do so because of his frequent transfers and sequestration in secure housing units.

—, 2021 WL 761850, at *4 (S.D.N.Y. Feb. 26, 2021) (holding that "the significant error in [the defendant's] Guidelines calculation[ ] and the absence of any other avenue to correct th[e] error constitute[s] an 'extraordinary and compelling reason' for sentence reduction"); United States v. Cano, No. 95-00481-CR, 2020 WL 7415833, at *5-*6 (S.D. Fla. Dec. 16, 2020) (granting compassionate release where the defendant claimed, in part, that the court erred in sentencing him to life imprisonment); United States v. Wahid, No. 1:14-CR-00214, 2020 WL 4734409, at *3 (N.D. Ohio Aug. 14, 2020) (granting compassionate release where the defendant was classified as a career offender and subsequent case law clarified that classification was in error).

Courts have also found that unfairly long sentences may constitute an extraordinary and compelling reason for early release.  See Maumau, 993 F.3d at 837 (holding that the district court had discretion to grant compassionate release in part because of the "incredible length of" the defendant's stacked sentences) (internal quotation omitted); Brooker, 976 F.3d at 237-38 (holding that a court should consider "all possible reasons for compassionate release," including the "injustice of [a defendant's] lengthy sentence").

In this case, the error in Fields's original PSR that caused BOP to misclassify Fields as a sex offender is akin to a sentencing error.  BOP's subsequent noncompliance with the court order compounded the error and prevented him from completing rehabilitative programming that may have reduced his sentence.  See 18 U.S.C. § 3632(d)(4).  These two errors, the mistake in Field's PSR and BOP's

noncompliance with a court order, have made Fields's sentence disproportionately punitive. According to Fields, he was physically assaulted and suffered severe injuries on multiple occasions due to his misclassification. While in BOP custody, and for most of his incarceration, Fields has been placed in a secure housing unit, which, according to Fields, has caused harm to his mental health and prevented him from participating in programming.[5] Under the unique circumstances of this case, Fields has presented an extraordinary and compelling reason for a sentence reduction. See Brooker, 976 F.3d at 237-38.

II.   Sentencing Factors

Next, the court must consider whether a sentence reduction would be consistent with applicable sentencing factors outlined in 18 U.S.C. § 3553(a). See 18 U.S.C. § 3582(c)(1)(A). The applicable section 3553(a) factors include the nature and circumstances of Fields's offense, his personal history and characteristics, and considerations such as promoting respect for the law, providing just punishment, affording adequate deterrence, protecting the public from further crimes, and providing Fields with needed training, medical care, and other treatment in the most effective way. 18 U.S.C. § 3553(a)(1)-(2).

---

[5] Extended seclusion can cause damage to a prisoner's mental health. See Haney, Craig, Restricting the Use of Solitary Confinement, 1 ANNU. REV. CRIMINAL 285, 296 (2018) ("Depriving people of normal social contact and meaningful social interaction over long periods of time can damage or distort their social identities, destabilize their sense of self, and, for some, destroy their ability to function normally in free society.")

With respect to the first sentencing factors—the nature and circumstances of the offense and Fields's history and characteristics—the court finds that early release properly accounts for both.  Fields was convicted of a serious crime: felon in possession of a firearm.  The court sentenced him to serve 10 years in prison.  Fields possessed firearms that he (and four others) obtained during a burglary.  It was a possessory offense, and the firearms were never discharged.  Fields and his cohorts were caught attempting to pawn the firearms for money to buy heroin.  While Fields had been previously convicted of other felonies, he had no prior firearm convictions nor any history of violence involving firearms.  This crime, like much of Fields's criminal history, was motivated by drug use.  But as of the date of his sentencing hearing, Fields had never received any sort of treatment for his severe drug addiction.  In addition to his drug addiction, Fields suffered from serious mental health problems.  Prior to his sentencing, doctors evaluated Fields and found that his mental health issues were serious enough that they declared him totally disabled.  Fields's upbringing and childhood were traumatic and no doubt led to his mental health problems and his drug addiction.  Having considered the nature and circumstances of Fields's crime and his personal history and characteristics, the court finds that both weigh in favor of early release.

Early release is not inconsistent with the second set of applicable sentencing factors: respect for the law, just punishment, deterrence, public protection, and treatment. Most importantly, Fields has served more than 80 percent of his sentence.  As Fields has served a large portion of his lengthy sentence, early release

is consistent with the goals of promoting respect for the law and deterring future crime.

The two sentencing factors that weigh most heavily in favor of release are ensuring public safety and providing Fields with mental health and drug treatment in the most effective way.  These two factors are interrelated.  With respect to protecting the public "from further crimes of the defendant," § 3553(a)(2)(C), if Fields remained in BOP custody there is a strong likelihood that he would have continued to suffer harm, physical and mental abuse, and seclusion in protective custody.  He would also likely have been prevented from receiving any mental health or drug treatment.  As the court made clear at Fields's resentencing:

> I'm concerned [about the misclassification] because he needs mental health treatment.  He needs drug treatment.  He needs help . . . He will be released at some point and be on supervised release.  If he is able to benefit from the intensive . . . mental health treatment and drug treatment at the prison, my hope is that he would be far less likely to recidivate.

Doc. no. 41.

Fields's release—whether early or at the end of his sentence—poses a danger to the public.  He has spent his adult life committing crimes, some of them violent. He has untreated drug addiction and serious mental health issues.  But the court did not sentence Fields to serve a life sentence; he received a ten-year sentence. Fields will be released eventually; the question is whether he will receive any treatment before his release.  The court anticipated that while in BOP custody Fields would receive intensive treatment for his mental health and drug addiction. Receiving that treatment within BOP was critical to the goal of public protection

because of Fields's high risk of recidivism without it.  But imprisonment within BOP did not serve the goal of providing Fields with needed treatment in any manner, let alone "in the most effective manner."  18 U.S.C. § 3553(a)(2).  Fields received no treatment in eight years of incarceration and instead suffered abuse and harm while in BOP custody.  Continued incarceration without treatment and prolonged exposure to physical abuse would only increase the risk that Fields will be a danger to the public.[6]  Because early release will provide Fields with needed drug and mental health treatment in a more effective manner than if he remained imprisoned, this factor and the goal of public protection weigh in favor of release.

In summary, the court finds that Fields has met his burden of persuading the court that he is entitled to compassionate release.  He has shown both an extraordinary and compelling reason for release and that his release is not inconsistent with the applicable section 3553(a) sentencing factors.  And the government acknowledges as much by assenting to his early release.

---

[6] On May 13, 2021, the court released Fields to a halfway house.  Fields was recently terminated from that halfway house due to drug use and confrontational behavior.  No party disputed in this case that Fields's eight years in BOP custody only increased the risk that he will recidivate.  The question remains whether belated drug and mental health treatment will be sufficient to reduce Fields's future risk of recidivism.  Since being terminated from the halfway house, the court has placed Fields on a curfew with electronic monitoring.  Fields has been evaluated and an intensive outpatient treatment center is recommended.  Probation is closely monitoring him as he continues to struggle with drug addiction and mental health issues.

## CONCLUSION

For the above reasons, the court granted Fields's motion for compassionate release (doc. no. 60).  The court now modifies its prior release order (doc. no. 66) to note that Fields's special term of supervised release, running through July 30, 2023, is revoked.  Instead, Fields will serve the three-year term of supervised release to which he was originally sentenced.  This term of supervised release will begin retroactively on the date of his release: May 13, 2021.  To reflect the change in the length of his supervision, the order granting Fields's motion for compassionate release is summarized as follows:

1. Fields's sentence will be reduced to time served.

2. Fields will be placed on supervised release for a term of three years.

3. During the term of supervised release, Fields shall be subject to the Conditions of Release as set forth in Appendix A and the modifications of conditions that the court approved on June 16, 2021 (doc. no. 70) and July 30, 2021 (doc. no. 74).

4. The court will issue an amended criminal judgment.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

August 9, 2021
cc:  Counsel of Record
     U.S Probation
     U.S. Marshal

28

**United States of America v. Joshua Fields**, 14-cr-074-LM

**APPENDIX A**

CONDITIONS OF RELEASE

While under supervision, you must comply with the standard conditions that have been adopted by this court, and the following mandatory conditions:

1. You must not commit another federal, state, or local crime.

2. You must not unlawfully possess a controlled substance.

3. You must refrain from any unlawful use of a controlled substance.  You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

4. You must cooperate in the collection of DNA as directed by the probation officer.

In addition, you must comply with the following special conditions:

1. You must reside at the Hampshire House Residential Reentry Center for the first six (6) months of your special term of supervised release. You must follow all rules and regulations of the Hampshire House.

2. You must not communicate, or otherwise interact, with the Dack family, either directly or through someone else, without first obtaining the permission of the probation officer.

3. You must participate in a mental health treatment program and follow the rules and regulations of that program. The probation officer will supervise your participation in the program (provider, location, modality, duration, intensity, etc.). You must pay for the cost of treatment to the extend you are able, as determined by the probation officer.

4. You must take all mental health medications that are prescribed by your treating physician. You must pay for the cost of treatment to the extend you are able, as determined by the probation officer.

1

5. You must participate in a substance use treatment program and follow the rules and regulations of that program. The probation officer will supervise your participation in the program (provider, location, modality, duration, intensity, etc.). You must pay for the cost of treatment to the extend you are able, as determined by the probation officer.

6. You must not use or possess any controlled substances without a valid prescription. If you do have a valid prescription, you must disclose the prescription information to the probation officer and follow the instructions of the prescription.

7. You must submit to substance use testing to determine if you have used a prohibited substance. You shall pay for the cost of testing to the extend you are able, as determined by the probation officer. You must not attempt to obstruct or tamper with the testing methods.

8. You must not knowingly purchase, posses, distribute, administer, or otherwise use any psychoactive substances (e.g., synthetic marijuana, bath salts, etc.) that impair a person's physical or mental functioning, whether or not intended for human consumption, except with the prior approval of the probation officer.

9. You must submit your person, property, house, residence, vehicle, papers, computers (as defined in 18 U.S.C. § 1030(e)(1)), other electronic communications or data storage devices or media, or office, to a search conducted by a U.S. Probation Officer. Failure to submit to a search may be grounds for revocation of release. You must warn any other occupants that the premises may be subject to searches pursuant to this condition. The probation officer may conduct a search under this condition only when reasonable suspicion exists that you have violated a condition of supervision and that the areas to be searched contain evidence of this violations. Any search must be conducted at a reasonable time and in a reasonable manner.